1  totally different things.  So even though we can
2  see you shaking your head or nodding, it's
3  important that you try to answer the questions
4  fully and verbally so we get an accurate
5  transcript.
6           Is that okay?
7      A.   Yes.
8      Q.   Ms. Kubas, how old are you?
9      A.   40.
10     Q.   When did you first come to work at
11  the gym facility that is now known as Rockwell?
12     A.   It was May of 2006.
13     Q.   When you came to work there in May of
14  2006, do you recall who the owners of the gym
15  were?
16     A.   It was Bob Seeman -- sorry he was the
17  CEO.  It was Morrie, I believe the last name
18  was Goldman.
19     Q.   When you first came to work, what was
20  the name of the gym that's now known as
21  Rockwell?
22     A.   Sport Fit.

1      Q.   Did you have sexual relations with
2  Mr. Conway on more than one occasion?
3      A.   No.
4      Q.   Where did these relations occur?
5      A.   Well there was one relation.  Can you
6  specify the question, please?
7      Q.   Sure.
8           In what physical place, meaning a
9  home, a business, a car, an apartment, a hotel,
10 wherever you associated did you have sex with
11 Mr. Conway?
12     A.   It was at his home.
13     Q.   After you stopped being a childcare
14 attendant with what was then Sport Fit, what
15 job did you transition into or what did you next
16 do for the business?
17     A.   I was childcare manager.
18     Q.   Was that a full-time position or
19 part-time position?
20     A.   It was part time.
21     Q.   How long roughly did you stay in that
22 position as the childcare manager?

1  working in the gym?
2      A.   Sweaty and in addition I just didn't
3  feel comfortable with people around -- him
4  colliding into me.  It was embarrassing.
5      Q.   Did you make any of these statements
6  or remarks to Mr. Conway in any form other than
7  verbally, meaning did you text him, did you
8  email him, did you put him on any written
9  notice?
10     A.   No.
11     Q.   Was there anyone present within what
12 you believe to be reasonable earshot that they
13 could overhear the conversations between you
14 and Mr. Conway during any of these alleged
15 instances where he, in your words, "collided"
16 with you in the hallways?
17     A.   To be honest, there were people
18 walking by.  We are in a gym.  There are people
19 around.  I can't surmise if there was a specific
20 person that heard.  It's unlikely.  It was
21 usually when I was walking down the hall and not
22 many people were around.  I really can't

1  speculate on that.
2     Q.   Let me retract that and I'll ask you
3  this.
4          You understand that at a certain point
5  in time a new business entity, which I'll
6  stipulate known as 331B, LLC, took ownership of
7  the gym, do you recall that?
8     A.   Yes.
9     Q.   Do you recall roughly when that
10 occurred?
11    A.   We had Sport Fit.  It changed to
12 Rockwell.  And then I want to say -- I honestly
13 can't remember -- not that long.  I think they
14 took over sometime in maybe 2018.  But I could
15 be wrong.
16    Q.   After the new ownership group took
17 control of the gym, which we'll call Rockwell
18 if we're both understanding what we mean by
19 that.  After the new ownership group took
20 control of Rockwell, did you notify any of the
21 new ownership groups, members, or management
22 about Mr. Conway allegedly colliding with you in

Page 31

1        MR. HORA:  Objection.  Asked and
2    answered.  Go ahead and answer again.
3        THE WITNESS:  Okay, I will give
4    another additional answer.  That is correct
5    as I've stated.  It is quite typical to not
6    report it right away.  If you want to ask
7    me again, I will give you the same answer.
8        BY MR. BUCKEL:
9    Q.   Do you recall going to a benefit event
10 at the gym in May of 2019?
11   A.   Yes.
12   Q.   Let me roll back for a second and ask
13 this.
14        During all these training sessions
15 that were in a two to three year period where
16 you claim that Mr. Conway inappropriately
17 touched you, was anyone else present or able to
18 physically observe these alleged touchings?
19   A.   Yes.
20   Q.   Who are these people?
21   A.   Like I stated it's a training room
22 so there were a couple of other individuals

Page 32

1  working out.  But they normally would just stick
2  with their trainer and do their own thing.
3           The person I'd say did observe was our
4  workout partner, Kirk.  He was the one in our
5  group.
6       Q.   What's his name?
7       A.   Kirk.  I can't recall his last name.
8       Q.   To your recollection, when did Kirk
9  stop working for the gym?
10      A.   He never worked for the gym.
11      Q.   Was he participating in these
12  training sessions with you and Mr. Conway?
13      A.   Yes.
14      Q.   Was anyone else participating in the
15  training sessions other than Kirk, you, and Mr.
16  Conway?
17      A.   Originally when we started there was
18  a group of more individuals.  They dropped out
19  shortly thereafter and it was left with Kirk,
20  Devin, and myself.
21      Q.   Did you ever have any conversations
22  with Kirk about what you believed to be Mr.

1   of Bobbi Beers?

2        A.   Yes.

3        Q.   How long have you known Bobbi Bears?

4        A.   I don't recall when she started.  I

5   would estimate maybe two, couple of years.

6        Q.   Two, couple of years from today?

7        A.   I'm sorry.  A few years.  I don't

8   recall when she started.  But I knew her from

9   the time she started until I was terminated, so

10  a few years give or take.

11       Q.   You weren't friends or acquaintances

12  with Ms. Beers prior to her working with the

13  gym, is that fair?

14       A.   I wasn't friends before, no.

15       Q.   How many hours a week on average do

16  you believe that you worked while under the

17  employer of 331B, LLC?

18       A.   I would estimate eight to 10.

19       Q.   Did you ever have a conversation with

20  Ms. Beers about Mr. Conway or his behavior?

21       A.   Yes.

22       Q.   Have you had an opportunity in

Page 167

1   situations.  She was having issues with Devin
2   around the same time because her and I were
3   friends.
4        Q.   When was the last time you talked to
5   Ms. Fridley?
6        A.   I want to say -- I can't recall.
7   Maybe within the last year.
8        Q.   Are you claiming that Mr. Fridley
9   ever indicated to you that she was allegedly
10  sexually harassed by Mr. Conway?
11       A.   No, I don't see me saying that on
12  the message either, but no.  She never said,
13  "Sexually harassed," to me.
14       Q.   Then you say, "...and the other girls
15  who have complained to me about him," so you've
16  talked to me a little bit about that today.
17            The "other girls," would that include
18  Riley Mayer?
19       A.   Yes.
20       Q.   Would it include Bree Moore?
21       A.   Yes.
22       Q.   Would it include Bobbi Beers?

1   to Ms. Beers?

2        A.   He said --

3             MR. HORA:   Objection.  Vague as to

4   time.  Go ahead and answer.

5             THE WITNESS:   He said --

6             BY MR. BUCKEL:

7        Q.   As of the 20th of June, were you

8   aware that he had spoken to Ms. Beers?

9        A.   You know I'm not sure.  I know he

10  said, "Other people, people in the gym," so I

11  can't recall if at that point he specifically

12  said Ms. Beers or just "Other people."  I can't

13  recall specifically.

14       Q.   Okay, I'm trying to be clear.

15            I believe you've testified that you

16  gave Mr. Chisholm two other names that you said

17  Mr. Conway harasses these people, Ms. Beers and

18  Ms. Moore.  And you're not sure if you told him

19  about Riley Mayer or not or when you told him,

20  is that fair?

21       A.   Yes.

22       Q.   If Mr. Chisholm hypothetically had