c. We agreed to put the matter behind us and to remain professional moving forward.

16. In or around mid-June of 2019, I noticed that Kim was not recording her time worked in the timekeeping system. Before I had the opportunity to confront Kim about her time records, she sent me a text message on June 17, 2019 at 10:03 a.m. The text message read: "Hey Devin. Just realized my time clock is completely fucked up, had been forgetting to clock in for meetings, work from home, etc. Can you put me down for 25 hours. [sic] I'll make any adjustments to next pay. Also, I'll be in around 1130 [sic] today. Is our call at 1?"

17. I responded to Kim via text message stating: "The call is at 1. From now on you will have to clock in/out when you are here and when you are working from home. No exceptions."

18. I found it odd that Kim claimed to work 25 hours that pay period, given that she seldom worked more than 20 hours in a pay period. Mr. Chisholm agreed to give Kim the benefit of the doubt and pay her for the full 25 hours that pay period.

19. Kim did not clock in or clock out on June 17th and did not clock in on June 18th.

20. On June 18, 2019, I conducted a manager meeting at Rockwell Fitness, which Kim attended. After the meeting, I asked Kim to stop by my office. When she arrived, I asked her why she still wasn't clocking in and out. Kim became defensive, claiming that my June 17th text message directing her to clock in and out with "no exceptions" was "hostile". While I do not recall the exact words I used during our meeting, I recall saying something along the lines of: "You are responsible for clocking in and out just like every other employee. You are not above or better than any other employee and you are not allowed to make up hours as you please." Kim then informed me that she had the ability to go into the system and manually edit her time entries. She also accused me of targeting her and of being visibly rude to her in the manager meeting.

21.     During my time as General Manager, I have not experienced problems with any other employee failing to clock in and out, except for Kim.

22.     On June 19, 2019, Kim and another employee, LaToya Butler Williams ("Ms. Williams"), requested a meeting with me and Mr. Chisholm. During the meeting Kim accused me of targeting her for falsifying her hours and refusing to clock in. I responded that if she would simply clock in and out, then we would not have any problems. Kim then stormed out of the meeting.

23.     On June 20, 2019, Mr. Chisholm informed me that Kim had filed a complaint accusing me of sexual harassment. This was the first I ever heard of the complaint and I was shocked by the allegations.

24.     On June 21, 2019, around 6:00 a.m., Andrew Smith ("Andrew"), another employee of Rockwell Fitness informed me that a member of the Gym had approached him in the free-weight room and asked if I was being fired for sexually harassing Kim. Andrew was under the impression that the member he spoke with had heard the rumor from Billy D. Williams ("Mr. Williams). Mr. Williams is a member of the Gym and Ms. Williams' husband. I called Mr. Chisholm around 7:00 a.m. to fill him in on the rumor situation.

25.     Sometime after 10:00 a.m. on June 21st, Mr. Chisholm informed me that Kim was occupied with taking her daughter to the doctor but that she would be making a bank deposit later that afternoon. I informed Mr. Chisholm that Kim had clocked in at 10:03 a.m.

26.     Kim remained on the clock for several hours until arriving at the Gym sometime after noon.

8. At the Benefit, Kim approached me and asked if we could talk. Kim and I went into the bathroom to speak. Kim was obviously very drunk and began ranting about Devin. While I cannot remember every statement she made that night, she went on and on insulting Devin and telling me I deserved better, despite me asking her to stop. Kim was babbling, telling me that Devin harassed her by going into her office and groping her, calling Devin a manipulator, and complaining that he treats her differently than everyone else. She also accused Devin of doing drugs. This was the only time Kim ever said anything to me about Devin harassing her. I did not believe anything Kim said to me that night.

9. On May 12, 2019 Kim called me to apologize for her behavior the night before and told me she didn't know why she had said all those awful things about Devin.

10. On May 12, 2019 I told Devin about Kim's behavior at the Benefit and about her apology.

11. In or around mid-June of 2019 I was approached by Brian Chisholm ("Mr. Chisholm"), one of the owners of Rockwell Fitness. Mr. Chisholm asked me if Devin had ever harassed me or made me feel uncomfortable, or if I had any knowledge of him doing so to Kim or other women. I told him that Devin had never harassed me or made me feel uncomfortable and I had never witnessed him doing so to anyone else. I told Mr. Chisholm about Kim's behavior at the Benefit, and that I thought Kim was trying to get Devin fired because she was jealous of him being promoted to General Manager.

12. I have never told Kim or anyone else that Devin harassed me or made me feel uncomfortable in any way.

13. I have never witnessed Devin harassing anyone else.

14. I have never observed Devin being mean to Kim, singling her out, or being unprofessional towards her.

**I HEREBY SWEAR AND AFFIRM UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND ACCURATE UPON MY PERSONAL KNOWLEDGE.**

_____                    _____
Bobbi Beers                                                Date

about how she hurt her ankle, she said something along the lines of "I'm not going to train with Devin anymore." I believe Kim said and meant it in a joking manner.

