**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | |
|---|---|
| **KIMBERLY KUBAS** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| **331B, LLC** ) | Civil Action No.  1:20-cv-2456 (CBD) |
| **(D/B/A ROCKWELL FITNESS)** ) | |
| ) | |
| Defendant**.** ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |

<u>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**</u>
<u>**HER OPPOSITION TO SUMMARY JUDGMENT**</u>

Respectfully Submitted by

ALDERMAN, DEVORSETZ & HORA PLLC
Sundeep Hora
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036

Tel: 202-969-8220
shora@adhlawfirm.com

**<u>TABLE OF CONTENTS</u>**

I.     **FACTS** ……………………………………………………………………... 1

II.    **SUMMARY JUDGMENT STANDARD** ……………………………..…………… 13

III.    **ARGUMENT**

      a.  **Ms. Kubas Has Established That She Engaged in Protected Activity** …….. 14

      b.  **Ms. Kubas Has Established a Causal Connection Between Her Protected Activity and Defendant's Adverse Action** …………………………………… 17

          i.  *Ms. Kubas has established a prima facie case of causality* …………… 17

         ii.  *Defendant's proffered legitimate reason for terminating Ms. Kubas was pretext for retaliation* …………………………………………...…… 20

IV.    **CONCLUSION** ………………………………………………………..… 25

## <u>TABLE OF AUTHORITIES</u>

<small><u>CASES</u></small>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 13

*Armstrong v. Index Journal Co.*, 647 F.2d 441 (4th Cir. 1981) .................................................... 15

*Bradford v. Molina Healthcare of S.C., LLC*, No. 2:18-cv-00649-RMG-MGB, 2019 U.S. Dist.

    LEXIS 225637 (D.S.C. Dec. 17, 2019) ............................................................................ 19, 21

*Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) ........................................................... 18

*Cole v. Family Dollar Stores of Md., Inc.*, 811 F. App'x 168 (4th Cir. 2020) ............................. 19

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) .......... 19

*Dugan v. Albemarle Cty. Sch. Bd.*, 293 F.3d 716 (4th Cir. 2002) ................................................ 21

*Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243 (4th Cir. 2015) ................................ 19

*Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734 (8th Cir. 2005) .......................... 15

*Haynes v. Waste Connections, Inc.*, 922 F.3d 219 (4th Cir. 2019) ............................................... 21

*Hoyle v. Freightliner, LLC*, 650 F.3d 321 (4th Cir. 2011) ........................................................... 21

*Hylind v. Xerox Corp.*, 380 F. Supp. 2d 705 (D. Md. 2005) ........................................................ 14

*King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003) .......................................................................... 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................... 13

*McCready v. Standard Ins. Co.*, 417 F. Supp. 2d 684 (D. Md. 2006) .......................................... 13

*Miller v. Leathers*, 913 F.2d 1085 (4th Cir.1990) ....................................................................... 14

*Nguyen v.CNA Corp.*, 44 F.3d 234 (4th Cir. 1995) ...................................................................... 13

*Pascual v. Lowe's Home Ctrs., Inc.*, 193 Fed. Appx. 229 (4th Cir. 2006) ................................... 18

*Price v. Thompson*, 380 F.3d 209 (4th Cir. 2004) ....................................................................... 18

*Richey v. City of Independence*, 540 F.3d 779 (8th Cir. 2008) .................................................... 15

*Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir. 1985).........................................14

*Sempowich v. Tactile Systems Technology, Inc.*, No. 20-2245 (4th Cir. December 3, 2021) ...... 18

*Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994) ............................................................13

*Strothers v. City of Laurel*, 895 F.3d 317 (4th Cir. 2018).........................................18

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014).........................................................14

*Villa v. CavaMezze Grill, LLC*, 858 F.3d 896 (4th Cir. 2017)..................................15, 17

*Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179 (4th Cir. 2017) .........................................19

*Wells v. Gates*, 336 F. App'x 378 (4th Cir. 2009) ...................................................23

*Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir. 1989)..................................17, 18

*Williams v. G4S Secure Solutions (USA), Inc.*, 2012 U.S. Dist. LEXIS 66249 (D. Md. 2012)... 16, 18, 21, 23

S‌TATUTES

F.R.C.P. 56..........................................................................................13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| **KIMBERLY KUBAS** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **331B, LLC** | ) | Civil Action No.  1:20-cv-2456 (CBD) |
| **(D/B/A ROCKWELL FITNESS)** | ) | |
| | ) | |
| Defendant**.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff Kimberly Kubas, through her undersigned counsel, hereby submits her

Opposition to Defendant 331B, LLC's (d/b/a Rockwell Fitness) Motion for Summary Judgment

(the "Motion").  For the reasons outlined below, Defendant's Motion should be denied and Ms.

Kubas's case should proceed to trial.

## I.   FACTS

In 2006, Kimberly Kubas began working at Sport Fit, now known as Rockwell Fitness, as

a Childcare Attendant. Ex. 1 (Kubas dep.), at 7:10 – 8:5.  During her first twelve years of

working at the gym, neither Defendant, nor its predecessor, had any issues with Ms. Kubas's

work performance. Ex. 2 (Conway dep.), at 116:19 – 118:11.  In fact, Ms. Kubas was described

by her previous employers as a trusted, helpful and invested employee. Ex. 3 (Chisholm dep.), at

93:18 – 94:14; Ex. 4 (Saab dep.), at 106:13 – 107:22.

During 2017 and 2018, Ms. Kubas was repeatedly subjected to sexual harassment by her coworker, Devin Conway at their mutual place of work. Ex. 1 (Kubas dep.), at 10:3 – 12:10. Mr. Conway would intentionally collide with Ms. Kubas in the hallway to rub up against her. *Id.* at 10:20 – 13:22. He would rub himself against Ms. Kubas during her group training sessions at the gym. *Id.* at 11:7-11, 27:14 – 28:6. Mr. Conway would call Ms. Kubas "hot buns" in the group training sessions and use various exercise equipment, such as training ropes, to simulate sexually suggestive acts. *Id.* at 35:7 – 40:11. On two occasions, Mr. Conway came into Ms. Kubas' office, closed the door, and groped her breasts from behind. *Id.* at 11:2-7; Ex. 6 (Plaintiff's production). Ms. Kubas did not report the assaults or the harassment for fear of losing her job. Ex. 1 (Kubas dep.), at 21:5.