7. That evening Kim was very drunk and was flirting with a lot of people at the Benefit; it was really uncomfortable to be around that behavior, so I kept walking away from her. At one point I walked into the bathroom and Kim was in there with Bobbi. Bobbi was obviously really uncomfortable, because Kim was drunk and she was ranting about Devin, degrading him and telling Bobbi to "watch out for your clients." Bobbi kept trying to get Kim to stop talking but Kim wouldn't stop. I did not hear Kim say anything about sexual harassment.

8. On or around May 13, 2019, I was in the Kid's Club at Rockwell Fitness when Kim met with Devin in the office. The Kid's Club is one room over from the office, but the walls are thin and you can hear everything from the office in the Kid's Club and vice-a-versa. Devin never yelled or raised his voice. After the meeting, Kim came to talk to me. She said everything was fine and that they were going to be professional and move on.

9. While I don't recall the exact date, and some point before Kim left Rockwell Fitness, I received a phone call from Brian Chisholm ("Mr. Chisholm"), one of the owners of Rockwell Fitness. Mr. Chisholm asked me if Devin had ever harassed me or made me feel uncomfortable and I told him no, he hadn't.

10. I have never told Kim or anyone else that Devin harassed me or made me feel uncomfortable in any way.

11. I have never witnessed Devin harassing anyone.

12. Kim has never complained to me that Devin sexually harassed her or anyone else.

13. Kim started acting weird when Devin told her she needed to clock in and out. Devin tells everyone to clock in and out because he needs to process the hours for us to get paid.

14. I have never observed Devin being mean to Kim, singling her out, or being unprofessional towards her. In our team meetings, Devin was always very pleasant and professional with everyone, including Kim.

**I HEREBY SWEAR AND AFFIRM UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND ACCURATE UPON MY PERSONAL KNOWLEDGE.**

_____   12/23/19
Breanna Moore                              Date

6. In April of 2019, Mr. Conway was selected from a pool of internal and external applicants to fill the General Manager role. Mr. Conway was selected, in part, because of his bachelor's degree in Kinesiology, his professional certifications in the health and wellness field, and his demonstrated capabilities working at the Gym. Ms. Kubas did not apply for the General Manager position.

7. On May 11, 2019, the Gym hosted two events:

   a. a daytime open house (the "Open House") to promote the Gym and the services offered there; and

   b. a charity benefit (the "Benefit") in the evening to raise money on behalf of a Rockwell Fitness employee who was sick.

8. Mr. Conway's mother, Connie Conway ("Mrs. Conway") is a member of the Gym. Mrs. Conway attended the Open House as a volunteer helping with the event.

9. On June 12, 2019, Ms. Kubas asked to speak with me via phone. I called her and she proceeded to tell me that she felt Mr. Conway was being mean to her and ignoring her. She also told me that Mr. Conway had made her, and other female employees feel uncomfortable. This was the first complaint I ever received concerning Mr. Conway.

10. I informed Ms. Kubas that I took her concerns seriously and would investigate. I asked Ms. Kubas for specific details, to which she responded:

   a. Mr. Conway had made her feel uncomfortable in a "sexually harassing way", specifically that he had gone into her office and said, "I can lock the door;" and

   b. Mr. Conway had made other suggestive comments and flirted but had never touched in an unwanted way.

11. I also asked Ms. Kubas for names of other individuals, if any, who could provide additional information or corroborate her claims. She stated that Bobbi Beers ("Ms. Beers") and Bree Moore ("Ms. Moore") had similar experiences with Mr. Conway and/or had witnessed the behavior Ms. Kubas was complaining of.

12. On or around June 14, 2019 I met with Mr. Conway privately in his office. I did not disclose that a complaint had been brought against him, but took the opportunity to remind him that as the General Manager, he was in a position of authority requiring him to maintain the utmost care in how he conducted himself with employees and members of the Gym. I reiterated the need for him to create and maintain a safe and comfortable work environment for all employees. Mr. Conway was very receptive and agreeable.

13. Between June 12, 2019 and June 20, 2019, I interviewed Ms. Beers and Ms. Moore the two (2) employees identified by Ms. Kubas as witnesses. Each of them unequivocally denied Ms. Kubas' allegations and insisted that they had never experienced or witnessed any problems with Mr. Conway.

14. When I spoke with Ms. Moore, the Assistant Manager of the Gym, she was surprised and bewildered. She assured me that Mr. Conway had never intimidated or harassed her or made her feel uncomfortable.

15. Ms. Beers is a Personal Trainer at the Gym. She was insulted by the insinuation that Mr. Conway had ever harassed her, or anyone for that matter. Ms. Beers then informed me of her interactions with Ms. Kubas at the Benefit. Ms. Beers stated that a very drunk Ms. Kubas had approached her at the Benefit and went on a rant of insulting and defaming Mr. Conway, carrying on about how she thought Mr. Conway was "a bad person" and that she believed Ms. Beers "deserved better." At no point during this encounter did Ms. Kubas raise allegations of sexual

harassment. Ms. Beers informed me that she believed Ms. Kubas was trying to get Mr. Conway fired because she was jealous of him being promoted to the General Manager position.