On September 1, 2018, Rockwell Fitness was purchased by Defendant 331B, LLC. Ex. 3 (Chisholm dep.), at 12:4. In March 2019, Mr. Conway was promoted to Co-General Manager and then to sole General Manager of Rockwell Fitness in May 2019. Ex. 2 (Conway dep.), at 11:6-11.

On Saturday, May 11, 2019, Ms. Kubas was approached by her coworker, Bobbi Beers at a benefit being held at the gym for another employee. Ex. 1 (Kubas dep.), at 44:9-45:16. Ms. Beers approached Ms. Kubas for advice on how to handle Mr. Conway; she explained that he was interested in her and was making her feel uncomfortable. *Id.* at 44:14-22. Ms. Beers told her that Mr. Conway had harassed her, showed up at her home unannounced and she felt that his behavior was "creepy." *Id.* at 45:3-5. Because Ms. Beers was a personal trainer and reported to Mr. Conway, she was nervous about reporting him because her livelihood depended on him referring clients to her. *Id.* at 45:6-17. In response, Ms. Kubas disclosed her own experiences with Mr. Conway and advised Ms. Beers to not be intimidated and say something, even though

Ms. Kubas herself felt like she was unable to disclose what happened to her because she was under Mr. Conway's control.[1]  *Id.* at 47:4-17; 48:15-49:13.  Unbeknownst to Ms. Kubas, Ms. Beers informed Mr. Conway of the discussion between herself and Ms. Kubas. *Id.* at 72:10.

Upon returning to work on Monday, May 13, 2019, Ms. Kubas immediately felt that something was "off" with Mr. Conway, so she sent him a text asking to meet.  *Id.* at 70:14-20. When Ms. Kubas met with Mr. Conway in his office, he looked visibly angry.  *Id.* at 72:1-73:2. She told him that he was acting "weird" and asked him, "What's going on?"  *Id.*  Mr. Conway responded, "I do not want this situation to get out.  Bobbi told me everything that you talked about.  I can't have this getting out and we need to sweep it under the rug right now and I don't want to hear another word about it."  *Id.*  He also told her that if he found out that she was telling anyone about this, there would be consequences.  *Id.*  Mr. Conway was also aware that Bree Moore, another gym employee, was aware of the discussion between Ms. Kubas and Ms. Beers on the night of the benefit.  *Id.* at 76:1.  Mr. Conway brought Ms. Moore into his office and reiterated to Ms. Moore, in Ms. Kubas's presence, that he did not want anyone to talk about it and he did not want to hear about this issue again.  *Id.* at 76: 2-11.

Mr. Conway's treatment of Ms. Kubas also changed dramatically that day.  *Id.* at 101:5 – 103:15.  Specifically, he began singling Ms. Kubas out for her failure to clock in and out, despite the fact that numerous other employees experienced the same issues during her tenure at Rockwell.  *Id.* at 103:11-14, 140:13 – 141:15, 144:1-11.  Prior to Ms. Kubas's conversation with

---

[1] Ms. Kubas felt like she was under Conway's control because they had had sexual relations on one occasion and because of this fact, she believed that Conway would use that against her should she come forward concerning his harassment and assault.  Ex. 1 (Kubas dep.), at 20:14-20; Ex. 5 at 331B 61.

Ms. Beers on May 11, 2019, Mr. Conway had no issue with Ms. Kubas's timekeeping.  *Id.* at

140:19-21.

In fact, there were many instances where Ms. Kubas and other Rockwell Fitness

employees failed to clock in or out and no issues were raised by management.  Ex. 2 (Conway

dep.), at 93:18 – 96:21; 110:15; Ex. 3, at 38:22 – 39:15, 73:14-21, 137:11-17.  Mr. Conway had

never so much as given an employee a formal write up for failing to clock in or out. *Id.* at

110:16-20.  In fact, prior to learning about Ms. Kubas's discussion with Ms. Beers concerning

his harassment, he had no issue with inputting Ms. Kubas's hours based on her verbal

representation of the hours she worked.

> Q. Here's the situation from Ms. Kubas on May 6th. She's just basically
> telling you what her hours are of 20.22 and that she had used a vacation
> day on 4/22/19, right?
>
> A. Yes, so I'm assuming there's probably two hours less in the system
> because she probably wasn't there for one day of her work. So it would
> probably look like 18.22 in the system. So I probably put the two hours
> from that vacation day to make it 20.22.
>
> Q. So you are adjusting her hours after the fact even though this is on
> April 22nd, 2019, right?
>
> A. Correct.
>
> **Q. At this point, it doesn't seem like there was any issue with that. You
> never indicated to her that, "Hey, you can't do that," right?**
>
> **A. Yes, using a vacation day or just once again –**
>
> **Q. No, I'm talking about making sure that the hours were accurate?**
> **A. Yes.**

*Id.* at 95:21-96:21.

After being subjected to his hostile demeanor towards her for several weeks, on June 12,

2019, Ms. Kubas spoke via telephone with Brian Chisholm, one of the gym's owners, concerning

the situation with Mr. Conway.  Ex. 1 (Kubas dep), at 15:21 – 16:2, 99:5-17.  Ms. Kubas

explained how she had endured two years of sexual harassment and was now experiencing unfair

treatment from Mr. Conway for talking to her coworkers about the harassment.  *Id.* at 100:20 –

102:9 (this teleconference is referred to as the "Verbal Complaint," hereinafter).  Mr. Chisholm

told Ms. Kubas that he took her complaints seriously and vowed to investigate her allegations of

sexual harassment. Ex. 5 (Chisholm Aff.), at 331B 32, ¶ 10.  In his sworn affidavit before the

EEOC, Mr. Chisholm claimed that the Verbal Complaint "was the first complaint I ever received

concerning Mr. Conway,"[2] however, more than a week prior, on June 4, 2019, Ms. Latoya

Williams, the front desk manager at the gym, wrote to Mr. Chisholm,

> Since we spoke on Friday some other things are coming about that have
> me wondering if I want to even stay through June let alone to July. **First I
> want to say that when I mentioned to you on Friday about how the
> other ladies are talking about leaving because they feel uncomfortable
> around Devin what I didn't tell you was that I knew about the
> incident that involved Kim but it was not my place to tell you this
> information and Kim was nervous about telling you. Kim had told me
> about it a couple weeks ago when she came in that Monday or
> Tuesday morning after the Spring Fair & benefit for Pete I noticed
> she seemed upset. We talked later that evening and that is when she
> told me about what happened. I told her then that she and the others
> needed to tell you and to tell you everything because he can not
> continue to get away with this and if the wrong person found out it
> would look bad for you and Sid. She said she was nervous about
> telling you because she was afraid that she would either be fired or if
> you said something to him he would either deny it happened or flip it
> around and make her the pursuer**…

*See* Ex. 5 (Defendant's production) at 331B LLC 61.  In her June 4, 2019 email to Mr.