16. I also interviewed Trista Chandler ("Ms. Chandler"), another Personal Trainer. Although not named as a witness by Ms. Kubas, I thought it appropriate to seek feedback from Ms. Chandler because of her extensive interactions with Mr. Conway at the Gym. Ms. Chandler, like the others, had no concerns or complaints concerning Mr. Conway.

17. On June 15, 2019, I received a phone call from my brother Bob Chisholm ("Bob") concerning Ms. Kubas. Bob owns a boat which he keeps docked at a slip at The Point in Arnold, MD and had been hanging out on the boat with his wife Sandi Chisholm ("Sandi") the previous night (Friday night, June 14, 2019). Bob and Sandi are friends with LaToya Butler Williams ("Mrs. Williams"), an employee and member of Rockwell Fitness. Mrs. Williams was at The Point with Ms. Kubas Friday evening, and ended up hanging out with Bob and Sandi on their boat. Bob called me to relay his concerns that Ms. Kubas had been very drunk Friday night while on the boat and that she had been ranting about Mr. Conway, making fun of his physical attributes and complaining that he did not deserve to be the General Manager of the Gym. At no point during this encounter did Ms. Kubas raise allegations of sexual harassment.

18. On June 19, 2019 Ms. Kubas and Mrs. Williams requested a meeting with me and Mr. Conway. During the meeting Ms. Kubas accused Mr. Conway of targeting her for falsifying her hours and refusing to clock in. Mr. Conway responded that if she would simply clock in and out, then we would not have any problems. Ms. Kubas then stormed out of the meeting.

19. At 6:14 p.m. on June 19th, I received an email from Ms. Kubas addressed to Mr. Saab and myself, formally documenting Ms. Kubas' complaint (the "Email"). The details of the

Email differed slightly from that which Ms. Kubas had relayed to me verbally in our June 12th phone call, but also drastically contradicted the information gleaned from my investigation:

   a. The Email alleged that Ms. Beers had approached Ms. Kubas claiming that Mr. Conway had been sexually harassing her, but Ms. Beers expressly refuted this;

   b. The Email alleged that Mr. Conway was berating Ms. Kubas for not clocking in even though other employees frequently failed to clock in and out, but there have been no issues with employees failing to clock in and out, except for Ms. Kubas; and

   c. The Email alleged that two (2) other women had approached Ms. Kubas to complain about Mr. Conway, but the other women Ms. Kubas identified in our June 12th phone call expressly refuted this claim.

20. In the Email, Ms. Kubas requested she be allowed to work from home. I granted this request because I needed to speak with Mr. Saab and Mr. Conway to determine how to proceed. In my email granting her request to work from home, I reiterated that Ms. Kubas was required to clock in and out for any work performed.

21. On June 20, 2019 I met with Mr. Saab and Mr. Conway to discuss Ms. Kubas' complaint and the investigation. This was the first time I made Mr. Conway aware of the complaint. I asked Mr. Conway to think and reflect on his interactions with all employees and members of the Gym; Mr. Conway could not recall anytime that he had acted inappropriately. I reinforced the importance of his role as General Manager in creating and fostering a safe and comfortable workplace.

22. Having thoroughly investigated Ms. Kubas' complaint I concluded that: (i) there was no corroboration of Ms. Kubas' allegations; (ii) the witnesses identified by Ms. Kubas credibly

28. Ms. Kubas responded at 9:45 a.m. stating: "I am at an appt [sic] for my daughter right now. As soon as I get to a computer [sic] I will let you know the amount being deposited." Ms. Kubas further instructed that she would get to the bank by 2:00 p.m.

29. Ms. Kubas clocked in remotely at 10:03 a.m. She sent me another text message at 10:07 a.m. letting me know the total amount to be deposited, and that she would "get there as soon as I'm done with this appt [sic]."

30. Upon realizing that Ms. Kubas was on the clock while attending to personal matters, I disabled her access to our accounts so that I would know when she tried to access it for work.

31. Ms. Kubas remained clocked in until 12:14 p.m. when she texted me again, informing me that she was at the bank trying to make the deposit. I asked her to come into the Gym to see me.

32. I met with Ms. Kubas upon her arrival and asked her why she had been clocked in for over two (2) hours while she was not working. Ms. Kubas immediately became flustered and defensive. I also asked her if she knew anything about the rumor among members that Mr. Conway was being fired for sexually harassing her. I made a comment about how these types of rumors could "spread like a cancer" and were very harmful to the Gym.

33. Ms. Kubas offered no response regarding the origin of the rumor or her whereabouts that morning, rather she asked me: "Am I being fired?" I responded that she was only being fired if she could not explain why she had been clocked in over two (2) hours while not working. Ms. Kubas said nothing but began to collect her belongings.

34. Ms. Kubas' employment was terminated because she was in effect stealing from the Gym by being clocked in while attending to personal matters and not performing work on behalf of Rockwell Fitness.

I HEREBY SWEAR AND AFFIRM UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND ACCURATE UPON MY PERSONAL KNOWLEDGE.

_____    ___12/11/19___
Brian Chisholm                                            Date