Chisholm, Ms. Williams references a conversation she had with him *last Friday*, which

---

[2] Ex. 5 (Chisholm Aff.) at 331B 33, ¶ 9.

was May 31, 2019.[3]  Therefore, contrary to his Affidavit, Ms. Williams made Mr.

Chisholm aware, *prior to Ms. Kubas's Verbal Complaint*, that: (1) Ms. Kubas had

concerns about Mr. Conway concerning harassment; (2) Ms. Kubas feared retaliation

specifically that she would be fired or that Mr. Conway would "flip it around and make

her the pursuer;" and (3) that there were other female employees who were considering

leaving their employment due to feeling uncomfortable around Mr. Conway.

Moreover, on June 2, 2019, Mr. Chisholm texted his co-owner, Sid Saab, "You

and I are going to have to have a serious talk about how to handle a certain situation

which is imperative that you and I do together because it involves sensitive sexual issues

at the gym.  If you have time you should come over my house and have a drink and eat a

burger or some hotdogs. It is just the Chisholm family so you're certainly welcome." Ex.

5 at 331B 1337.  The reasonable inference here is that Mr. Chisholm lied when he

asserted under oath that the Verbal Complaint was the first time that he became aware of

any complaints concerning Mr. Conway.  Another reasonable inference here is that

Messrs. Chisholm and Saab conspired to address the complaints against Mr. Conway by

terminating Ms. Kubas, which is what ultimately occurred.  Mr. Chisholm never took any

action or even investigated Ms. Williams' allegations concerning Mr. Conway that she

voiced during their May 31, 2019 meeting and in her June 4, 2019 email.  Ex. 3

(Chisholm dep.) at 110:9-16.

---

[3] *See also*, Ex. 5 at 331B 1072 ("I would like to talk to you away from the club and would like our conversation to stay between us as what I need to talk about no one else knows and I would like for it to stay that way until I am ready to tell them myself. Please let me know when would be a good time for you today if it is at all possible that we could meet up as you know I get off around 10AM so any time after that would be fine.").

During the Verbal Complaint on June 12, 2019, Ms. Kubas spoke to Mr. Chisholm for about a half hour.  Ex. 1 (Kubas dep.) at 102:10-11.  She told Mr. Chisholm everything[4] about what happened including what Ms. Beers disclosed to Ms. Kubas during the benefit concerning Mr. Conway's harassment, how Mr. Conway treated her poorly thereafter; how Mr. Conway had harassed her and groped her in her office and, because she wanted to make sure that he knew everything, how she and Mr. Conway had consensual sex on one occasion.  *Id.* 100:2-102:9.  On June 18, 2019, Mr. Chisholm texted Conway that he was "getting a little sick of listening to [Ms. Kubas and her coworker, Latoya Williams] complain to [him] about stupid crap." Ex. 5 at 331B 1284.[5]

The following day, a meeting was held between Ms. Kubas, Mr. Chisholm, Mr. Conway, and Mrs. Williams where Ms. Kubas again explained that she felt retaliated against for making a complaint against Mr. Conway.  Ex. 1 (Kubas dep.), at 112:2 – 116:11.  During the meeting, Ms. Kubas and Ms. Williams expressed that Mr. Conway was targeting them but for separate reasons:  Ms. Kubas for failing to clock in/clock out and Ms. Williams for how she was managing the smoothie bar.  *Id.* at 113:22-114:11; Ex. 5 (Chisholm Aff.) at 331B 35, ¶ 18 ("During the meeting Ms. Kubas accused Mr. Conway of targeting her for falsifying her hours and refusing to clock in.  Mr. Conway responded that if she would simply clock in and out, then we would not have any problems.").  In an email to his business partner, Sid Saab, Mr. Chisholm

---

[4] Ms. Kubas explained that she "laid it all out there" Ex. 1 (Kubas dep.), at 101:13.
[5] Mr. Chisholm attempted to explain that when he wrote that he was getting sick of listening to Ms. William's and Ms. Kubas's complaints, he was referring to an unrelated situation involving Ms. William's and Mr. Conway concerning the smoothie bar she ran at the gym.  Ex. 3 (Chisholm dep.), at 153:22-154:19 ("A. This is completely about that smoothie bar and Devin being mean. It was like handling a fifth grade complaint. I recall how the environment in there was at that point. It had nothing to do with sexual harassment claims or any type of claim like that.").  However, Chisholm could not explain why he included Ms. Kubas in his rant to Saab when Ms. Kubas had nothing to do with the smoothie bar.  *Id.*

referred to this meeting as a "bitch-fest between [Mrs. Williams and Ms. Kubas] against [Mr. Conway]," in which he told his employees that they are to "do their jobs and stop all the immature gossip." Ex. 5 at 331B 1075.

Later that same evening of June 19, 2019, Ms. Kubas formally documented her complaints of mistreatment in an email to both Mr. Chisholm and Mr. Saab. She wrote, in part,

> Having been with the company for 13 years, I have formed great relationships with members as well as staff, that keeps me coming back each day with a smile. It was a pleasure to meet you two, and I can see both of you have a financial, as well as emotional investment in the gym as well.
>
> This all started May 11, 2019, after the benefit for Pete. Bobbi Beers asked me if I could give her any advice on how to handle Devin. She told me he has been acting aggressive (sexually) towards her, and she does not trust him. She stated she was afraid of losing clients if she stood up to him. I told her that she needs to trust her instinct, and that I have personally witnessed him doing the same to others, including myself.
>
> That Monday, May 13, Devin did not acknowledge me at all. I said hello, he ignored me. I asked to meet with him, at which point he demanded that I keep it all a secret, it never happened, and to sweep it under the rug. In addition, he berated me for coming clean to Bobbi. I felt badly for her, and my sole intention was to let her know she is not trapped with this situation. Since then things have gotten worse. I did reach out to you, Brian. And I thought and thought about it, debating if it was the right thing to do. I was nervous and scared, but I did.
>
> There are at least 2 other women who have approached me with similar stories, and if need be I can contact them and disclose their identities, if they wish.
>
> **I have felt highly uncomfortable around Devin since this came to light, due to the fact he is singling me out. It is without a doubt related to my bringing his sexual harassment to light. He berated me about my error in clocking in. There are plenty of times staff forgets to clock in, and he has never had an issue with anybody else previously.**
>
> I had not clocked in properly, due to the schedule of our software conference calls, and providing care for my daughter during those times. He called me in his office on June 18, and accused me of thinking I'm better than everyone, and not clocking in just to get him upset.

He also admitted talking to other staff about this situation. (Bree and Sarah).  That is when I felt the most embarrassed and upset. I have kept this whole situation private, between you (Brian) and Devin. I have gone out of my to make sure this situation is protected and anonymous, and I feel let down.

I have been feeling dread and anxiety anytime I have to communicate with Devin, and it is taking a toll on me.

Ex. 6 at PL Prod. 80-82 (hereinafter, the "Written Complaint").

Ms. Kubas requested to work from home for the next two weeks as she did not wish to interact with Mr. Conway.  *Id* at 81.  Mr. Chisholm allowed her to work from home and indicated that he would continue to investigate her allegations.  *Id.*  With respect to Ms. Kubas's reference to the timekeeping software in her Written Complaint, notably, an hour prior to Ms. Kubas submitting her Written Complaint, Conway texted Mr. Chisholm to inform him that he had "Just finished and saved. I had to make further corrections to Ryen dill, Conner K, and Lexi R. ***Sending over the corrected time clock now***." Ex. 5 at 331B 1244 (emphasis added).[6]

After she submitted her Written Complaint, Ms. Kubas texted Ms. Williams to tell her she had submitted her Written Complaint to document Mr. Conway's mistreatment to the owners, writing, "…enough is enough."  Ex. 6 at PL Prod. 33-34.  Ms. Williams responded, "It is. And the thing is the way Brian is handling this sends the messages that he condones having a sexual predator on staff and doesn't care about the female staff or members." *Id.* at 34.  Around 7:42 PM the same evening, Mr. Chisholm texted Mr. Saab, "Long day dealing with her and

---

[6] In a text message from Mr. Conway to Mr. Chisholm dated June 20, 2019, just one day before Ms. Kubas was fired, Conway admitted that he forgot to add in Kim's hours into ADP and that "Bree [Moore]and [Ms. Kubas] have more hours after the club automation calls," further evidencing the timekeeping issues faced by all employees. *See* Ex. 5 at 331B 1284.

LaToya. Only to have [Ms. Williams's] Mom come in to talk to me and almost demand I fire [Conway]. I can handle them all but this shit is stopping right now…" Ex. 5 at 331B 1264.

**<u>Ms. Kubas is Terminated Two Days Later on June 21, 2019</u>**

Mr. Conway claims that on June 20, 2019, Mr. Chisholm "informed me that [Ms. Kubas] had filed a complaint accusing me of sexual harassment.  This was the first time I ever heard of the complaint and I was shocked by the allegations." Ex. 5 (Conway Aff.) at 331B 21, ¶ 23.

The next day, on June 21, 2019, Mr. Conway stated that "Andrew Smith ("Andrew"), another employee of Rockwell Fitness informed me that a member of the Gym had approached him in the free-weight room and asked if I was being fired for sexually harassing Kim. Andrew was under the impression that the member he spoke with had heard the rumor from Billy D. Williams ("Mr. Williams).  Mr. Williams is a member of the Gym and Ms. [Latoya] Williams' husband. I called Mr. Chisholm around 7:00 a.m. to fill him in on the rumor situation." *Id.* at 331B 21, ¶ 24; *Id.* at 331B 37, ¶ 26 (Chisholm Aff.) ("Around 7:00 a.m. on Friday, June 21, 2019, I received a phone call from Mr. Conway informing me that members in the Gym were discussing a rumor that he [Conway] was getting fired for sexual harassment. Mr. Conway specifically identified Billy Williams ("Mr. Williams") as the member spreading the rumor. Mr. Williams is also a friend of mine and is married to Mrs. Williams.").

At 8:17 AM, Mr. Chisholm texted Ms. Kubas to "go in first thing this AM and make any deposits we have right now.  We are stretched very thin and I want to know if Sid and I need to deposit more money in there right now…." Ex. 7 (text messages), at 1.[7]  At 9:43 AM, Mr.

---

[7] Defendant's production of text messages resulted in several text messages being included on one page.  In order to facilitate the Court's review of these messages, counsel for Plaintiff increased the size and took screenshots and included them as exhibits herein.  Plaintiff has the actual production version, should the Court wish to see it.

Chisholm texted Ms. Kubas asking if he could "call [her] later," presumably in response to a call he received from her. *Id.* at 2; Ex. 3 (Chisholm dep.), at 178:15-20. Within seconds, Ms. Kubas texted Mr. Chisholm informing him that she was at a doctor's appointment for her daughter and that "[a]s soon as I get to a computer I will let you know the amount being deposited." Ex. 7 (text messages), at 2.

While she intended on working on the deposits when she got home, because Mr. Chisholm was concerned about the amount of the deposits and the possibility of having to put extra money in the business account to cover expenses, she started working on the issue at her daughter's doctor's appointment. Ex. 1 (Kubas dep.), at 286:10-287:2. Because she was performing work at the appointment and had been told to clock in when she started working, Ms. Kubas logged into the system remotely. *Id.* at 267:3-13 ("Normally I wouldn't think much it, but it was just kind of ingrained in me. You need to clock in no matter when you're working -- home. So I just didn't want any further issues. So I thought to myself I'd better clock in. I don't need any further time clock issues with Mr. Conway."). Ms. Kubas clocked in remotely at 10:03 a.m. Ex. 5 (Chisholm Aff.) at 331B 38, ¶ 29. She sent Mr. Chisholm another text message at 10:07 am informing him of the total amount to be deposited and that she would get there as soon as she was done with her daughter's appointment. *Id.*; Ex. 7 (text messages), at 2; Ex. 1 (Kubas dep.), at 148:12 -17. After that, Ms. Kubas drove home to retrieve the deposits, which were in bags, in order to prepare them to be deposited at the bank. *Id.* at 268:6-269:1. She also started working on membership reports that Mr. Chisholm had requested the night before. *Id.* She realized that there were two additional deposits which were still in the safe at work that she needed to retrieve before going to the bank. *Id.* Shortly before she left her home, her software "froze," so she thought she "might as well go to the office now since the computer [at home] was

not working for me and I wanted to finish the deposits." *Id.* at 269:5-13.  Unbeknownst to Ms. Kubas, it was not a computer or software malfunction; Mr. Chisholm had disabled her access to Rockwell's system, which was called "Mind Body."  *See* Ex. 5 (Chisholm Aff.) at 331B 38.  Mr. Conway had informed Mr. Chisholm that Ms. Kubas had clocked in to work but had not clocked out, which is what prompted Mr. Chisholm to disable her access.  *Id.* (Conway Aff.) at 331B 21, ¶ 25.

Unaware that Mr. Chisholm had purposefully disabled her access, Ms. Kubas texted him at 12:14 p.m. to let him know that she was at the office trying to finish the deposits, but she was locked out of the software. Ex. 7, at 3.  Ms. Kubas took the deposits she was able to complete, prior to her access being revoked, to the bank. Ex. 1 (Kubas dep.), at 269:14 – 270:3.  At 12:27 p.m., Mr. Chisholm told her that her permission level had been changed and asked her to come see him at the gym. Ex. 7, at 3; Ex. 5 (Chisholm Aff.) at 331B 38, ¶ 31.  At the same time, Mr. Chisholm texted his business partner, Mr. Saab, informing him that he was firing Ms. Kubas. Ex. 3 (Chisholm dep.), at 197:13-15; Ex. 5 at 331B 1295.

Upon her return to the gym, Mr. Chisholm asked Ms. Kubas about her activities for the past two hours and accused her of being clocked in while not working.  Ex. 5 (Chisholm Aff.) at 331B 38, ¶ 32.  Ms. Kubas explained once again that she had been handling the deposits, but she had trouble with the software and was not able to finish all of the deposits as a result. Ex. 1 (Kubas dep.), at 274:2-9.  Mr. Chisholm then questioned Ms. Kubas if she had anything to do with the rumor that had spread throughout the gym that morning.  Ex. 5 (Chisholm Aff.) at 331B 38, ¶ 32.  Ms. Kubas told Mr. Chisholm that she had no knowledge of this rumor.  Ex. 1, at 274:14-21.  Mr. Chisholm told Ms. Kubas that she and Ms. Williams were a "cancer" to the gym and that he could not have these rumors.  Ex. 1 (Kubas dep.), at 274:22-275:20; 176:14-177:18.

12

Mr. Chisholm told Ms. Kubas that she could go now and that he would pay her for the next two weeks. *Id.* at 275:8-13. Ms. Kubas had been fired so she left the gym immediately. *Id.* at 275:18 – 276:7.

No one except Ms. Kubas was terminated or even disciplined for not properly clocking in or out during her 14-year tenure with the gym, even though this was a frequent issue.  Ex. 2 (Conway dep.), at 93:18 – 110:20, 110:16-20; Ex. 3 (Chisholm dep.), at 38:22 – 39:15, 66:4-69:14, 73:14-21, 137:11-17.

## II.   SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, "[a] party may move for summary judgment . . ." which the court must grant "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  For the purposes of the motion, "[a] genuine issue exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case…" whereas "[t]he opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials."  *Nguyen v. CNA Corp.*, 44 F.3d 234, 237 (4th Cir. 1995) (citing *Shaw*, 13 F.3d at 798).

In evaluating a motion for summary judgment, the court is "obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party."  *McCready v. Standard Ins. Co.*, 417 F. Supp. 2d 684, 695 (D. Md. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Significantly "[t]he plaintiff is entitled to have the credibility of all his evidence presumed." *Shaw*, 13 F.3d at 798

(citing *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990)).   The witnesses on both sides come to [any] case with their own perceptions, recollections, and even potential biases.  It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system.  "[It is a] fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014).

### III.   ARGUMENT

"A *prima facie* claim of retaliation requires that an employee prove that (1) the employee engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action." *Hylind v. Xerox Corp.*, 380 F. Supp. 2d 705, 710 (D. Md. 2005) (citing *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir. 1985)).

Defendant argues that summary judgment is appropriate, because (a) Ms. Kubas cannot establish that she engaged in protected activity; (b) Ms. Kubas cannot establish a causal connection between her protected activity and her termination; and (c) Ms. Kubas cannot demonstrate that Defendant's reason for terminating her was pretextual. Def. Br. at 12-20.  As discussed in greater detail below, Ms. Kubas can establish all of the required elements and has raised genuine issues of material facts that require denial of Defendant's Motion for Summary Judgment.

### a.   Ms. Kubas Has Established That She Engaged in Protected Activity

Even if Defendant's assertion that Ms. Kubas could not prove that Mr. Conway sexually harassed her or her co-workers, the crux of this case is retaliation for complaining about his unlawful conduct.  Ms. Kubas's Verbal and Written Complaints, unequivocally, constitute

14

protected activity.  "To fall under the protection of the opposition clause in § 704(a) [of Title VII], behavior need not rise to the level of formal charges..." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (reversing trial court's dismissal of employee's Title VII action because plaintiff's complaints of gender discrimination to her manager constituted protected activity).  While the opposition clause "does not protect the making of a knowingly false allegation," it does protect complaints of a Title VII violation that the employee *subjectively* believes to be true. *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) (citing *Richey v. City of Independence*, 540 F.3d 779, 785 (8th Cir. 2008)).

Moreover, "when an employer is presented with a 'he said, she said' set of facts involving two employees, and the employer chooses to disbelieve and discipline the employee who had engaged in protected opposition to unlawful activity, then the employee's claim of retaliation *must go to a jury*." *Richey*, 540 F.3d at 785 (emphasis added) (citing *Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734 (8th Cir. 2005).  "[A]n employer cannot legitimately fire every 'employee who files a Title VII claim and is disbelieved.'" *Id.* at 784 (quoting *Gilooly*, 421 F.3d at 740).  In *Gilooly*, the court "held that summary judgment was inappropriate…because the employer's disbelief in the employee was 'founded solely on the statements of other employees and witnesses,' rather than on 'independently verifiable evidence' or 'independent corroboration…from neutral non-parties.'" *Richey*, 540 F.3d at 784 (discussing *Gilooly*, supra).

Here, Defendant has conveniently concluded that Ms. Kubas's allegations of sexual harassment were fabricated and, thus, her complaints were not protected activity under Title VII. Def. Br. at 18-20.  This bold allegation is undeniably disputed by the facts, which this Court "must construe…in favor of the plaintiff and accept her account" that she was sexually harassed

by Mr. Conway, that she reasonably believed others had been as well, and was terminated for complaining to her employers. *Williams v. G4S Secure Solutions (USA), Inc.*, 2012 U.S. Dist. LEXIS 66249, *46 (D. Md. 2012).

In support of her retaliation claim, Ms. Kubas has set forth sufficient facts to allow a reasonable jury to find that she engaged in protected activity. Ms. Kubas has sufficiently alleged that she engaged in protected activity that she informed Brian Chisholm, co-owner of Defendant 331B LLC, through her Verbal and Written Complaints, of Mr. Conway's sexual harassment and how she was experiencing unfair treatment from Mr. Conway after talking to her coworkers about the harassment. Ex. 1 (Kubas dep.), at 100:20 – 102:9; Ex. 10. Indeed, both owners, Brian Chisholm and Sid Saab, were made aware of Ms. Kubas's claims in great detail and vowed to investigate her claims. Ex. 5 (Chisholm Aff.) at 331B 33-34, ¶ 9-11; Ex. 6 at PL Prod. 80. In an email dated June 19, 2019, two days before she was fired, Ms. Kubas wrote to Mr. Chisholm and Mr. Saab that Mr. Conway was treating her unfairly by berating her "about [her] error clocking in," and explained that this behavior was "related to [her] bringing his sexual harassment to light." *Id.* at PL Prod. 81.

Conversely, in support of its argument for summary judgment, Defendant suggests that Ms. Kubas's claims are false because other employees denied having been sexually harassed by Mr. Conway. Def. Br. at 19-20. That other employees denied being subjected to sexual harassment by Mr. Conway is immaterial.[8] The crux of Ms. Kubas's claim is that she herself

---

[8] Moreover, Ms. Kubas was not the only employee who informed Mr. Chisholm of the sexual harassment complaints against Mr. Conway. On June 4, 2019, Ms. Williams emailed Mr. Chisholm and informed him that "the other ladies are talking about leaving because they feel uncomfortable around Devin." Ex. 5 at 331B 1072. After realizing that Ms. Kubas had discussed the harassment with Ms. Beers, Mr. Conway told her to "sweep it under the rug" because he didn't want the "situation to get out." Ex. 1 (Kubas dep.), at 72:1-73:2.

was sexually harassed by Mr. Conway, that she subjectively believed others were as well, and

that she was terminated for complaining to her employers in violation of Title VII.[9]  Such

complaints clearly qualify as protected activity and, thus, Defendant's motion for summary

judgment on the ground that this activity was not protected by the opposition clause of Title VII

must be denied.

Defendant also relies on *Villa*, supra, to support its argument that summary judgment is

appropriate.  In *Villa*, the court affirmed summary judgment because the employee's termination

was based on her employer's reasonable belief that the employee knowingly made a false

complaint of sexual harassment.  *Villa*, 858 F.3d at 903.  Here, however, Defendant has never so

much as suggested that Ms. Kubas was fired for filing an allegedly false complaint.  In fact,

Defendant has vehemently protested Ms. Kubas's claim that her termination had anything to do

with her complaint.  Rather, Defendant's "legitimate, non-retaliatory" reason for firing Ms.

Kubas is her failure to clock in and out. Def. Br. at 14.  Therefore, *Villa* is inapposite to the facts

of the instant matter and does not support Defendant's motion for summary judgment.

### b. Ms. Kubas Has Established a Causal Connection Between Her Protected Activity and Defendant's Adverse Action

#### i.  Ms. Kubas has established causation

Establishing, *prima facie*, that a causal connection existed between protected activity and

adverse employment action is not an onerous burden.  *Williams v. Cerberonics, Inc.*, 871 F.2d

452, 457 (4th Cir. 1989).  "In the retaliation context, under the *McDonnell Douglas* proof

scheme, the causal connection prong may be proved circumstantially."  *Williams*, 2012 U.S.

---

[9] It was reasonable for Ms. Kubas to believe that Ms. Beers had also been harassed by Mr. Conway because Ms. Beers told her that "he was making her feel uncomfortable," and that "he would harass [her]." Ex. 1 (Kubas dep.), at 44:14-45:1.

Dist. LEXIS 66249 at 30.  "A causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity."  *Pascual v. Lowe's Home Ctrs., Inc.*, 193 Fed. Appx. 229, 233 (4th Cir. 2006) (quoting *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004)).  Furthermore, where the temporal proximity between an employer's knowledge of protected activity and an adverse employment action is "very close," this alone can provide proof of causation.  *Id.* (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

In *Sempowich v. Tactile Systems Technology, Inc.*, the Fourth Circuit recently reversed the district court's grant of summary judgment to an employer in a sex discrimination and retaliation case, finding that the district court applied the incorrect legal standards .  With respect to plaintiff's retaliation claim, the Court found that the district court "erred by holding that temporal proximity alone cannot establish a causal relationship.  We have made abundantly clear that temporal proximity suffices to show a causal relationship. We explained this in *Strothers v. City of Laurel*, 895 F.3d 317 (4th Cir. 2018).  A plaintiff may establish a causal relationship 'simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee *soon after* becoming aware of such activity.'"  *Sempowich v. Tactile Systems Technology, Inc*., No. 20-2245 at 16 (4th Cir. December 3, 2021) (quoting *Strothers*, 895 F.3d at 336).[10]

Courts in the Fourth Circuit have routinely found a causal connection based on temporal proximity in numerous cases.  *E.g., Williams*, 871 F.2d at 457 (plaintiff established a prima facie

---

[10] Because this case was published on December 3, 2021, and immediately prior to the filing of this Opposition, an electronic citation was not available.  Accordingly, Plaintiff is including the Fourth Circuit's opinion in *Sempowich* as Ex. 9.

case of causality where she was fired after her employer became aware she filed a discrimination charge); *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 253 (4th Cir. 2015) (evidence that plaintiff complained about sexual harassment just one month before she was terminated was sufficient to create a jury question regarding causation); *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003) (plaintiff's termination came two and a half months after his EEO complaint and the court found this sufficient to give rise to the inference of causation); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) (that plaintiff engaged in protected activity four months before the retaliatory conduct was sufficient for a finding of a causal connection); *Bradford v. Molina Healthcare of S.C., LLC*, No. 2:18-cv-00649-RMG-MGB, 2019 U.S. Dist. LEXIS 225637, at *23 (D.S.C. Dec. 17, 2019) (causal connection existed where plaintiff complained about discrimination and retaliation less than two months prior to the termination of her employment); *see also Waag v. Sotera Def. Sols., Inc*., 857 F.3d 179, 192 (4th Cir. 2017) (for purposes of establishing a prima facie case, close temporal proximity between activity protected by statute and an adverse employment action may suffice to demonstrate causation); *Cole v. Family Dollar Stores of Md., Inc*., 811 F. App'x 168, 174 (4th Cir. 2020) (saying same).

Ms. Kubas has established that she was terminated *less than one month* after her Verbal complaint.  Ms. Kubas informed her employers of the sexual harassment in early June[11] and was terminated on June 21, 2019.[12]  Based on the foregoing caselaw, the temporal proximity between

---

[11] Ex. 1 (Kubas dep.), at 15:21 – 16:2, 99:5-17
[12] Ex. 3 (Chisholm dep.), at 197:13-15.

Ms. Kubas's protected activity and Defendant's adverse action is more than sufficient to raise an inference of causation.

Moreover, Defendant claims that Ms. Kubas was not fired; rather, it claims that she quit because she could not explain her whereabouts after clocking in at her daughter's doctor appointment. Ex. 5 (Chisholm Aff.) at 331B 38, ¶ 33 ("…she asked me: "Am I being fired?" I responded that she was only being fired if she could not explain why she had been clocked in over two (2) hours while not working. Ms. Kubas said nothing but began to collect her belongings."); Ex. 4 (Saab dep.) at 4:14-45:8. However, prior to Mr. Chisholm's interrogation of Ms. Kubas in which he terminated her, Mr. Chisholm told Mr. Saab that he was going to fire her. Ex. 3 (Chisholm dep.) at 197:13-15; Ex. 5 at 331B 1295. Therefore, Ms. Kubas's termination was not based on her purported activities after she clocked in, but because of her protected activity. This is further established in a text message exchange between Messrs. Chisholm and Williams. Specifically, after Ms. Kubas was terminated, Mr. Chisholm texted Billy Williams concerning the rumor he was allegedly spreading concerning the sexual harassment allegations against Mr. Conway. Ex. 8 (text messages), at 1. He asked Mr. Williams not to have any further public discussions about it. *Id.* In response, Mr. Williams apologized and wrote, "This thing is spiraling way out of control [a]nd I hate conflict." *Id.* at 2. Mr. Chisholm agreed that it was and Mr. Williams wrote, "Wish things were back to normal brother," to which Mr. Chisholm responded "*Working on it.*" *Id.* (emphasis added).

> ii. *Defendant's proffered legitimate reason for terminating Ms. Kubas was pretext for retaliation*

As discussed above, Ms. Kubas has established a prima facie case of retaliation. Defendant, however, contends that Ms. Kubas's termination was not retaliation for engaging in protected activity, but rather for her failure to "properly clock in and out." Def. Br. at 14.

Assuming, arguendo, that the Defendant has satisfied its burden of producing a legitimate, non-retaliatory reason for terminating Ms. Kubas, its motion for summary judgment must still be denied.  Ms. Kubas has presented sufficient evidence for a reasonable jury to find that Defendant's proffered reason for terminating her was merely a pretext for retaliation.

"If the plaintiff establishes a prima facie case, a presumption of illegal discrimination arises, and the burden of production shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action." *Williams*, 2012 U.S. Dist. LEXIS 66249 at 30 (citing *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011) (internal quotations omitted).  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted… [And if] the defendant meets its burden, the plaintiff must then prove, by a preponderance of evidence, that the proffered reason was not the true reason for the employment decision, but was, instead, a pretext for discrimination…" *Id.* at 30-31.

In order to show pretext, "a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact" (*Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019)), or that it is simply "unworthy of credence" (*Bradford*, 2019 U.S. Dist. LEXIS 225637, at *26 (citing *Dugan v. Albemarle Cty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002)).  "Once the plaintiff offers such circumstantial evidence, the case *must be decided by a trier of fact and cannot be resolved on summary judgment*." *Haynes*, 922 F.3d at 225 (emphasis added).  "After taking the evidence in the light most favorable to the plaintiff, any resulting reason to disbelieve the defendant's proffered nonretaliatory reason for the disputed action is certainly sufficient evidence for the plaintiff to overcome a defendant's motion for summary judgment." *Bradford*, 2019 U.S. Dist. LEXIS 225637 at *26.

21

First, Defendant's proffered nondiscriminatory reasons for terminating Ms. Kubas have shifted over time.  Shortly after her termination, Ms. Kubas filed for unemployment.  Ex. 6 at PL Prod. 106-7.  In his response to Ms. Kubas's request for unemployment, Mr. Chisholm told the Division of Unemployment Insurance that she was terminated for working from home without prior authorization.  *Id.*  Mr. Chisholm stated that Ms. Kubas "was supposed to work in the office [on the day she was terminated]," and that "[s]he was required to tell [him] beforehand if she was working at home," but that "[s]he never told [him] she was working at home that day."  *Id.*  He further stated that he "told her why she was being let go…that she had logged in while out of the office after being told she must physically clock in at the office." *Id.*

Not only is this justification significantly different from Defendant's current reasoning, but these statements are false.  Prior to working from home on June 21, 2019, Ms. Kubas obtained permission to do so from Mr. Chisholm. Ex. 6 at PL Prod. 80.  In an email exchange dated June 19, 2019, Ms. Kubas requested "the ability to work from home for the next two weeks," to which Mr. Chisholm responded, "[a]s I stated earlier today, I am good with you working from home."  *Id.*

After realizing that it could not rely on this patently false justification, Defendant shifted its argument to its current position: that Ms. Kubas was terminated for failing to clock in and out properly.  Defendant's motion for summary judgment still fails because Ms. Kubas can show that this justification for terminating her is pretextual based on its selective enforcement of timekeeping policies.  "An employer may enforce generally applicable employment policies against its employees without creating a cause of action for retaliation…but…[if] defendant only enforced the policy after [an employee] engaged in protected activity, a reasonable jury could determine that the employer's conduct was retaliatory, based on its selective enforcement…"

*Williams*, 2012 U.S. Dist. LEXIS 66249 at *46 (citing *Wells v. Gates*, 336 F. App'x 378, 385 (4th Cir. 2009).

Defendants allege that Ms. Kubas was fired for failing to clock in and out (even though she clocked in at her daughter's doctor's appointment).  Def. Br. at 14.  However, Ms. Kubas's alleged timekeeping faux pas did not become a problem for either Mr. Conway or Mr. Chisholm until after her Verbal Complaint in June 2019.[13]   For example, in April 2019, Mr. Conway had no issue with adjusting Ms. Kubas's hours based on her representation of the hours she worked. Ex. 2 (Conway Dep.) at 95:21-96:21; Ex. 6, PL 8-9.  Prior to Ms. Kubas making her complaint, she was a model employee and according to Mr. Conway, there were no issues with her performance. *Id.* at 116:19 – 118:11.  Ms. Kubas was described by Mr. Chisholm and Mr. Saab as a trusted, helpful, invested employee and friend. Ex. 3 (Chisholm dep.), at 93:18 – 94:14; Ex. 4 (Saab dep.), at 106:13 – 107:22.  After her complaint, however, Ms. Kubas was portrayed as a time stealing thief.  As Defendant pointed out in its brief, Ms. Kubas was disciplined for her timekeeping deficiencies four times in the five days in preparation for her termination.  Def. Br. at 16.  Within a few short weeks Ms. Kubas went from an invested and trusted employee to being terminated for stealing time.

Ms. Kubas was not the only employee who made timekeeping errors, but she was the only employee who was fired, or even disciplined for it.  Ex. 2 (Conway dep.), at 93:18 – 110:20; Ex. 3 (Chisholm dep.), at 38:22 – 39:15, 66:4-69:14, 73:14-21, 137:11-17.  In fact, so many employees routinely made errors clocking in and out, to the point that there was an entire

---

[13] Prior to her complaint to Mr. Chisholm, there were no issues taken with Ms. Kubas's timekeeping errors. See, e.g., Ex. 6, PL 8-9. However, after her complaint, both Mr. Chisholm and Mr. Conway reprimanded Ms. Kubas for her failure to clock in/out as they saw fit. Ex. 6 at PL 10, 31; Ex. 5 (Chisholm Aff.) at 331B 38, ¶ 30; Ex. 5 (Conway Aff.) at 331B 20, ¶ 16-17; Ex. 1 (Kubas dep.), at 140:13 – 141:15.

Slack group dedicated to correcting these timekeeping errors. Ex. 2 (Conway dep.), at 91:1-93:8; Ex. 5 at 331B 206-222 (slack forum messages).

Third, Defendant's purported reasoning for terminating Ms. Kubas is simply disingenuous. On the date of Ms. Kubas's termination on June 21, 2019, Mr. Chisholm agreed to let her work from home he specifically asked her to "clock in everyday" in order to "avoid any possible conflict between [her] and [Mr. Conway]." Ex. 6 at PL Prod. 80. Yet, Mr. Chisholm took issue with Ms. Kubas clocking in to work that day and now claims that she was stealing time even though he was the one who requested her urgent assistance with a work-related matter that morning. Def. Br. at 14. Mr. Conway even acknowledged that she was following his instructions when she clocked in at her daughter's appointment to answer Mr. Chisholm's questions about the amount of the deposits. Ex. 2 (Conway dep.), at 156:22-158:10. In sum, Ms. Kubas followed her employer's instructions by clocking in to work before performing her duties.

The reality is that Ms. Kubas was fired for her protected activity. The morning of her termination, Mr. Chisholm learned that a rumor was spreading through the gym about Ms. Kubas's allegations of sexual harassment. He literally interrogated her on this issue and accused her of being the source of the rumor moments before firing her. Ex. 5 (Chisholm Aff.) at 331B 38, ¶ 32. Mr. Chisholm, by his own admission, told Ms. Kubas that these rumors "could 'spread like a cancer' and were very harmful to the Gym." *Id.* at 331B 38, ¶ 32. Ms. Kubas asserts that Mr. Chisholm used the term "cancer" to specifically refer to her and Ms. Williams due to their complaints concerning Mr. Conway's sexual harassment. Moreover, prior to Ms. Kubas even meeting with Mr. Chisholm that day, he told Mr. Saab that he was going to fire her. Mr. Chisholm was not concerned with Ms. Kubas's whereabouts that morning, but rather with his reputation and the reputation of his business due to her protected activity.

24

Taking the above evidence into consideration, a reasonable jury could find that Defendant's proffered nonretaliatory reason for terminating Ms. Kubas is unworthy of credence. As such, Defendant's motion for summary judgment must be denied.

### IV.   CONCLUSION

Contrary to Defendant's arguments, Ms. Kubas has set forth a *prima facie* case of retaliation.  She has proven that she engaged in protected activity by reporting allegations of sexual harassment to her employers and that she was terminated less than one month later. Moreover, she has sufficiently alleged a causal connection between her protected activity and her termination, and, further, that Defendant's proffered reason for terminating her was pretextual.

Accordingly, Ms. Kubas respectfully requests that this Court deny Defendant's motion for summary judgment.

Respectfully submitted,

Date:        December 3, 2021                      _____*/s/ Sundeep Hora*_____
Sundeep Hora (M.D. Bar. No. 28208)
ALDERMAN, DEVORSETZ & HORA PLLC
1025 Connecticut Ave., NW
Suite 615
Washington, D.C. 20036
Tel. 202.969.8220
Fax 202.969.8224
E-mail: shora@adhlawfirm.com

**Attorneys for Plaintiff**