# EXHIBIT 1

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MARYLAND

 3                  Northern Division

 4    -------------------------x

 5    KIMBERLY KUBAS,              :

 6              Plaintiff,    :

 7       v.                      :  Civil Action No.

 8    331B, LLC                   :  1:20-cv-2456

 9    (D/B/A ROCKWELL FITNESS), :

10              Defendant.    :

11    -------------------------x

12                     Potomac, Maryland

13                     Thursday, August 5, 2021

14    Video Conference Deposition of:

15                     KIMBERLY KUBAS,

16    the Plaintiff, called for examination by counsel

17    for the defendant at MGB Reporting, 9805 Korman

18    Court, Potomac, Maryland, commencing at 9:48 a.m.

19    before Matthew Kwong, via video conference,

20    Court Reporter and Notary Public for the State

21    of Maryland, and were present on behalf of the

22    respective parties:
```

Kimberly Kubas

Page 6

1  though we are doing this virtually, it's
2  important that we try our best to allow each
3  other to finish our thoughts.  So allow me to
4  finish the questions and I'll do my level best
5  to allow you to finish your answers so that it
6  can be adequately recorded and transcribed by
7  the court reporter and that we're not speaking
8  over each other.
9         Sometimes people get into a
10  conversational tone like we would in a normal
11  conversation where we are both kind of speaking
12  at the same time.  That's fine, except it's
13  difficult for the court reporter to ultimately
14  transcribe that.
15         The other instruction that I would ask
16  you to try to do your best to comply with is to
17  answer questions fully verbally.  By that, what
18  I really mean is some people tend to have
19  tendencies for the word, "No," to say, "Uh-uh,"
20  and for the word, "Yes," to say, "Uh-huh."
21  Well "Uh-Uh" and Uh-huh" sound very much alike
22  on the transcript.  Obviously they mean two

Page 7

1  totally different things.  So even though we can
2  see you shaking your head or nodding, it's
3  important that you try to answer the questions
4  fully and verbally so we get an accurate
5  transcript.
6         Is that okay?
7      A.  Yes.
8      Q.  Ms. Kubas, how old are you?
9      A.  40.
10      Q.  When did you first come to work at
11  the gym facility that is now known as Rockwell?
12      A.  It was May of 2006.
13      Q.  When you came to work there in May of
14  2006, do you recall who the owners of the gym
15  were?
16      A.  It was Bob Seeman -- sorry he was the
17  CEO.  It was Morrie, I believe the last name
18  was Goldman.
19      Q.  When you first came to work, what was
20  the name of the gym that's now known as
21  Rockwell?
22      A.  Sport Fit.

Page 8

1      Q.  The position that you took when you
2  first came to work for what was then known as
3  Sport Fit, what was your job?
4      A.  At the time it was childcare
5  attendant.
6      Q.  How long did you work within the gym
7  as a childcare attendant before your
8  responsibilities or job duties shifted?
9      A.  It's just an estimation.  I didn't
10  have access to my personnel file which would
11  help me with the dates.  I would say
12  approximately a year or two.  Maybe less.
13      Q.  You've had sexual relations with
14  Devin Conway?
15      A.  Yes.
16      Q.  Do you recall when that occurred?
17      A.  It was -- I don't have the exact
18  month.  I believe it was August 2017, maybe
19  July.  Around that period.
20      Q.  Would it be fair to say sometime in
21  summer of 2017?
22      A.  Yes.

Page 9

1      Q.  Did you have sexual relations with
2  Mr. Conway on more than one occasion?
3      A.  No.
4      Q.  Where did these relations occur?
5      A.  Well there was one relation.  Can you
6  specify the question, please?
7      Q.  Sure.
8         In what physical place, meaning a
9  home, a business, a car, an apartment, a hotel,
10  wherever you associated did you have sex with
11  Mr. Conway?
12      A.  It was at his home.
13      Q.  After you stopped being a childcare
14  attendant with what was then Sport Fit, what
15  job did you transition into or what did you next
16  do for the business?
17      A.  I was childcare manager.
18      Q.  Was that a full-time position or
19  part-time position?
20      A.  It was part time.
21      Q.  How long roughly did you stay in that
22  position as the childcare manager?

3 (Pages 6 to 9)

**Kimberly Kubas**

Page 10

1    A.  Once again I wish I had my file.  I
2  would say a couple of years.
3         Q.  You've alleged that Devin Conway
4  sexually harassed you, are you aware you made
5  those allegations in this lawsuit?
6    A.  Yes, I am aware.
7         Q.  Are you alleging that Mr. Conway's
8  sexual harassment also included unwanted sexual
9  or physical touch, meaning that he physically
10 touched you as opposed to verbal statements or
11 other actions?
12   A.  Yes.
13        Q.  Can you name for me every situation
14 that you recall where Mr. Conway
15 committed unwanted physical touching of you?
16   A.  Okay, let me begin.  There were a
17 couple of instances where I would walk down a
18 hallway.  My office was at the end of the
19 hallway.
20        He would collide with me, rub against
21 my body, kind of blocking.  He would stand in
22 front of me and just sort of bump into me and

Page 11

1  rub against me.
2         I believe it was twice he came to my
3  office.  My back -- the way my office was set up
4  my back is to the door.  So people would come
5  in.  I would not know who was coming in.
6         He came in, shut the door, came up
7  behind me, and groped me.  And then during
8  training he would touch me.  Same -- similar
9  situations.  Not the full on groping, but the
10 rubbing against me, pretending to bump into me,
11 things of that nature.
12        Q.  Let's get a little more specific.
13        Do you recall dates, weeks, or months
14 when you believed that Mr. Conway in your words,
15 "collided" with you in the hallways of the
16 business?
17   A.  Honestly, I don't recall specific
18 dates.  I know within a year.  But it happened
19 quite often so I can't pin down an exact date.
20        Q.  Was it happening in the calendar year
21 2019?
22   A.  I don't recall.

Page 12

1         Q.  Was it happening in the calendar year
2  2018?
3    A.  Yes.
4         Q.  Do you recall the last time that you
5  remember Mr. Conway allegedly engaging in one of
6  these situations where he, in your words,
7  "collided" with you in the hallways?
8    A.  Once again I don't have a specific
9  date.  I would say he started -- he sort of
10 stopped in 2019.  So it was before that.
11        Q.  Did you ever notify or tell Mr. Conway
12 that you did not want him to, in your words,
13 "collide" with you or touch you in these
14 hallway encounters?
15   A.  Yes.
16        Q.  When did you tell him that?
17   A.  Right after he would do it.  I said
18 something to the effect of, "That's gross," or
19 -- because he was sweaty.  So I remember saying,
20 "Don't bump into me."  Something to that effect.
21        Q.  You were disturbed because he was
22 sweaty, presumably he had been working out or

Page 13

1  working in the gym?
2    A.  Sweaty and in addition I just didn't
3  feel comfortable with people around -- him
4  colliding into me.  It was embarrassing.
5         Q.  Did you make any of these statements
6  or remarks to Mr. Conway in any form other than
7  verbally, meaning did you text him, did you
8  email him, did you put him on any written
9  notice?
10   A.  No.
11        Q.  Was there anyone present within what
12 you believe to be reasonable earshot that they
13 could overhear the conversations between you
14 and Mr. Conway during any of these alleged
15 instances where he, in your words, "collided"
16 with you in the hallways?
17   A.  To be honest, there were people
18 walking by.  We are in a gym.  There are people
19 around.  I can't surmise if there was a specific
20 person that heard.  It's unlikely.  It was
21 usually when I was walking down the hall and not
22 many people were around.  I really can't

**MGB REPORTING, INC.**
**(301)983-9315 - mgbreporting.com**

Kimberly Kubas

Page 14

1    speculate on that.
2        Q.  Let me retract that and I'll ask you
3    this.
4            You understand that at a certain point
5    in time a new business entity, which I'll
6    stipulate known as 331B, LLC, took ownership of
7    the gym, do you recall that?
8        A.  Yes.
9        Q.  Do you recall roughly when that
10   occurred?
11       A.  We had Sport Fit.  It changed to
12   Rockwell.  And then I want to say -- I honestly
13   can't remember -- not that long.  I think they
14   took over sometime in maybe 2018.  But I could
15   be wrong.
16       Q.  After the new ownership group took
17   control of the gym, which we'll call Rockwell
18   if we're both understanding what we mean by
19   that.  After the new ownership group took
20   control of Rockwell, did you notify any of the
21   new ownership groups, members, or management
22   about Mr. Conway allegedly colliding with you in

Page 15

1    the hallways or rubbing up against you without
2    your consent?
3        A.  I just want to specify it became
4    Rockwell with the owner before 331B, LLC.  So I
5    want clarification.  You're referring to when
6    Brian took ownership, not when it became
7    Rockwell, correct?
8        Q.  Right, when I say Rockwell I just mean
9    the gym.
10       A.  Okay.
11       Q.  After 331B, LLC, took ownership of the
12   gym, which you just testified you are positive
13   that you believe it was some point in time in
14   2018.
15           After that point in time, did you ever
16   notify any of the ownership group or management
17   about these alleged instances where you claim
18   Mr. Conway collided with you in the hallways or
19   rubbed up against you?
20       A.  Yes.
21       Q.  When did you notify 331B, LLC and who
22   did you notify?

Page 16

1        A.  I notified Mr. Chisholm.  I believe it
2    was early June of 2019.
3        Q.  If I understand your testimony
4    correctly, you stated that you don't believe
5    that Mr. Conway actually engaged in any of these
6    alleged colliding or bumping into you during
7    2019, correct?
8            MR. HORA:  Objection.
9            THE WITNESS:  Like I said --
10           MR. HORA:  Please continue, Mr.
11   Buckel.
12           BY MR. BUCKEL:
13       Q.  Is that correct?
14           MR. HORA:  Objection.  Misstates her
15   testimony.  Go ahead and answer.
16           THE WITNESS:  Like I said it's
17   rough dates.  It was approximately 2019.
18   Devin became manager April of 2019.  So
19   it's possible it continued into early '19.
20   It was a regular occurrence.  Like I
21   stated I can't give specific dates.
22           BY MR. BUCKEL:

Page 17

1        Q.  When you say, "It was a regular
2    occurrence," how often did this happen on a
3    weekly or monthly basis?
4        A.  I would say weekly.
5        Q.  Yet you never notified or commented on
6    these alleged instances in which Mr. Conway, in
7    your words, "collided" with you in the hallways
8    inappropriately until June of 2019?
9        A.  Correct.
10       Q.  You also said that on two occasions
11   Mr. Conway came into your office in your words,
12   "Groped me" or groped you.  Specifically
13
14   exactly what are you alleging that Mr. Conway
15   did on those two occasions?
16       A.  I'm assuming you want specifics.
17       Q.  Yes.
18       A.  I'll try to be as specific as I can.
19   Like I stated earlier, I do have a small office.
20   I didn't mention that.  I couldn't see who was
21   coming to my office.  Normally people would
22   knock because they know I'm going to be a little

MGB REPORTING, INC.
(301)983-9315 - mgbreporting.com

Kimberly Kubas

Page 18

1  scared.  My back is facing the door.  He came
2  into my office.  I assumed it was something he
3  needed to tell me about work or for that matter.
4  He came up behind me, put his arms behind me --
5  I know it has to be verbal -- but he put his
6  arms behind me and groped my breast and my body,
7  just rubbing all over.
8      Q.  You stated that this occurred on two
9  occasions.  Can you tell me with specificity to
10 the best that you can recall when these two
11 occasions were?
12     A.  I know for a fact the two occasions
13 occurred within a few months of each other.  As
14 far as years, dates, and times -- to be honest I
15 tried to block it out.  I would estimate it
16 definitely happened between 2017 and 2018 time
17 period.
18     Q.  I don't want you to make something up
19 if you can't remember, but that's a fairly
20 broad time period.  In the summer of 2017, you
21 testified that you at least on one occasion had
22 consensual sexual relations with Mr. Conway,

Page 19

1  correct?
2      A.  Correct.
3      Q.  Was the instance where you're now
4  claiming that he, in your words, "groped" you as
5  you've described on these two occasions that
6  you've testified were very close together in
7  time, how close in time were they to your
8  recollection when you had sex with him?
9      A.  I believe -- once again I've stated
10 this three times.  I cannot remember exact dates.
11 I believe it was after the encounter, but I
12 could be wrong.
13     Q.  So it's possible that these two
14 instances happened before you had sex, it's
15 possible it may have happened after you had sex,
16 but it wasn't in 2019?
17     A.  I do not think it was in 2019.
18     Q.  Did you ever advise the prior
19 ownership and prior management of the gym --
20 we'll just call it Rockwell, whether it was
21 called Rockwell or Sport Fit it doesn't matter
22 to me.  We're just talking about the gym.

Page 20

1      Q.  Did you ever advise the prior
2  ownership and prior management before 331B, LLC,
3  assumed ownership of any of these instances
4  involving alleged sexual harassment or groping
5  by Mr. Conway?
6      A.  I believe I stated earlier that the
7  first complaint I made was in June of 2019.
8      Q.  If Mr. Conway was coming into your
9  office and groping you on multiple occasions in
10 2017 and 2018, why didn't you advise anyone of
11 that?
12     A.  Why didn't I report sexual harassment,
13 is that the question?
14     Q.  My question is exactly what it is.
15     Why didn't you advise someone in 2017
16 or 2018 of Mr. Conway's behavior?
17     A.  I was nervous.  I didn't want to lose
18 my job.  When I did eventually report it, I
19 ended up losing my job.  And it was always a
20 fear.
21     Q.  Were you afraid of the prior
22 management and ownership group as well because

Page 21

1  they certainly would have owned the gym in 2017
2  or up until the last few months of 2018,
3  correct?
4      A.  I was not afraid of anybody per say.
5  I was afraid of losing my job.  What led me to
6  finally report Devin was because of the other
7  women -- the younger women that had come up to
8  me.  And at that point, I felt an obligation.
9      I've been through it.  I didn't want
10 it to happen to younger women.  And that is what
11 led me to finally have the courage to report his
12 behavior.
13     Q.  Ms. Kubas, is it possible that these
14 instances where you claim Mr. Conway groped you
15 from behind, didn't you testify that that may
16 have occurred before you had sex with him?
17     A.  Once again I think I answered that.
18     Q.  You can't remember --
19     A.  I remember --
20     Q.  -- if he groped you before you had sex
21 with him or after you had sex with him?
22     MR. HORA:  Objection.

6 (Pages 18 to 21)

Page 26

1       MR. HORA:   Just to be aware that we
2   are having a little bit of a lag.  It's not
3   a problem.  Go ahead, sorry.
4       MR. BUCKEL:   At any point in time you
5   can't understand what I'm saying or the
6   court reporter (inaudible) let us know and
7   we'll do our best to redo it.
8       MR. HORA:   It's breaking up again.
9   But that's okay.  We can proceed.
10      BY MR. BUCKEL:
11      **Q.  Ms. Kubas, can you hear me accurately**
12  **now?**
13      A.  I can.  It's a little lagging and I'll
14  let you know.  I can hear you.  Just the
15  movement is lagging.  But I'll let you know if I
16  can't hear you.
17      **Q.  Thank you.**
18          **We had discussed two different**
19  **categories that you've described to me where you**
20  **allege that Mr. Conway touched you.  You said he**
21  **collided with you.  I think your words were,**
22  **"frequently in the hallway."  On two occasions**

Page 27

1   **you allege that he came into your office and in**
2   **your words "groped" you, which you've described.**
3          **You've also said that during training**
4   **I believe your testimony was that Mr. Conway**
5   **did not quote unquote, "grope" during**
6   **training, but he would bump into you or rub up**
7   **against you.**
8          **Can you describe with more**
9   **specificity when that occurred and what you mean**
10  **by saying that he bumped into you?**
11      MR. HORA:   Objection to form.  Go
12  ahead and answer.
13      THE WITNESS:   Once again it was
14  during training sessions.  I trained with
15  him I believe from -- again I'm estimating
16  -- 2016 through maybe early 2019.  So it
17  was a couple year period.  So I cannot
18  nail down the months.  I'm sorry.  I can't.
19  But I can describe the harassment.
20      It was an open training room.
21  Obviously we are close.  We are working
22  out.  I would be doing an exercise.  He

Page 28

1   would come up behind me and just rub
2   against me.  Or if I'm doing an exercise
3   he'll come and under the guise of helping,
4   he would come behind me and just sort of
5   push against my body, against my backside,
6   that kind of situation.
7       BY MR. BUCKEL:
8       **Q.  You continued to train with Mr. Conway**
9   **as a personal trainer for --**
10          **(inaudible)**
11      MR. HORA:   You froze.
12      THE WITNESS:   Yes.
13      MR. BUCKEL:   -- after you had sex
14  with --
15      MR. HORA:   It's frozen.
16      MR. BUCKEL:   -- and after you allege
17  that he came into your office --
18      MR. HORA:   Mr. Buckel, if you can
19  hear me, you are frozen on our screen.  The
20  last thing that I heard was, "You continued
21  to train with Mr. Conway," and then it kind
22  of froze after that.  I think the court

Page 29

1   reporter is shaking his head.
2       MR. BUCKEL:   Can you guys hear me
3   now?  I hate Zoom.
4       MR. HORA:   I know.  Yes, I can hear
5   you now.  Ms. Kubas, can you?
6       THE WITNESS:   I can now.
7       MR. BUCKEL:   Okay.
8       MR. HORA:   I'm only going to
9   interrupt you, sir, if I feel it's getting
10  to the point where we can't hear you.  I'm
11  not trying to interrupt you.  If you could
12  please repeat your question again?
13      MR. BUCKEL:   That's fine.  I
14  appreciate that, Mr. Hora.  You guys all
15  completely froze on my screen there as well
16  so I knew something was wrong.  I believe
17  my question was this if I can go back.
18      **Q.  Based upon what you just testified,**
19  **Ms. Kubas, that you trained with Mr. Conway**
20  **from 2016 into early 2019, is it then fair to**
21  **assume that you continued to personally train**

**MGB REPORTING, INC.**
**(301)983-9315 - mgbreporting.com**

**Kimberly Kubas**

Page 34

1    answer?
2         THE WITNESS:   Just that he was a dad.
3    He came there to train to kind of obviously
4    relax.  I don't see what benefit he would
5    have to report.  But that's just my
6    opinion.
7    BY MR. BUCKEL:
8         Q.  To your knowledge, this individual
9    named Kirk also never reported anything about
10   these alleged instances of sexual touching or
11   inappropriate touching during training sessions
12   to anyone?
13        A.  To my knowledge, no.
14        Q.  We talked a little about alleged
15   physical acts of inappropriate touching or
16   sexual touching.  I now want to direct your
17   attention and get all the information we can.
18        Are you alleging that Mr. Conway made
19   statements or communications to you either
20   verbally, through text messages, or otherwise of
21   an unwanted sexual nature?
22        A.  Yes.

Page 35

1         Q.  Can you tell me to the best of your
2    recollection all of the communications that you
3    can recall that you are alleging that Mr. Conway
4    made to you over unwanted sexual nature?
5         MR. HORA:   Objection to form.  Go
6    ahead and answer.
7         THE WITNESS:   The example that sticks
8    in my mind was just the nicknames he'd
9    refer to me as in our training group.  He
10   wouldn't even call me by my name.  He would
11   say, "This is hot buns."  And it was
12   continuous.
13        I recall at one point we were doing an
14   exercise with ropes where you shake the
15   ropes.  And he went up next to me and
16   simulated masturbation.  He would name
17   exercises different sexual names.  So it
18   was that kind of verbiage.
19   BY MR. BUCKEL:
20        Q.  Anything else that you can recall?
21        A.  That's the general vibe.
22        Q.  No specific text messages sent to you

Page 36

1    over sexually harassing or of a demeaning
2    nature?
3         A.  Interestingly enough, I think he -- in
4    my opinion -- I think he knew better.  But no,
5    nothing that I can recall through texts.
6         Q.  Did he call you the nickname, "Hot
7    buns," in or around the office and other
8    individuals who were in management of the
9    company?
10        A.  It was generally during training
11   sessions.
12        Q.  During these training sessions, would
13   anyone that you can recall have the opportunity
14   to overhear him using that term or nickname for
15   you?
16        A.  As I answered previously, the only
17   person would have been Kirk.
18        Q.  Do you know of anyone else to your
19   recollection who ever overheard Mr. Conway refer
20   to you as, in your words, "Hot buns?"
21        A.  Once again the only person that was in
22   our group when he would use those terms was

Page 37

1    Kirk.
2         Q.  So the answer is no, other than Kirk
3    you are not aware of anyone else who would have
4    heard him say these things to you?
5         MR. HORA:   Objection.  Asked and --
6         THE WITNESS:  I can't --
7         MR. HORA:   Hold on.
8         Objection.  Asked and answered.  You
9    can answer.
10        THE WITNESS:   I can't speculate.
11   Maybe somebody did.  Maybe they didn't.  I
12   don't know.
13   BY MR. BUCKEL:
14        Q.  Did anyone else ever discuss this
15   situation with you and had a conversation with
16   you about; Hey, Mr. Conway calls you hot buns
17   or I heard he called you this, or anything to
18   that effect?
19        A.  The one conversation as I stated
20   previously with Kirk.  We were leaving and he
21   said something to the effect of; Wow, if I
22   treated women this way at my job, I would be

10  (Pages 34 to 37)

**Kimberly Kubas**

Page 38

1  fired for sexually harassed.  And that's a
2  conversation I do recall having with Kirk at
3  one point.
4      Q.  You can't recall Kirk's name and other
5  than Kirk, there is no one?
6          I just want to make that clear.
7      A.  I do recall his name.  I can't
8  pronounce it properly.  I believe it was
9  Patouga (ph). It was an odd last name.  I know
10  his last name.  It's just hard to pronounce
11  and I may get it wrong.  But if it's important,
12  I believe that is how you pronounce his last
13  name.
14      Q.  You indicated that there was a
15  situation.  I don't know.  I couldn't tell from
16  your answer if this only happened once or more
17  than once.  So you can clarify, where Mr. Conway
18  was participating or leading you in an exercise
19  where you pull on ropes, is that what you were
20  referring to?
21      A.  Correct.
22      Q.  During this episode -- and you can

Page 39

1  tell me if it happened more than once.  I can't
2  tell from your answer.
3          You claimed that he simulated
4  masturbation.  Did that happen once or more
5  than once, can you explain what you mean?
6      A.  I'll try to explain it in verbal
7  terms.  It's a little difficult without going
8  into too much detail.
9          So the ropes, you would shake.  You
10  would shake the ropes.  It was an arm exercise
11  so I guess it appeared to him as if it's
12  somebody masturbating.
13          So he made the movement of
14  masturbation while I am using the ropes, if that
15  explains it.  Let me know if you want more
16  detail.
17      Q.  Did it happen once or more than once?
18      A.  I know it happened at least once.  It
19  could have been more.  I trained weekly so there
20  were many instances.
21      Q.  When you say you know it happened at
22  least once, when did it happen?

Page 40

1      A.  Once again that period of time I
2  trained with him, I cannot tell you the month.
3  It blurs together because I trained every week.
4  So I'm sorry, Mr. Buckel.  I can't pin down an
5  exact month or day.  But it was between the
6  periods of 2017 and 2018.
7      Q.  Was it before you had sex with Mr.
8  Conway or after you had sex with Mr. Conway,
9  this instance where you claim that he simulated
10  masturbation?
11      A.  Once again I can't recall.
12      Q.  You also said as part of what you
13  testified about any non-physical, or mainly
14  verbal alleged sexual harassment from Mr.
15  Conway, that he named exercises with "sexual
16  names," in your words.
17          Can you describe for us what exactly
18  you are referring to?
19      A.  The one that stands out because it
20  appears in a text message -- it was an exercise
21  where you lay down and you sort of -- it's a leg
22  exercise.  So it's like clam.  You open and

Page 41

1  close your legs.  It's a glut exercise and I
2  recall Devin telling us the name of the exercise
3  was called, "Butt spreaders."
4          That's one example of many instances
5  where he sexualized exercises.  I kind of felt
6  as if it's -- I was the only women in the group
7  so it felt, you know, offensive.
8      Q.  Did this individual, Kirk, did he
9  participate in all of these training sessions
10  with you from 2016 through 2019?
11      A.  He did except for the few times where
12  he couldn't make it.  But other than that, yes.
13      Q.  Did you ever use the phrase, "Butt
14  spreaders," in a text message?
15      A.  Yes.
16      Q.  Did Mr. Conway ever use that phrase to
17  your recollection in any messages directed
18  towards you?
19      A.  Not in a text message.  He coined the
20  term in training.  He made up that term -- the
21  previous session.
22      Q.  Do you know an individual by the name

11  (Pages 38 to 41)

Kimberly Kubas

Page 42

1  of Bobbi Beers?
2      A.  Yes.
3      Q.  **How long have you known Bobbi Bears?**
4      A.  I don't recall when she started.  I
5  would estimate maybe two, couple of years.
6      Q.  **Two, couple of years from today?**
7      A.  I'm sorry.  A few years.  I don't
8  recall when she started.  But I knew her from
9  the time she started until I was terminated, so
10  a few years give or take.
11      Q.  **You weren't friends or acquaintances**
12  **with Ms. Beers prior to her working with the**
13  **gym, is that fair?**
14      A.  I wasn't friends before, no.
15      Q.  **How many hours a week on average do**
16  **you believe that you worked while under the**
17  **employer of 331B, LLC?**
18      A.  I would estimate eight to 10.
19      Q.  **Did you ever have a conversation with**
20  **Ms. Beers about Mr. Conway or his behavior?**
21      A.  Yes.
22      Q.  **Have you had an opportunity in**

Page 43

1  connection with this litigation to review an
2  affidavit that Ms. Beers submitted?
3      A.  Yes.
4      Q.  **Are you aware that Ms. Beers' claims**
5  **differ from your allegations in the complaint?**
6      A.  Yes.
7      Q.  **Do you think Ms. Beers is lying?**
8      MR. HORA:  Objection.  Calls for
9  speculation (inaudible).
10      THE WITNESS:  Yes.
11      BY MR. BUCKEL:
12      Q.  **Tell me about any conversation, just**
13  **list them out, that you claim you ever had**
14  **verbally, or via text, or any other forms of**
15  **communication with Ms. Beers regarding Mr.**
16  **Conway?**
17      MR. HORA:  Objection (inaudible).
18      THE WITNESS:  I believe there could
19  have been little things previously.  But
20  the one that I obviously recall is the
21  night of the benefit.
22      MR. HORA:  By the way, I was on mute.

Page 44

1  I had just objected as to the form of that
2  question.  I was on mute.  I have now
3  unmuted myself.  But just for the record.
4  Go ahead.
5      BY MR. BUCKEL:
6      Q.  **The night of the benefit, can we agree**
7  **that was in May of 2019?**
8      A.  Yes.
9      Q.  **What is your recollection of what any**
10  **conversations or communications you had with Ms.**
11  **Beers that evening?**
12      MR. HORA:  Objection to form.  Go
13  ahead and answer.
14      THE WITNESS:  I recall Ms. Beers at
15  some point coming up to me and telling me
16  that she wanted to discuss something to me
17  regarding Devin.  I asked her what's going
18  on.  She told me that he was interested in
19  her and possibly dating her, but he was
20  making her feel uncomfortable.  She was
21  also a trainer so she spent a lot more time
22  in the room with him.  Saying that he would

Page 45

1  harass.  Similar stories like I had told
2  you, similar instances.
3      She also disclosed that he would show
4  up at her home unannounced and she felt it
5  was creepy.
6      She also told me that, "I'm nervous,"
7  at this point he was director so he was in
8  charge of delegating clients to the other
9  trainers.  She clearly told me she was
10  worried about her job.
11      If she was to stand up to him or
12  reject him, she was worried about her
13  livelihood.  In other words, he wouldn't
14  assign her clients.  He would ostracize
15  her.  That's the jist of what she had told
16  me regarding Devin that night.
17      BY MR. BUCKEL:
18      Q.  **Where did this conversation occur?**
19      A.  We began talking in the hallway, but
20  it's pretty open.  There's a lot of people
21  floating around.  I recall her saying, "Let's go
22  somewhere a little more private," because Devin

12  (Pages 42 to 45)

**Kimberly Kubas**

Page 46

1  was also in attendance and obviously I don't
2  think she'd want him to overhear.
3      So we ended up in the women's locker
4  room and finished the conversation.
5      Q.  How inebriated were you that evening?
6      MR. HORA:  Objection to form and
7  vague as to time.  Go ahead and answer.
8      THE WITNESS:  At that time, I was
9  not.  When we had our conversation, I was
10  not inebriated.  I had maybe a couple of
11  drinks, but that's it.
12      BY MR. BUCKEL:
13      Q.  Did you ever admit or communicate to
14  others that you were inebriated that evening the
15  night of the benefit?
16      A.  Yes, so I don't know if you want me to
17  go into more detail.  That was after our
18  conversation.  Bobbi and I ended up going out
19  together and spending time outside after the
20  benefit at which point, then I was inebriated.
21      Q.  Did you tell Ms. Beers anything about
22  Mr. Conway?  You've testified as to what you

Page 47

1  allege she told you.
2      What did you tell her to your
3  recollection?
4      A.  I recall she asked me for advice.  At
5  the time I didn't know if she knew anything
6  about Devin.  I didn't know what her angle was,
7  but I was honest.  I told her, "Look, I know
8  what you mean.  He's been doing it to me.  If
9  you need my advice, my advice is," you know,
10  "Don't be scared.  Just say something.  Do
11  something.  Don't let him intimidate you."
12      I said, "Trust me, he's been like this
13  with me for a while," you know, "I believe you,"
14  kind of thing.  I felt as if I was helping her.
15      The jist is I just felt at the time
16  by disclosing my situation with Devin, it would
17  help her process her situation with Devin.
18      Q.  Did you disclose to Ms. Beers that
19  evening that you had consensual sexual relations
20  with Mr. Conway?
21      A.  I don't recall if she already knew or
22  if I had told her.  But either way, yes.  She

Page 48

1  was aware.
2      Q.  But you remember if you said it or
3  not?
4      A.  I can't recall.  I think she said,
5  "Oh, he told me," but I can't recall if it was
6  before or after I admitted it to her.  But
7  either way she was aware that night that we had
8  a relation, yes.
9      Q.  Are you testifying that you encouraged
10  Ms. Beers to report Mr. Conway's behavior to
11  anyone?
12      MR. HORA:  Objection.
13  Mischaracterizes her testimony.  Go ahead
14  and answer.
15      THE WITNESS:  I don't recall if I
16  said the word, "Report."  I basically said
17  to not let him intimidate you and to not
18  be fearful.  And I might have said
19  something along the lines of; Hey, if he
20  continues, then yes.  This is your
21  livelihood.  If you feel as if he's going
22  to affect the money you make, then yes you

Page 49

1  should say something.
2      BY MR. BUCKEL:
3      Q.  But up until that point in time in
4  May of 2019, according to your testimony you
5  hadn't said anything to anyone about your
6  experiences with Mr. Conway?
7      A.  Yes, that is correct.
8      Q.  At that point in time, were you afraid
9  of Mr. Conway in May of 2019 based upon all this
10  history you've just given us?
11      A.  The word, "Afraid," I feel is very
12  objective.  I felt as if I was somehow under his
13  power, under his control.
14      Q.  Did you ever invite Mr. Conway out to
15  socialize with you and get drinks with you in
16  2018 or 2019?
17      A.  I recall a couple of instances.  At
18  the time I had a coworker named Kat who at the
19  time, you know, she thought Devin was nice.  She
20  wanted his company.  So I do recall her asking
21  if I would kind of correlate a situation where
22  he could come out with her and myself.

13 (Pages 46 to 49)

Kimberly Kubas

Page 70

1  As I stated previously my office is down at the
2  end of the hall so I kind of passed my
3  everybody.  Devin was in the training room.
4  And normally, you know, I'd walk by and say,
5  "Good Morning," like I do with my coworkers.
6          And then I remember him giving me
7  this angry look and just like looking down and
8  then staring at me as I'm walking down in an
9  angry manner.  So I thought to myself;  What is
10  going on?
11     **Q.  Did you have communications with Mr.**
12  **Conway after that or during that day?**
13     A.  During that day, yes.
14     **Q.  What were those communications?**
15     A.  The communications, I remember -- I
16  believe I sent him a text.  I said I felt
17  something was off, you know, obviously.  I
18  believe I asked to meet.  I don't recall if he
19  or I asked, but we obviously ended up meeting
20  in his office.
21     **Q.  Did you consider yourself up until**
22  **that time as being friends with Mr. Conway?**

Page 71

1     A.  I'd say more work acquaintances.  I
2  wouldn't say friends.
3     **Q.  Have you had sex with any other work**
4  **acquaintances in the years that you worked at**
5  **Rockwell?**
6          MR. HORA:   Objection to form and
7  argumentative.  Go ahead and answer.
8          THE WITNESS:  I don't recall.  I
9  mean I was there for 13 years.
10          BY MR. BUCKEL:
11     **Q.  You don't remember when you had sex**
12  **with any other coworkers at the gym?**
13     A.  I had a relationship with somebody,
14  but I don't recall if they worked at the gym at
15  the time or not.  So I can't recall.
16     **Q.  Let's turn back to the day that you**
17  **said you believe you texted Mr. Conway and that**
18  **participated some communication or meeting**
19  **between you, is that fair?**
20     A.  Correct.
21     **Q.  What occurred to your recollection in**
22  **this meeting or conversation?**

Page 72

1     A.  I recall going into his office.  It
2  was just Devin and myself.  I recall him
3  looking visibly angry.  I thought I had an
4  opportunity to talk.
5          I kind of said, "Why are you ignoring
6  me?  You are acting weird.  What's going on?"
7  Because at that point I could just tell he was
8  angry with me at which point he basically said,
9  "I do not want this situation to get out.
10  Bobbi told me everything you talked about.  I
11  can't have this getting out and we need to
12  sweep it under the rug right now and I don't
13  want to hear another word about it."  I recall
14  that because I remember just feeling shocked.
15          He said something along the lines of;
16  If I find out you're telling anyone about
17  this there will be --  something like there
18  will be trouble, consequences, you'll regret
19  it.  Something to that effect.
20          And I felt shocked.  Number one I
21  didn't know that Bobbi would discuss everything
22  to him.  And number two I didn't think he would

Page 73

1  react in that manner.  So I felt very
2  intimidated.
3     **Q.  Did you find it strange that**
4  **according to you Ms. Beers was stating that she**
5  **was being sexually harassed by Mr. Conway, but**
6  **he wasn't upset with her --**
7     **(inaudible)**
8     A.  You're freezing.
9          MR. HORA:  You're freezing on us.
10          MR. BUCKEL:  Everybody freezes,
11  great.  The question that I had, Ms.
12  Kubas.
13          BY MR. BUCKEL:
14     **Q.  Did you find it strange or concerning**
15  **you're alleging that Ms. Beers was complaining**
16  **about a pattern of sexual harassment from Mr.**
17  **Conway --**
18     **(inaudible)**
19          MR. HORA:  You're frozen again.  I
20  think you are going to have to take three
21  on that one.  Still frozen on my end.
22          THE WITNESS:  Same.

19 (Pages 70 to 73)

**Kimberly Kubas**

Page 74

1      MR. HORA:  You might be back now.
2  Do you want to try it again?
3      MR. BUCKEL:  Great.  Can you hear
4  me now?
5      MR. HORA:  Yes.
6      THE WITNESS:  Yes.
7  BY MR. BUCKEL:
8      **Q.  Was it concerning to you at all or**
9  **did you have any thoughts about your claim that**
10 **Ms. Beers was alleging Mr. Conway was sexually**
11 **harassing her, but Mr. Conway didn't seem upset**
12 **with her, only with you, is that your**
13 **testimony?**
14     MR. HORA:  Objection.  Calls for
15 speculation.  Go ahead and answer if you
16 can.
17     THE WITNESS:  At that time, I didn't
18 know how he felt toward Bobbi.  I only
19 know how he reacted towards me.  So I
20 can't say if he was angry or not angry at
21 Bobbi at that time.
22     BY MR. BUCKEL:

Page 75

1      **Q.  In your Answers to Interrogatories**
2  **you claim that Mr. Conway, after speaking with**
3  **you on the date in question that you've**
4  **described, then called Bree Moore into his**
5  **office and repeated the same instructions to**
6  **her.**
7      **Upon what basis do you make that**
8  **statement?**
9      A.  I'm sorry.  I don't understand the
10 question.  On what basis, can you clarify?
11     **Q.  Did Bree Moore tell you that that's**
12 **what happened?**
13     A.  No, I was there.
14     **Q.  You were physically present while**
15 **Bree Moore, Mr. Conway, and you were all having**
16 **a discussion about this?**
17     A.  I was present with Devin initially
18 by myself.  And then I recall -- I don't
19 remember if he asked me to get Bree or he got
20 Bree -- but then Bree came into the office.
21 So it was the three of us at that time.
22     And he basically said the same thing

Page 76

1  to Bree.  He was aware that Bree knew.  So yes.
2      **Q.  What did he tell Ms. Moore?**
3      A.  I recall the same thing like, "We
4  don't want to talk about this anymore.  Don't
5  talk about this.  I don't want to hear anything
6  more about it," same sort of vibe.
7      In other words, he didn't want anyone
8  to have knowledge to appear to talk about it
9  again.
10     **Q.  What did Ms. Moore say in response to**
11 **this?**
12     A.  I don't remember her saying much.
13 She was just kind of like, "Okay."  I don't
14 recall her saying much more than that.
15     **Q.  She just said, "Okay?"**
16     A.  In other words, she just basically
17 said, "That's fine."  There wasn't -- I don't
18 recall her arguing with Devin or anything like
19 that.
20     **Q.  What did you say in response to these**
21 **statements from Mr. Conway?**
22     A.  I didn't.  I actually don't recall

Page 77

1  saying much either.  I remember feeling upset,
2  kind of thrown under the bus so to speak.  I
3  felt shocked because I felt like I didn't
4  expect Bobbi to relay everything to Devin, you
5  know.  So I remember kind of freezing and
6  sitting there and wanting to get out of there.
7      **Q.  You didn't leave that meeting on May**
8  **13th and communicate anything about any of this**
9  **to Mr. Chisholm, Mr. Saab, or anyone connected**
10 **with 331B, LLC?**
11     A.  When you say, "connected," you are
12 referring to the owners, correct?
13     Q.  Yes.
14     A.  At that point, I did not.
15     **Q.  Did you leave that meeting and**
16 **recount what Mr. Conway had told you to anyone**
17 **else?**
18     A.  Maybe a friend.
19     **Q.  What would that friend's name be?**
20     A.  I can't recall.  I'm pretty sure I
21 had called one of my friends.  I remember being
22 upset.  I can't recall who.

**MGB REPORTING, INC.**
**(301)983-9315 - mgbreporting.com**

**Kimberly Kubas**

Page 98

1  recall if she was still in our
2  conversation at that point.
3      MR. BUCKEL:  Okay.  (inaudible).
4      MR. HORA:   You're frozen now for
5  us.
6      MR. BUCKEL:  (inaudible).
7      MR. HORA:  We cannot hear a thing.
8  The picture is frozen as well as your
9  audio is not coming through.
10     Mr. Buckel can you hear us?  Or Mr.
11 Beeman?
12     MR. BEEMAN:  Sundeep, can you hear
13 me?
14     MR. HORA:  I can hear you and I can
15 see you.  But I think Mr. Buckel --
16     MR. BEEMAN:  His computer keeps
17 logging him in and out or our internet
18 connection for whatever reason doesn't
19 seem to be stable enough.
20     (Discussion was held off the record)
21     (11:39 a.m. - 11:53 a.m.)
22     BY MR. BUCKEL:

Page 99

1      Q.  Ms. Kubas, what I want to tell me
2  is -- and I don't mean to ask you for different
3  things.  Just one dimensional -- same path with
4  all these disruptions.
5      Is the first time that you ever
6  notified anyone from 331B, LLC, your employers,
7  about your allegations concerning Mr. Conway
8  was that a telephone conversation on June 1st,
9  2019?
10     MR. HORA:  Objection.  Asked and
11 answered and to the extent you are
12 mischaracterizing her testimony.  Go
13 ahead.
14     THE WITNESS:  Yes, like I said I
15 don't recall if it was the 1st, but it
16 was in June.  That was the first -- it was
17 verbal conversation, yes.
18     BY MR. BUCKEL:
19     Q.  That's what I'm looking to get.  I
20 don't want to mischaracterize you.  I don't
21 want ask and answered from you.
22     I want you to tell me the first time

Page 100

1  that you ever communicated a concern about
2  Devin Conway in a sexual harassment context to
3  anyone at 331B, LLC?
4      And when you tell me, I want you to
5  tell me the day to the best you can recall and
6  I want you to tell me the format.  You keep
7  saying it's a verbal conversation.  I want to
8  know if it was phone call or was it a personal
9  conversation?  You tell me.
10     MR. HORA:  Objection.  Asked and
11 answered.  Vague as to form.   Go ahead
12 and answer.
13     MR. BUCKEL:  (inaudible) Go ahead.
14     THE WITNESS:  As stated previously
15 it was phone call to Mr. Chisholm in early
16 June.
17     BY MR. BUCKEL:
18     Q.  You can't recall the date?
19     A.  No.
20     Q.  Tell me everything that you told Mr.
21 Chisholm about Devin Conway on this telephone
22 call?

Page 101

1      A.  To the best of my knowledge, I
2  remember calling Mr. Chisholm telling him
3  briefly the situation at the benefit, what
4  Bobbi had disclosed to me.
5      And I also remember telling him how
6  Devin was treating me poorly thereafter.  I
7  also disclosed I didn't want to hide anything.
8  I also disclosed that Devin and I had a one
9  time consensual encounter.  I told him at the
10 time.  I trusted Mr. Chisholm.  I felt like he
11 had my back.  I felt like I could confide in
12 him.
13     So I laid it all out there.  In other
14 words the harassment, the groping.  I told him
15 things that happened during the training and
16 about the situation that Bobbi had told me.
17     Mr. Chisholm seemed sympathetic to
18 the point where he disclosed to me that he had
19 visited a massage parlor, Evergreen Massage,
20 which is down the street from me.  He had
21 disclosed to me during that conversation that
22 had visited this business recently and they

26  (Pages 98 to 101)

Kimberly Kubas

Page 102

1  were, lack of a better word, busted for
2  prostitution.  And he said if it makes me feel
3  any better, this is something I got to share
4  with you.  Which obviously seems unflattering,
5  but I took it as he's trying to commiserate and
6  gain my trust.  And I found it odd that he
7  brought that up, but he did.  He said he was
8  sorry I was in this state of mind and that we
9  will talk soon after.
10      **Q.  How long did this conversation take?**
11      A.  Approximately maybe half an hour.
12      **Q.  Did you place it from your cell phone**
13  **or another phone?**
14      A.  It was my cell phone.
15      **Q.  It's your testimony that during this**
16  **conversation you told Mr. Chisholm that Mr.**
17  **Conway had physically sexually harassed or**
18  **assaulted you or physically touched you in an**
19  **unwanted way?**
20      MR. HORA:  Objection to form.  Vague
21  and ambiguous.  Go ahead and answer.
22      THE WITNESS:  I don't recall using

Page 103

1  the word, "assault," but I do recall
2  telling him how he had touched me
3  inappropriately, yes.
4      BY MR. BUCKEL:
5      **Q.  After this conversation ended what's**
6  **the next communication you had with anyone**
7  **connected to 331B, LLC, the owners, about these**
8  **allegations?**
9      A.  I recall at one point communicating
10  with Mr. Chisholm again stating that Devin
11  still was in my opinion treating me poorly.  He
12  berated me a couple of times about the time
13  clock.  I felt as if I was a target to him at
14  that point.  So I do recall asking to meet.  Is
15  that okay?
16      **Q.  Yes, I'm asking for specifics.**
17      A.  Okay.
18      **Q.  And I have to ask again.**
19      A.  Sure.
20      **Q.  And Mr. Hora will probably object**
21  **again.**
22      **I'm asking specifically after your**

Page 104

1  **first telephone conversation, when is the next**
2  **time and in what format do you recall speaking**
3  **to someone on behalf of 331B, LLC?**
4      **You just gave me a lot of -- your**
5  **answer, but I want to know specifically when**
6  **did you talk to Mr. Chisholm, Mr. Saab, or**
7  **someone on their behalf after the first**
8  **telephone call?**
9      MR. HORA:  I'm going to object for
10  the record because she is answering your
11  question.
12      MR. BUCKEL:  She's not answering it.
13      MR. HORA:  She is.  She is answering
14  your question to the best of her ability.
15  If you are not happy with her answer, you
16  are welcome to ask follow up questions --
17      MR. BUCKEL:  That's what I'm doing.
18      MR. HORA:  -- but you can't
19  criticize the witness for answering the
20  question that is posed to her.  She is
21  answering your question.  Go ahead and
22  answer.

Page 105

1      MR. BUCKEL:  I'm going to ask it
2  again.
3      BY MR. BUCKEL:
4      **Q.  Ms. Kubas, can you tell me**
5  **specifically the next time that you recall**
6  **speaking to Mr. Chisholm, Mr. Saab, or anyone**
7  **on their behalf for 331B, LLC, whether that's**
8  **an email, whether that's a text, whether that's**
9  **a phone call, whether it's a personal**
10  **conversation, after your first telephone**
11  **conversation with Mr. Chisholm?**
12      MR. HORA:  Same objections.  Go
13  ahead and answer.
14      THE WITNESS:  I recall asking for
15  a meeting with Mr. Chisholm --
16      BY MR. BUCKEL:
17      **Q.  You asked for the meeting?**
18      MR. HORA:  She's trying to answer
19  your question, Mr. Buckel --
20      MR. BUCKEL:  Mr. Hora, I understand,
21  but the time she gets through telling me
22  about the 11 things that she recalls, then

27 (Pages 102 to 105)

Kimberly Kubas

Page 110

1   while.
2           MR. BUCKEL:  Yes, you talk a lot.
3           BY MR. BUCKEL:
4       **Q.  Ms. Kubas, can you to tell me**
5   **specifically the very next time that you recall**
6   **contacting Mr. Chisholm, Mr. Saab, or anyone on**
7   **behalf of 331B, LLC, regarding your complaints**
8   **about Mr. Conway after your first telephonic**
9   **communication with Mr. Chisholm?**
10          MR. HORA:  Same objections.  Go
11  ahead and answer.
12          THE WITNESS:  I recall reaching out
13  to Mr. Chisholm I believe via text
14  requesting to speak with him.  We ended up
15  having a meeting shortly thereafter about
16  the situation.
17          MR. BUCKEL:  Are you done with that
18  answer -- okay.
19          BY MR. BUCKEL:
20      **Q.  What day did you text him?**
21  A.  I don't recall the exact day.
22      **Q.  What day did you have a meeting with**

Page 111

1   **him?**
2   A.  I don't recall the exact day.
3       **Q.  Do you recall at all how close in**
4   **time this meeting was from your original**
5   **telephone conversation?**
6   A.  I do.  I'd say maybe two weeks.
7           MR. HORA:  Just for the record, I
8   think your expressions are actually very
9   insulting, Mr. Buckel.  She's answering
10  your questions to the best as she can.
11  Obviously you don't like the answers for
12  whatever reason.  But the way you are
13  looking at my client when she's answering
14  the questions is very disrespectful.  And
15  I want to note it for the record.
16          MR. BUCKEL:  Thank you, Mr. Hora.
17  Ms. Kubas, please answer the question.
18          THE WITNESS:  I believe it was
19  maybe within a week or two.
20          BY MR. BUCKEL:
21      **Q.  A week or two after the first**
22  **conversation via telephone?**

Page 112

1   A.  Correct.  Yes.
2       **Q.  Who was present at that meeting?**
3   A.  It was Mr. Chisholm, Mr. Conway,
4   myself, and Ms. Butler-Williams.
5       **Q.  Where did that meeting occur?**
6   A.  It occurred in Devin's office.
7       **Q.  Why was Ms. Butler-Williams there?**
8           MR. HORA:  Objection to the extent
9   that you have to speculate.  Go ahead and
10  answer.
11          THE WITNESS:  It is speculation.
12  That actually led me to recount when you
13  had asked me if anybody else was aware of
14  what had happened.  I do recall telling
15  Ms. Butler-Williams about what happened.
16  We were close.  So to go back to that
17  question originally when you asked if
18  anyone else knows.  I thought you meant
19  that day.
20          But yes, I had disclosed to Ms.
21  Butler-Williams what was going on.  She
22  was having issues with Devin --

Page 113

1           MR. BUCKEL:  Please stop.  You are
2   now answering questions completely outside
3   of the question that I asked you --
4           MR. HORA:  You have to let her
5   answer the question.  It doesn't matter.
6   If you don't like the answer, then you can
7   ask a follow up question.  But you have to
8   let her --
9           MR. BUCKEL:  I like all of her
10  answers.  They're great for me.
11          MR. HORA:  -- let her answer the
12  question.  That's how depositions work,
13  sir.  You ask the question.  She answers
14  it.
15          MR. BUCKEL:  Ma'am, I didn't ask
16  you what problems Ms. Butler-Williams was
17  having.
18          THE WITNESS:  You asked me why Ms.
19  Butler was present.
20          MR. HORA:  Yes, she's giving you an
21  answer.
22          MR. BUCKEL:  Alright, go ahead.

29  (Pages 110 to 113)

Kimberly Kubas

Page 114

1      THE WITNESS:   She was present
2  because she was also having issues with
3  Devin.  She had disclosed to me that she
4  felt other women were uncomfortable in
5  addition to feeling like Devin was
6  targeting her performance at work during
7  the same time period.
8      So I'm assuming -- it's speculation
9  -- but I'm assuming that was why she was
10 present in the meeting with us, to answer
11 your question, sir.
12     BY MR. BUCKEL:
13     **Q.  Did you ask her to be present in the**
14 **meeting?**
15     A.  No, I did not.
16     **Q.  What was communicated at this**
17 **meeting?  You don't have a date on it.**
18     MR. HORA:  Objection to form.  Go
19 ahead.
20     THE WITNESS:   To answer that, I
21 don't know the exact date because it's
22 not in front of me.  This was years ago.

Page 115

1  I know the timeframe and what was
2  discussed at the meeting was Devin.  That
3  was the source of the meeting;  why we
4  were unhappy.  That was my implication;
5  what's going to make things better for
6  everybody.  That was Mr. Chisholm's
7  implication as to why we're having a
8  meeting, yes.
9      BY MR. BUCKEL:
10     **Q.  To your knowledge, Ms. Butler-**
11 **Williams never alleged she was sexually**
12 **harassed by Mr. Conway, correct?**
13     A.  She's never alleged that personally,
14 correct.
15     **Q.  Ms. Butler-Williams and her problems**
16 **with Mr. Conway -- and you were present for**
17 **this meeting so I don't want you to speculate.**
18 **Just tell me what you heard.**
19     **Did those problems relate to business**
20 **operational issues about a smoothie bar?**
21     MR. HORA:  Objection to the extent
22 that you are speculating.  Go ahead and

Page 116

1  answer.
2      THE WITNESS:   It referred to her
3  feeling retaliated against by Devin.
4  In effect it probably had something to do
5  with the smoothie.  The major issue was
6  she felt Devin was targeting her and I
7  felt similar.  That was the theme.  We
8  both felt targeted by Devin and maybe in
9  different ways, but that was why we were
10 all in the meeting together, to the best
11 of my knowledge.
12     BY MR. BUCKEL:
13     **Q.  When was the last time you had any**
14 **communications with Ms. Butler-Williams?**
15     A.  I believe it was February of this
16 year.
17     **Q.  Pull up if we can -- actually for**
18 **some reason these don't have bates numbers on**
19 **them.**
20     **Take all the time you need to review**
21 **this.  Is this the last communication that you**
22 **had from or with Ms. Butler-Williams?**

Page 117

1      MR. HORA:   Mr. Buckel, I think it
2  would better for both of us if you put a
3  bates stamp on the record in terms of the
4  document you are referring to.
5      MR. BUCKEL:  Yes, unfortunately the
6  way you guys bates stamped these is so
7  small and I'm getting so old that I can't
8  read them.  Mr. Beeman says that it's
9  Plaintiff Production 24 and then the next
10 page is 25 and 26.
11     MR. HORA:   Okay, I see the 24.
12 Go ahead.
13     BY MR. BUCKEL:
14     **Q.  Can you see this document, Ms. Kubas?**
15     A.  (Reviewing)  Yes.
16     **Q.  Is this the last communication that**
17 **you had with LaToya?**
18     A.  After I received this message, I did
19 respond.  And that I believe was the last
20 communication.  Is my response there?
21     **Q.  Next page.  Do you have the next**
22 **page -- no.  Whatever this page is, Mr. Beeman,**

Kimberly Kubas

Page 138

1    I --
2        Q.  That's right.  That's my question.
3        Mr. Conway in fact never spoke to
4    you again after the night of June 20th, did he?
5        A.  To answer your original question, he
6    did bother me the next day.  Not directly, but
7    we can go into that later.
8        Q.  I just had a simple question.
9        Did Mr. Conway ever communicate with
10   you again between the evening of June 20th and
11   the next day June 21st when your employment
12   ended?
13       A.  Not to me personally.
14       Q.  You just testified that, "With the
15   assumption all is well moving forward," mean
16   Devin was going to leave you alone or treat
17   you better?
18       A.  Yes.
19       Q.  Devin didn't do anything in the next
20   day did he, did he have any communication with
21   you?
22       A.  I'd say partly because I was working

Page 139

1    -- I was supposed to be working from home so I
2    wouldn't have an opportunity to even see Devin
3    until I was called in.
4        Q.  By this point in time on June 20th,
5    you had already been working from home for
6    some period of time, correct?
7        A.  No.
8        Q.  You hadn't?
9        A.  No.
10       Q.  So you never worked from home until
11   June 20th?
12       A.  I believe if you scroll down, it's
13   in these emails.  I think that was the very
14   first day, if not the day before that I
15   requested to work from home.  I believe if you
16   scroll down it says I went into the business to
17   get deposits and my work to prepare to work
18   from home.  So it hadn't really even started,
19   my working from home.
20       Q.  On the 21st, did you have any direct
21   communications with Mr. Conway?
22       A.  I believe I answered that.  Now

Page 140

1    direct communications, no.
2        Q.  You testified before that you thought
3    that Mr. Conway was retaliating against you.
4    Those were your words because of your
5    allegations about him.
6        Can you tell me specifically what you
7    think Mr. Conway did to retaliate against you?
8        A.  I stated earlier that the Monday
9    after the benefit, I came into work as usual.
10   Said, "Hi," to my coworkers, said, "Hi Devin,"
11   and he just gave me an angry look, ignored me,
12   turned around.
13       And then I believe within that week,
14   he called me into his office another time to
15   discuss the time clock.  He said something to
16   the effect like, "You're just not clocking
17   out to upset me.  You think you're better than
18   people," and you know, I've worked there for 13
19   years.  My hours are the same.  Never has
20   this been brought up to me with anybody ever
21   until this week.
22       Then he sent me a text, same thing.

Page 141

1    "You need to clock in and out while you are at
2    home working and in the office."  We would have
3    meetings.  I think we had one club automation
4    meeting.
5        He just basically -- you can tell
6    when someone is ignoring you and giving you
7    hostility.
8        And then the day I was terminated
9    I found out later, but I had a feeling at the
10   time, that he was kind of checking my time
11   clock.  I don't know why.  And communicating
12   with Mr. Chisholm about things to do with
13   these allegations that whole morning.  Like
14   I'm under the radar.  That's how I felt.
15   That's how I felt retaliated.
16       Q.  You felt retaliated against because
17   Mr. Conway warned you that you had to
18   accurately use the timekeeping system in order
19   to be paid?
20       MR. HORA:  Objection to the extent
21   that you are mischaracterizing her
22   testimony.  Go ahead and answer.

36 (Pages 138 to 141)

Kimberly Kubas

Page 142

1          BY MR. BUCKEL:
2          **Q.  Is that what he warned you, did he**
3   **tell you, "You have to clock in and clock out**
4   **accurately.  You can't not do that anymore,"**
5   **is that not what he basically said?**
6          MR. HORA:   Same objections.
7          THE WITNESS:   He texted that.
8   Verbally in his office it was not that
9   way.  He was instead --
10         BY MR. BUCKEL:
11         **Q.  So verbally in his office, he said**
12  **exactly what, did he say, "I'm holding you to**
13  **a higher standard because you made allegations**
14  **against me?"**
15         MR. HORA:   Objection to the extent
16  that you are mischaracterizing her
17  testimony.  Go ahead answer.
18         THE WITNESS:   No.
19         MR. BUCKEL:   I'm asking what he
20  said and I still haven't heard what he
21  said.
22         THE WITNESS:   I did say what he

Page 143

1   said, but I'll say it again.  He sat me
2   down.  Basically made me feel ashamed,
3   said, "You think you are better than
4   everyone else, don't you?  You're not.
5   You need to clock in like everyone else.
6   I think you're doing this just to piss me
7   off."  That was the context of when I
8   was called into his office.  And I felt
9   a loss for words.  I just said, "Okay,"
10  and left.  He's never --
11         BY MR. BUCKEL:
12         **Q.  Would you acknowledge -- I'm sorry.**
13  **I still can't tell when you are finished.**
14         A.  Okay, I'm finished.
15         **Q.  Great.**
16         **Would you acknowledge that on the**
17  **situations where you were admonished or warned**
18  **about failure to properly record your time, in**
19  **fact you had failed to properly record your**
20  **time?**
21         A.  No.
22         **Q.  Why?**

Page 144

1          A.  For instance, the morning of my
2   termination I did clock in.  I don't know why
3   Mr. Chisholm and Mr. Conway were basically
4   using their time to sort of track my time clock
5   when there are so many employees that do
6   exactly if not more than what I have done.  So,
7   of course, it felt like retaliation when I'm
8   the only one.  Because I worked there, I know
9   that's being reprimanded for something that
10  occurs frequently.  That would be retaliation
11  in my book.
12         **Q.  Are you done?  I can't tell.**
13         A.  I am done.
14         **Q.  Great.**
15         **Is it your testimony that 331B, LLC,**
16  **retaliated against you by monitoring your work**
17  **time after you had been warned on multiple**
18  **occasions about your logging in and logging**
19  **out issues?**
20         MR. HORA:   Objection to form and to
21  the extent you are mischaracterizing her
22  testimony.  Also asked and answered.  You

Page 145

1   can answer the question again.
2          BY MR. BUCKEL:
3          **Q.  Ma'am, you just testified you felt**
4   **retaliated because Mr. Chisholm and Mr. Conway**
5   **were looking at you being logged into work on**
6   **the morning of the 21st.**
7          **Why do you think that's retaliation**
8   **for the business owner to monitor the**
9   **employee's time entries if they had already**
10  **been warned about time entries?**
11         MR. HORA:   Objection.  Calls for
12  speculation.  Asked and answered and to
13  the extent that you are mischaracterizing
14  her testimony.  Go ahead and answer again.
15         THE WITNESS:   To answer your
16  question, like I said, many, many
17  employees do the same thing.  They'll
18  forget.  And I was clocked in.
19         Furthermore, the very next day after
20  I was requested to work at home to avoid
21  Devin and to have him conduct an
22  investigation, I am called in during

Kimberly Kubas

Page 146

1    Devin's shift.  So to me, I wanted to go
2    there in the afternoon.  So that in my
3    book is retaliation as well for forcing
4    me to come during this person's shift when
5    I was specifically told to work from home
6    to avoid him for two weeks.  So in my
7    book that is also retaliation.
8        BY MR. BUCKEL:
9        Q.  In order to do these deposits, would
10   you have to come in to work physically on some
11   days?  You couldn't just work from home all
12   time could you?
13       A.  I had most of the deposits at my
14   home.  I had told Brian, "I will go to the bank
15   in the afternoon," the same day -- on the same
16   day.  But I knew Devin wouldn't be there.
17       Q.  Ma'am, were you logged in to the
18   timekeeping system that morning from
19   approximately 10 o'clock a.m., a few minutes
20   after that until after 12 in the afternoon
21   that day?
22       A.  I believe so, yes.

Page 147

1        Q.  For a period of that time, you were
2    at a personal or family doctor's appointment,
3    correct?
4        A.  For a little bit I was at my
5    daughter's doctor appointment.
6        Q.  Your job task that morning was to
7    physically make a deposit of six hundred and
8    some dollars in a local bank, is that correct?
9        A.  Yes.
10       Q.  How many minutes did that take you to
11   compile deposit slips amounting to six hundred
12   and some dollars and physically depositing them
13   at a bank?
14       A.  Let me think.  Approximately an hour
15   or a little more.
16       Q.  When you came to work that day on the
17   21st, were you aware that you had already been
18   warned about your timekeeping habits?
19       MR. HORA:  Objection to form.
20       THE WITNESS:  Yes.
21       BY MR. BUCKEL:
22       Q.  Yet on the day in question on the

Page 148

1    21st, the very first day to your testimony
2    that you were given this privilege of being
3    able to work from home, you logged in and
4    stayed logged in for several hours without
5    really doing any work outside of making one set
6    of deposits?
7        A.  That's not --
8        MR. HORA:  Objection to the extent
9    that you're mischaracterizing her
10   testimony.  Go ahead and answer.
11       BY MR. BUCKEL:
12       Q.  But you were logged in to work while
13   you were at a doctor's appointment.  So someone
14   was paying you to do that, correct?
15       A.  Mr. Buckel, I was performing work at
16   the appointment.  I was performing work when I
17   returned home from the appointment.
18       Q.  How many minutes did it take you --
19   I'm sorry.  I can never tell when you are done
20   answering.  I'm sorry.
21       A.  I'm done.  I'm done.
22       Q.  Great.

Page 149

1        How many minutes did it take you --
2    I mean we have the email records.
3        How many minutes did it take you from
4    when Mr. Chisholm requested what the deposits
5    were until you texted him back and you computed
6    the deposits?
7        A.  That was probably 10 minutes or less,
8    to give him a number that would be deposited.
9        Q.  What did you do for the other two
10   hours that you were logged on to the system?
11       A.  I returned home which had the
12   deposits.  They are in baggies.  You know, each
13   shift -- I believe there are four shifts.
14   There's maybe five days.  So each thing is in
15   a baggie per shift.
16       Then you have to pull up reports
17   which I happen to have for each day.  Record
18   them.  Break it down.  Put the deposits up for
19   each day.  And then I also started working on
20   the task -- I believe it's up here -- that he
21   had asked me to handle.  So I started working
22   on that.

38  (Pages 146 to 149)

**Kimberly Kubas**

Page 174

1  to Ms. Beers?
2      A.  He said --
3          MR. HORA:   Objection.  Vague as to
4  time.  Go ahead and answer.
5          THE WITNESS:  He said --
6          BY MR. BUCKEL:
7      Q.  As of the 20th of June, were you
8  aware that he had spoken to Ms. Beers?
9      A.  You know I'm not sure.  I know he
10  said, "Other people, people in the gym," so I
11  can't recall if at that point he specifically
12  said Ms. Beers or just "Other people."  I can't
13  recall specifically.
14     Q.  Okay, I'm trying to be clear.
15         I believe you've testified that you
16  gave Mr. Chisholm two other names that you said
17  Mr. Conway harasses these people, Ms. Beers and
18  Ms. Moore.  And you're not sure if you told him
19  about Riley Mayer or not or when you told him,
20  is that fair?
21     A.  Yes.
22     Q.  If Mr. Chisholm hypothetically had

Page 175

1  gone and spoken to Ms. Beers, to Ms. Moore,
2  and to Ms. Mayer, and they had all denied your
3  allegations, what more would you have expected
4  him to do in the investigation?
5      A.  You know, I can't answer that.  I
6  honestly expected a little more in the sense
7  that he could see why they denied it.  As far
8  as my knowledge is concerned, two of the three
9  still work there.  So I'm sure they don't want
10  to lose their jobs.  I would have at the very
11  minimum expected to not be terminated the next
12  day.  I mean that's a start.
13     Q.  Ma'am, after going through all these
14  emails from the very first day that you
15  notified Mr. Chisholm on behalf of 331B which
16  you say is on or around June 1st, that first
17  telephone call.  All of the email and text
18  exchanges between you, Mr. Chisholm, and Mr.
19  Saab, they reflect that they are concerned
20  about you, that they are willing to give you
21  two weeks off, and that they'll conduct an
22  investigation.

Page 176

1          Can you point to anywhere from June
2  1st until June 21st where 331B, LLC, threatens
3  you or threatens to fire you because of your
4  allegations about Mr. Conway?
5          MR. HORA:   I'm going to object based
6  on it's a vague question.  It's compound.
7  You are also mischaracterizing the record,
8  but the documents will speak for itself.
9  But go ahead and answer subject to those
10  objections.
11         MR. BUCKEL:   I'll cut the question
12  down to this.
13         BY MR. BUCKEL:
14     Q.  Can you point to anything from June
15  1st to June 21st where Mr. Chisholm or Mr.
16  Saab or 331B, LLC, indicates or communicates
17  -- whatever you want to call it -- to you that
18  they were upset with you and were thinking
19  about firing you if you keep making these
20  allegations?
21         MR. HORA:   I'm going to object again
22  to the extent that it's vague as to

Page 177

1  whether or not you are asking her personal
2  knowledge or just knowledge gained in this
3  litigation.  But go ahead and answer to
4  the best that you can.
5          THE WITNESS:   Yes, the morning of my
6  termination, Brian appeared in my office
7  and brought up a rumor that I had no
8  knowledge of this situation.  Basically
9  told me LaToya and I are cancer to the
10  gym.  He can't have that.  You know, in
11  that instance on the dates you stated, I
12  felt my job was in danger now because of a
13  rumor he heard that morning.
14         So that's the instance I felt as if
15  -- he clearly stated I'm in trouble
16  because of this rumor.  And do I know
17  about it.  So that's the instance where I
18  felt my job was truly in danger.
19         MR. BUCKEL:
20     Q.  Ms. Kubas, wasn't that all part and
21  personal in the same conversation that resulted
22  in you leaving the company?

**MGB REPORTING, INC.**
**(301)983-9315 - mgbreporting.com**

Kimberly Kubas

Page 266

1   with this appt," right?
2       A.  Yes.
3       Q.  In this text message, were you
4   communicating to him the amount of the deposit
5   as he had asked you to?
6       A.  Yes.
7       Q.  Were you also communicating to Mr.
8   Chisholm of the fact that you were still at a
9   doctor's appointment at the time that you were
10  able to communicate the information regarding
11  the amount of the deposit?
12      A.  Correct, yes.
13      Q.  His response was then, "Ok thanks,"
14  right?
15      A.  Yes.
16      Q.  At this point either prior to or
17  whatever did you clock in into the system?
18      A.  Yes, I did.
19      Q.  What system did 331B, LLC have at
20  that point that would allow you to clock in
21  while you were at this doctor's appointment?
22      A.  It was called Mindbody.  So it was

Page 267

1   a web based software so you can clock in via
2   phone or computer.
3       Q.  Why did you decide to clock in at
4   your daughter's doctor appointment prior to
5   sending this text letting Mr. Chisholm know the
6   amount of the deposit?
7       A.  Normally I wouldn't think much it,
8   but it was just kind of ingrained in me.  You
9   need to clock in no matter when you're working
10  -- home.  So I just didn't want any further
11  issues.  So I thought to myself I'd better
12  clock in.  I don't need any further time clock
13  issues with Mr. Conway.
14      Q.  When you say it was, "ingrained,"
15  how was it ingrained into your head at that
16  point that you needed to make sure to clock in
17  even though you were at your daughter's doctor
18  appointment?
19      A.  His text message stuck in my head.
20  "No exceptions," like I said I took it to mean
21  if I forgot or didn't clock in, something bad
22  would happen.

Page 268

1       And in addition to the meeting when
2   he said I think I'm better than everyone and I
3   need to clock in.  So I was clocked in because
4   I had to do some work.  So that's why I decided
5   to clock in before I did the work.
6       Q.  After the doctor's appointment, what
7   did you do next?
8       A.  I drove home.  At my home was the
9   deposits.  I don't know if I had stated, but
10  they were in bags.  And I had all the reports
11  and everything.  I took all my work home.  So I
12  started to put them together in order to take
13  them to the bank.
14      Then I started working on -- I
15  believe he had asked me for some sort of
16  membership report situation the night prior.
17  So I started kind of spending a little time on
18  that.
19      And I realized that there was two
20  additional deposits which were still in the
21  safe.  So I thought I'd better go up there and
22  get those so I could get them done before, you

Page 269

1   know, the bank closed.
2       Q.  In order to work on this membership
3   issue, how would you have done that?
4       A.  Through the software.
5       Q.  At this point, did you have access to
6   the software?
7       A.  I software I believe was up, but I
8   also had reports.  And then I remember when I
9   was ready to leave around that time at some
10  point it kind of froze.  I couldn't do anything
11  else.  So I thought I might as well go to the
12  office now since the computer wasn't working
13  for me and I wanted to finish the deposits.
14      Q.  Did you later learn why the system
15  froze on you?
16      A.  Yes, later.
17      At the time once again I thought it
18  was my internet.  I went at that point into the
19  physical office trying to login there and I
20  couldn't.
21      That's when I thought something was
22  wrong, at which point I believe I sent Brian a

MGB REPORTING, INC.
(301)983-9315 - mgbreporting.com

Kimberly Kubas

Page 270

1  text like, "What's going on?  I can't get in
2  the software.  I can't do the job you had
3  asked me to complete."
4      Q.   When you said that you went into the
5  office at that point, do you know if Mr.
6  Chisholm was in the office as well?
7      A.   I did not see Mr. Chisholm when I
8  walked in.  I only saw Mr. Conway.
9      Q.   When you saw Mr. Conway, did you have
10  any communication with him?
11      A.   No, I tried not to see him.  I
12  remember walking by.  He was in his office and
13  he kind of glared at me.  I just kept walking
14  back to my office.
15      Q.   After you went into the office, what
16  did you do next?
17      A.   I went to the safe.  I got the
18  deposits.  In the office I tried logging in
19  and like I said I texted Brian, "What's going
20  on?"  So I thought to myself he's not really
21  responding.  I might as well take what I have
22  and go to the bank because, you know, I didn't

Page 271

1  want them to bounce anything like he implied.
2      Q.   I'm sorry.
3          Are you finished?
4      A.   Yes, I am.
5      Q.   This is again 331B 46 and we're
6  looking at a text message, Friday, June 21st
7  at 12:14 p.m. where you had written, "I am here
8  trying to do these deposits.  It looks like I
9  am blocked from accessing any of the
10  information I need.  Did my permission level
11  get changed?"
12          Were you at the office at the time
13  that you sent that text message or at the bank?
14      A.   I was at the office.
15      Q.   He (sic) then responds, "At the bank.
16  I am depositing all I can.  Have two left that
17  I am unable to do."
18          Was this later on?
19      A.   That was me as well.  I don't recall
20  if there was a text in the middle where he
21  responded.  I think he sending something like,
22  "Where are you?" in between the two.

Page 272

1      Q.   You indicated that you were at the
2  office but in your text message you indicated
3  that you were at the bank, does that --
4      A.   Yes --
5          MR. BUCKEL:  Objection to the form
6  of the question.  You may answer.
7          BY MR. HORA:
8      Q.   -- recollection when you sent the
9  text message?
10      A.   Let me see.  Can you scroll up?  No,
11  I was at the office.  I sent that and the bank
12  is a couple minutes.  So I think when he
13  texted, "Where are you," I was on my way to the
14  bank or in the bank at that point.
15      Q.   After you get to the bank, were you
16  able to successfully make the deposit?
17      A.   The ones that I completed at home,
18  yes.  The other two, no.
19      Q.   Why were you able to deposit the ones
20  from home but not the ones you picked up at
21  work?
22      A.   The ones at home I had printed

Page 273

1  reports.  When I brought all my work home, it
2  makes it quicker and easier than going back and
3  forth.
4          And then I was still able to use the
5  software until a certain point.  Once I got to
6  the office I could no longer access the
7  software, which I need to tell me how much
8  money it is per day.  I just recall leaving
9  the money in my drawer, locking it up, and
10  going to the bank and doing what I had so he
11  would have some money in the bank.
12      Q.   After the bank, you went back to the
13  gym?
14      A.   Yes.
15      Q.   What happened next?
16      A.   I walked back to my office still
17  confused.  I go into my office and Mr. Chisholm
18  is sitting in my office at that point.
19      Q.   Who spoke first?
20      A.   I'm trying to recall.  I believe it
21  was Mr. Chisholm.  I shut the door and I
22  believe he said something along the lines of,

69 (Pages 270 to 273)

Kimberly Kubas

Page 274

1 "Where were you," or something to that effect.
2     Q.  Do you recall what you said in
3 response?
4     A.  I told him I was at my daughter's
5 appointment and I'm trying to do these
6 deposits.  You know where I am.  I asked what's
7 going on with the software.  He's like, "I cut
8 you off."  And I'm starting to get very
9 anxious at that point.  Like what's going on?
10     Q.  What did he say to you, if you
11 recall?
12     A.  So the next it went -- I remember
13 this.  It was very brief.  And then he went
14 into this thing about -- he asked me if I've
15 heard a rumor about Mr. Conway being fired or
16 possibly being fired for sexual harassment.  He
17 asked if I had knowledge of this rumor.  He
18 appeared angry, very angry.  I didn't have
19 knowledge.
20     Q.  Did you tell him that?
21     A.  Yes, I said, "I have no idea."
22     Q.  Do you recall anything else you might

Page 275

1 have told him at that moment when he asked you
2 about this rumor?
3     A.  I said, "I have no idea about the
4 rumor."  Something to the effect that I think
5 the only person that knows or the people that
6 we know knows.  So I don't see how a rumor is
7 spreading.
8         Then he goes at some point, "I won't
9 forget this," because it was upsetting.  He
10 basically was like, "You and LaToya are cancer
11 to the gym," you know, "I can't have these
12 rumors.  I can't have this.  It's not looking
13 good for me," something to that extent.
14         And I've never seen him angry and
15 frankly I was nervous.  It was uncomfortable to
16 say the least.  My office is very tiny and
17 there's nobody else there.
18         Then at that point he goes, "You can
19 go now.  You can take your stuff and go now
20 and I'll pay you your two weeks.  Just go."
21     Q.  Okay.
22     A.  And I recall like tearing up, putting

Page 276

1 on my sunglasses, grabbed my purse.  I left
2 everything on my desk and I just left like he
3 told me.
4     Q.  Did you interpret his statement to
5 mean that you were being terminated?
6     A.  Oh, yes.  When he said, "Go and I'll
7 pay your next paycheck."
8     Q.  Did he actually pay you the two weeks
9 like he indicated that he was going to pay you?
10     A.  He did, but not on the payroll day.
11 It was much later.
12         MR. HORA:  I have no further
13 questions.
14         THE WITNESS:  Thank you.
15         MR. BUCKEL:  Thank you.
16 I have a few follow ups.
17 EXAMINATION BY COUNSEL FOR THE DEFENDANT
18 BY MR. BUCKEL:
19     Q.  You testified with respect to some of
20 Mr. Hora's first questions that you felt, your
21 exact words, "powerless," with respect to Mr.
22 Conway after your sexual encounter with him.

Page 277

1         How long did you continue to work
2 with Mr. Conway and training with Mr. Conway
3 after that sexual encounter?
4     A.  I believe he stopped training early
5 2019, I want to say.  So around that time.
6     Q.  I'm not meaning to ask this to you
7 again.  Just my notes are a little fuzzy and I
8 thought you might have been a little fuzzy.
9         Did you have sex with him in the
10 summer of '17 or summer of '18.
11     A.  I recall -- I believe it was '17.
12     Q.  Summer of '17, okay.
13         You did train with other individuals
14 on different occasions, didn't you?
15     A.  I'm sorry.  Are you referring to
16 other clients or other trainers?
17     Q.  Other trainers.
18     A.  No, Bobbi eventually started
19 training us way later after he stopped training
20 when he became manager.  It was always Devin
21 unless maybe he was sick, but I don't recall.
22     Q.  Do you recall the evening of the

70 (Pages 274 to 277)

Kimberly Kubas

Page 286

1  In order to take them to the bank, I can't just
2  bags of money and say, "Here."
3        I have to break them down, record
4  them each day and make note of all, you know,
5  what checks.  And I worked a little bit on the
6  report.
7        So those two hours I was working,
8  just not in the office.  I had them all put
9  together when I went into the office.
10      **Q.   From the moment you logged off or you**
11 **stopped texting Mr. Chisholm at roughly 10:07,**
12 **you're claiming that you were working that**
13 **entire time while finishing up your daughter's**
14 **appointment while driving from a personal**
15 **errand and back to your house, you were logging**
16 **that as work time?**
17      A.   Once again, he had asked me in
18 urgency for the amount.  I don't think he'd
19 appreciate it if I waited to finish the
20 appointment, then drive to the office.
21      I logged in to give him the amount
22 when he asked.  Then I went home to do the work

Page 287

1  and that is what happened.  I had the work at
2  my house.  I needed --
3        **Q.   My question was did you bill and stay**
4  **on the time system --**
5        MR. HORA:   (inaudible) you didn't
6  let her finish.
7        MR. BUCKEL:   -- from the minute you
8  -- no one is contesting the --
9        MR. HORA:   No, no, no.  You did not
10 let her finish.
11       MR. BUCKEL:   -- three or four
12 minutes that you --
13       MR. HORA:   You need to let her
14 finish.
15       MR. BUCKEL:   Can I ask my question
16 before you interject?
17       MR. HORA:   No, you can't interrupt
18 the witness when she's in the middle of
19 answering your question.
20       MR. BUCKEL:   She wasn't in the
21 middle of answering my question.
22       MR. HORA:   You cannot do that.

Page 288

1        MR. BUCKEL:   She wasn't in the
2  middle of answering my question.  She had
3  stopped --
4        MR. HORA:   She was.  She was right
5  in middle of a --
6        MR. BUCKEL:   -- speaking until I
7  started speaking.
8        MR. HORA:   Ask her.  She was in the
9  middle of answering your question and she
10 --
11       MR. BUCKEL:   Well she'll say it now
12 after you've said it for her, Mr. Hora.
13 There's no --
14       THE WITNESS:   Can I --
15       MR. HORA:   I mean if --
16       MR. BUCKEL:   -- about that.
17       MR. HORA:   -- you are paying
18 attention you would see what I'm seeing.
19       MR. BUCKEL:   Well Mr. Hora, your
20 perspective is a little jaded I'm afraid.
21 Ms. Kubas, go ahead and say --
22       MR. HORA:   We can (inaudible).

Page 289

1        MR. BUCKEL:   -- whatever you want
2  and I'll ask my next question.
3        THE WITNESS:   Thank you.  I was just
4  trying to say that -- I just want to
5  correct the record that those hours --
6  yes, I drove home.  It's like maybe a five
7  minute or less drive.  And then yes, I went
8  right to my desk and started working until
9  I left my home and then drove directly to
10 the gym.  I couldn't log out at my home.
11 And that's the timeline.
12       I'm finished.  Thank you.
13       BY MR. BUCKEL:
14       **Q.   You're testifying that you didn't go**
15 **home and provide care for your daughter and**
16 **simply be at home during those two hours before**
17 **you decided to then drive in to the office or**
18 **the bank, you were working the whole time from**
19 **your house?**
20      A.   Correct.  Yes, I believe my son was
21 home at the time.  So he was kind of keeping
22 an eye on my daughter, which is why my daughter

73 (Pages 286 to 289)

# EXHIBIT 2

Page 40

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MARYLAND

 3                  Northern Division

 4    -------------------------x

 5    KIMBERLY KUBAS,            :   VOLUME II

 6               Plaintiff,   :

 7       v.                     :   Civil Action No.

 8    331B, LLC                 :   1:20-cv-2456

 9    (D/B/A ROCKWELL FITNESS), :

10               Defendant.    :

11    -------------------------x

12                     Potomac, Maryland

13                     Friday, July 30, 2021

14    Video Conference Deposition of:

15                     DEVIN CONWAY,

16    the Witness, called for examination by counsel

17    for the plaintiff at MGB Reporting, 9805 Korman

18    Court, Potomac, Maryland, commencing at 9:02 a.m.

19    before Matthew Kwong, via video conference,

20    Court Reporter and Notary Public for the State

21    of Maryland, and were present on behalf of the

22    respective parties:
```

Devin Conway - Vol. I

Page 10

1    Q.   What is your position at VIDA?
2    A.   Personal Training Manager.
3    Q.   Are you in a particular location, or
4  do you work at multiple locations?
5    A.   U Street mainly.
6    Q.   What other locations do you work at?
7    A.   I'm over at the City Vista location,
8  the Ballston location, and I sometimes travel to
9  the Navy Yard location.
10   Q.   When did you first start working at
11 Rockwell Fitness?
12   A.   May of 2015.
13   Q.   When you were hired in May of 2015,
14 did you hold the title of Personal Training
15 Manager and Coordinator?
16   A.   No.  I was strictly just Personal
17 Trainer.
18   Q.   Okay.  Were you ever elevated to that
19 position, Personal Training Manager and
20 Coordinator?
21   A.   It was called Personal Training
22 Director, but that was in May of 2017, 2017 I

Page 11

1  believe.
2    Q.   You called it a Personal Training
3  Manager?
4    A.   It was called Director.  Just same
5  titles, same responsibilities.
6    Q.   Got it.  Then at some point did you
7  get promoted?
8    A.   Yes.  In March of 2019 I became Co-
9  General manager, and then in probably late
10 April, even early May of 2019, I became the sole
11 General Manager.
12   Q.   When you were Co-General manager, who
13 was your other Co in the manager?
14   A.   His name was Ryan Brewer.
15   Q.   Who is Ryan VanBrackel?
16   A.   He was the General Manager before me
17 and Ryan Brewer became Co-Managers.
18   Q.   Okay.  Mr. VanBrackel, do you know
19 why he left Rockwell?
20   A.   In specifics, I believe he took
21 another position.
22   Q.   Was there any sort of issues between

Page 12

1  himself and Mr. Chisholm, or anyone else at
2  Rockwell that may have led to his departure?
3    A.   No.
4    Q.   So after you and Ryan became Co-
5  Manager, that only lasted for a few weeks,
6  correct?
7    A.   Correct.
8    Q.   Why did that end after a few weeks?
9    A.   There was problems with him and
10 employees in terms of management style, in terms
11 of management of said employees.
12   Q.   Was there any particular employees
13 that he was having issues with?
14   A.   Yes.
15   Q.   Which employees?
16   A.   LaToya Butler-Williams.
17   Q.   What was the nature of the dispute
18 between Ms. Butler-Williams and Mr. Brewer?
19   A.   Me and Mr. Brewer were putting in
20 policies into effect, changing a few things here
21 and there.  And I don't believe that Ms. Butler
22 Williams agreed with any of those changes, and

Page 13

1  did not take kindly to respecting Ryan's
2  decisions or any of the processes he was putting
3  in place.
4    Q.   That led him to leave as a result,
5  even though he was the manager or co-manager?
6    A.   Correct.
7    Q.   Do you know where he went?
8    A.   I believe he went to Orange Theory in
9  Baltimore City, I believe.
10   Q.   After he left, then did you just
11 become the general manager of the entire gym
12 then?
13   A.   Correct.
14   Q.   Did you get an increase in salary at
15 that point?
16   A.   Correct.
17   Q.   What was your salary at the time prior
18 to being promoted to general manager or co-
19 general manager, and what was it after you were
20 promoted?
21   A.   Prior to co-general manager, it was
22 $26,000.  Co-manager brought it up to $40,000 a

Devin Conway - Vol. II

Page 93

1  channels in terms of one for -- basically it's
2  a communications tool similar to message log
3  you would leave in a book.  But this way it's
4  documented with a timestamp so you can see when
5  things were put in.
6         But it was like I remember there was
7  like an hours clock in one.  There was like a
8  membership one -- yes, there they are.
9     Q.  This is the hour correction one,
10 right?
11    A.  Yes, so Ryan created it and that's
12 the hour correction for anyone that --
13    Q.  At some point around May, you became
14 the general manager on May 1st at least, you
15 were the full time general manager after Ryan
16 left, right?
17    A.  Yes.
18    Q.  Here's an example on May 1st,
19 "Stephanie in kids club was here on Friday
20 4/12/19 from 8:15 - 11:30 but she forgot to
21 clock in.  She just wanted to confirm that her
22 hours were correct," so even though this is

Page 94

1  being sent on May 1st, this is about an event
2  that occurred several weeks prior on April
3  12th, 2019, right?
4     A.  Correct, it looks like she was just
5  checking her hours in terms of making sure that
6  she did get credit for those hours for clocking
7  in and clocking out.  Because I'm assuming she
8  looks like she closed up the kids club.  It
9  usually closes at 11:30, so she must have
10 walked out and didn't correct it.  But I
11 think that --
12    Q.  But you don't actually know what
13 happened, you're assuming all this because
14 you're saying, "She must have, she might
15 have, she probably --"
16    A.  Yes, this is --
17    Q.  I'm asking you specifically where
18 there's an indication that she was actually
19 working in the kids club several weeks prior
20 from 8:15 to 11:30 but she forgot to clock in,
21 so wouldn't that error have been caught by you
22 immediately based on what you just said, the

Page 95

1  fact that --
2     A.  Yeah.
3     Q.  -- the fact that she forgot to clock
4  in --
5     A.  So that was (inaudible) me.
6     Q.  -- May 1st and she's going back in
7  there --
8     A.  Yes, so that's --
9     Q.  -- regarding the Slack channel?
10    A.  So she's asking me to just check in
11 and make sure her hours were correct.  I
12 probably already corrected those hours when it
13 happened back in 4/12.  Unless you mean -- it
14 was more of a note of like, "Hey, can I make
15 sure my hours are correct on that date?"  It
16 looks like this is probably more --
17    Q.  You're assuming, you don't know
18 though?
19    A.  I'm just -- once again to the best of
20 my knowledge.
21    Q.  Here's the situation from Ms. Kubas
22 on May 6th.  She's just basically telling you

Page 96

1  what her hours are of 20.22 and that she had
2  used a vacation day on 4/22/19, right?
3     A.  Yes, so I'm assuming there's probably
4  two hours less in the system because she
5  probably wasn't there for one day of her work.
6  So it would probably look like 18.22 in the
7  system.  So I probably put the two hours from
8  that vacation day to make it 20.22.
9     Q.  So you are adjusting her hours after
10 the fact even though this is on April 22nd,
11 2019, right?
12    A.  Correct.
13    Q.  At this point, it doesn't seem like
14 there was an issue with that.  You never
15 indicated to her that, "Hey, you can't do
16 that," right?
17    A.  Yes, using a vacation day or just
18 once again --
19    Q.  No, I'm talking about making sure
20 that the hours were accurate?
21    A.  Yes.
22    Q.  Here's another instance on June 3rd,

15 (Pages 93 to 96)

Devin Conway - Vol. II

Page 97

1  2019, "Devin, left you a note about my hours on
2  your desk," right?
3      A.   Yes, I mean that note could have been
4  any kind of hours.  That could have been, "Hey,
5  I wanted to work more hours.  Hey, I want to
6  get more hours."
7      Q.   But you don't know what that note is
8  about, right?
9      A.   No, I don't think any of us do.
10     Q.   If Ms. Kubas told you that she left
11 that note indicating how many hours she worked,
12 would you have any reason to dispute that?
13     A.   I'd have to see the note.
14     Q.   Would you have any reason to dispute
15 her testimony given the fact that you don't
16 recall what the note was about?
17     A.   If the note was presented.
18     Q.   You don't know one way or the other?
19     A.   No one knows until the note is
20 presented.
21     Q.   So you don't know one way or the
22 other, right?

Page 98

1      A.   To my knowledge.
2      Q.   Here's someone else indicating to you
3  what their hours were, "8:29 - 3:35," it
4  doesn't look like Ms. Moore, who was your
5  girlfriend at the time, clocked in or clocked
6  out, right?
7      A.   That is incorrect.  Ms. Moore was not
8  my girlfriend at the time.
9      Q.   I'm sorry.  That's Bobbi Beers.
10          My apologies.
11     A.   Yes.
12     Q.   Ms. Moore is indicating to you what
13 her time was, "9 - 5," on June 10th.  Then on
14 June 14th, she's just simply putting, "8:29 -
15 3:35," because she failing to clock in and
16 clock out, right?
17     A.   No, I actually do remember that.  I
18 was sending Ms. Moore out to do some -- either
19 it was -- kind of just walking the
20 neighborhood, putting flyers around, things
21 like that.  I remember sending usually her and
22 Tommie Parker, my sales guy.  I would send them

Page 99

1  out for the day just to go do stuff.  So they
2  weren't actually in the club to clock in or
3  clock out.
4      Q.   That wasn't my question.
5          Can't you clock in remotely though
6  using Mindbody?
7      A.   No, not usually.  Unless there's
8  permission to work at home and you have the
9  Mindbody software at home.  But I think Ms.
10 Kubas would be the only one that worked from
11 home to be able to clock in like that.
12          Ms. Moore may have had it, but I
13 can't remember if we gave her the permission
14 for it.
15     Q.   You are sure that on June 10th, 2019,
16 even though you've been telling me throughout
17 this deposition that these events occurred
18 three years ago, you are sure that on June
19 10th, 2019 from nine to five, Ms. Moore was out
20 posting flyers in the neighborhood for eight
21 hours?
22     A.   It could have been.  Like I said to

Page 100

1  my knowledge.  I --
2      Q.   Could have been or happened, sir?
3      A.   In general we did a big --
4      Q.   Could have been or happened?
5      A.   Could have been.  I can't recall.
6      Q.   You don't know one way or the other?
7      A.   To my knowledge.
8      Q.   When you say, "To my knowledge," to
9  your knowledge you don't know one way or the
10 other?
11     A.   I'm clearly not as knowledgeable as
12 you in this situation.  So I'm saying, "To my
13 knowledge," that this is to my knowledge that
14 this is what I can recall.
15     Q.   On June 14th, do you also recall Ms.
16 Moore working from 8:29 to 3:35 out posting
17 flyers four days later?
18     A.   It could be a possibility.
19     Q.   Ryen Dill, "1 - 6 Thursday," he's
20 basically not clocking in and clocking out,
21 right?
22     A.   It actually could be something else

16 (Pages 97 to 100)

Devin Conway - Vol. II

Page 101

1  as well.  It could be that they just --
2      Q.  Not could be, sir.
3          Do you actually know why Mr. Dill
4  (sic) is indicating to you what his hours are
5  on June 15th, 2019 as being one to six on
6  Thursday?
7      A.  That's Ms. Dill.
8          And I'm assuming that like I said
9  it's all up to speculation.  There's no
10  definitive answer unless you were there as well
11  or I was -- once again I was there, it was
12  three years ago.  So I can't remember June
13  15th, Ryen's exact shift of what she was doing
14  on that day.
15      Q.  The date that he's (sic) actually
16  sending this to you is June 15th, which I'm
17  going to share my calendar with you here.  I
18  don't know if you can see that.  I'm putting my
19  calendar up there.
20          June 15th is a Saturday, do you see
21  that?
22      A.  Correct.

Page 102

1      Q.  It's 2019 and it's a Saturday, do you
2  see that?
3      A.  Correct.  You had a hiking trip that
4  day.
5      Q.  That was Savanna actually.
6          It looks like Mr. Dill -- or Ms.
7  Dill.  I'm sorry.
8          Ms. Dill is indicating to you two
9  days later that on Thursday she had worked one
10  to six on Thursday, correct?
11      A.  Correct.
12      Q.  She's basically telling you two days
13  after the fact what her hours were, correct?
14      A.  She could be checking to make sure
15  that I entered them, that they were entered --
16      Q.  Not could be, sir.
17          That's what she's indicating to you
18  two days after the fact what her hours were on
19  that Thursday, right?
20      A.  There's no clear indication of that.
21  It just says -- it's a number, one to six on
22  Thursday.  That could mean a million things.

Page 103

1  I'm assuming what I could think could happen.
2          But clearly you know this Slack
3  software and this kind of dated app better than
4  I do.  Which like I said you can make
5  assumptions wherever you want, but I'm assuming
6  that if it was done on a Saturday, she could
7  have been checking her hours.  She could have
8  been putting a note in here.  She could be
9  making sure that she gets credit for those
10  hours.
11      Q.  Alright, let's go to the next one.
12          Ms. Moore, "Abby's," now she's even
13  telling you about somebody else's hours, right?
14  Abby, was that an employee there?
15      A.  Yes, Abby actually had just started
16  that summer.  She was a high school girl that
17  just started.  It looks like she did some
18  on boarding, "6/3 6/5 9 - 12 and then 6/7 9 -
19  12:15."
20      Q.  It looks like Abby didn't clock in
21  and clock out, right?
22      A.  It looks like Bree was reporting for

Page 104

1  her because she must have not set up her time
2  clock or something of the sort by then.
3      Q.  That was permissible, right?
4      A.  Yes, if you were a brand new employee
5  or if you were just started out, we are going
6  to have a little leeway with that.  It's not
7  like you've been working for 10 years.
8      Q.  So Mr. Taub --
9      A.  I can actually answer this one
10  definitively.  I had a couple issues with Mr.
11  Taub and his clocking in and clocking out.  I
12  do remember -- he was an interesting -- he was
13  16 or 17 years old -- he was an interesting guy.
14  But we did have a lot of issues with his
15  clocking in and clocking out.  So he actually
16  was eventually let go from Rockwell.
17      Q.  He was let go because of his clocking
18  in and clocking out?
19      A.  A matter of other issues as well.  He
20  just -- it was his first job.  Parents were
21  members.  They wanted us to just give him his
22  first job, get him working and I don't think he

17 (Pages 101 to 104)

Devin Conway - Vol. II

Page 105

1   was quite mature or ready for the workforce.
2           There were a couple of issues that
3   came up.  Couple of things that me and him had
4   multiple conversations.  We went through a lot
5   of on boarding trying to teach these things
6   trying to kind of teach him how to clock and
7   how to clock out.  He was a high school kid.
8   Like I said he was just starting out.
9       Q.   That's crazy.  But Listen.
10          If Mr. Taub had to get fired and if
11  Mr. Chisholm testified that no one got fired
12  for time keeping other than Ms. Kubas --
13      A.   I'm not saying he got fired.
14      Q.   -- would you disagree with Mr.
15  Chisholm?
16      A.   I'm not saying he got fired.  He
17  could have resigned.
18      Q.   You don't know what happened to Mr.
19  Taub then?
20      A.   I would have to go back and look at
21  any kind of records.  I can't recall.
22      Q.   Just to summarize his testimony just

Page 106

1   so we can shortcut this a little bit.
2           Do you agree that you had many issues
3   with Mr. Taub clocking in and clocking out
4   appropriately?
5       A.   It was just related to clocking in.
6   It looks like I only see two issues right here.
7   But in terms of --
8       Q.   Your testimony will speak for itself.
9           Here's a situation, Mr. Parker, he
10  worked from 11 to 2, but he clocked in at
11  11:30, that was okay though, right?
12      A.   Yes, once again Tommie was our sales
13  guy, so he was doing sales.  He was working on
14  a commissions based position.
15      Q.   Here's Mr. Taub again, "Forgot to
16  clock out for my 5 - 10," right?
17      A.   Yes.
18      Q.   It looks like Ms. Moore again is
19  telling you what her hours are on a particular
20  Friday, correct?
21      A.   Yes.
22      Q.   She's also reporting hours for July

Page 107

1   3rd, which is 13 days prior to the date that
2   she's posting it on July 16th, she's reporting
3   hours for Rachel?
4       A.   That's probably an on board.
5   Probably -- once again I'm not sure who was
6   being on boarded at what point three years
7   later.  But it could have been multiple
8   scenarios.
9       Q.   Then you have Andrew, "I forgot to
10  clock out at 2pm on 7/29," which is the day
11  before.  And on the day of he clocked in at
12  9 a.m. on July 30th.
13          What was Andrew's last name, do you
14  remember?
15      A.   You're really testing my memory today
16  -- Smith.  Andrew Smith.
17      Q.   Let me ask you this.
18          Did Andrew suffer from any
19  consequences as a result of his failure to
20  clock in and clock out appropriately?
21      A.   Andrew Smith, usually anytime it's a
22  once in a time kind of thing --

Page 108

1       Q.   I'm not asking for usually.  I'm
2   asking you a specific question --
3       A.   Specifically, there was --
4       Q.   -- now you're telling me what you had
5   for breakfast.
6           Did Andrew suffer any consequences
7   as a result of his failure to clock in and
8   clock out?
9           I don't care what you had for
10  breakfast.
11      A.   I had a banana.
12      Q.   Answer that question.
13      A.   I had a banana for breakfast if you
14  are interested.  I can tell --
15      Q.   Sir, we can continue this deposition
16  day-to-day until it's completed.  It doesn't
17  really bother me.
18      A.   I can talk --
19      Q.   We can keep going.
20      A.   -- or I can --
21      Q.   I'm going to ask you the question
22  again and I'd like an answer.  We'll move on

MGB REPORTING, INC.
(301)983-9315 - mgbreporting.com

**Devin Conway - Vol. II**

Page 109

1  once I get an answer.
2       **Did Andrew suffer any consequences**
3  **or disciplinary action for failing to clock in**
4  **and clock out appropriately?**
5       A.  Correct, anytime there was an issue
6  on their first time with any type of clocking
7  thing, it was a verbal warning.  But the verbal
8  conversation as I mentioned previously --
9       **Q.  Did you have a verbal conversation**
10  **with Andrew or are you speculating as to what**
11  **you typically did allegedly?**
12       A.  A verbal conversation.  A verbal
13  conversation.
14       **Q.  Do you recall having a verbal**
15  **conversation with Andrew?**
16       A.  Can you recall any verbal
17  conversation?  I had tons of employees.
18       **Q.  The answer is no, you have no**
19  **recollection whatsoever of having a verbal**
20  **conversation?  You're telling me that you**
21  **assume that you had a conversation?**
22       A.  That was the protocol.  Anytime an

Page 110

1  employee failed to clock in or anything like
2  that, there was a verbal conversation that we
3  had.
4       I told you in the beginning of this
5  conversation that they would document in here
6  whatever the misconception with their time was.
7  But they were required to either talk to myself
8  or with Ryan Brewer.  They were required to
9  talk to Ryan Brewer.
10       So it was a verbal -- this was a
11  documentation tool only.  This wasn't a:  You
12  know what, I'm going to put all my information
13  here.  It's to document the time and date so I
14  know it.  But the conversation happened off of
15  Slack.
16       **Q.  Do you recall anyone ever getting**
17  **disciplined for failing to clock in or clock**
18  **out other than Ms. Kubas?**
19       A.  There was verbal stuff.  Like I said
20  I never had to do a formal write up.
21       **Q.  Can you give me any person in**
22  **particular that you recall a specific verbal**

Page 111

1  conversation with --
2       MR. BEEMAN:  Sundeep, I'm sorry.
3  Everyone is lagging really bad on my end
4  here.  Can we take 10 seconds or 15
5  seconds?
6       MR. HORA:  Sure.
7       MR. BEEMAN:  Just to see if it's my
8  connection.  I apologize.  It seems to be
9  back to normal now.  I missed probably
10  about 10 to 15 seconds of the last
11  question.
12       BY MR. HORA:
13       **Q.  Do you recall any specific employee**
14  **that was disciplined for failing to clock in**
15  **and clock out appropriately?**
16       You've already told me your protocol.
17  I'm not really interested in your protocol.
18       I'm asking you specifically, do you
19  recall any employee other than Ms. Kubas who
20  was disciplined for failing to clock in or
21  clock out appropriately?
22       A.  Ms. Kubas was also disciplined for

Page 112

1  not only failing to clock in and clock out, but
2  for forging hours because she admitted that she
3  could go in and change her own hours in her
4  time clock.  And that was really the biggest --
5       **Q.  Sir, do you want to answer the**
6  **question or not?  Because we can also have this**
7  **deposition be done in front of the judge if**
8  **you're going to continue to not answer the**
9  **question that's being posed because that's the**
10  **next step, okay?**
11       **As much as you think this is fun and**
12  **games, it's not.  It's serious.  You're**
13  **testifying under oath under penalty of perjury.**
14  **Your testimony is going to be viewed by a**
15  **judge and potentially by a jury.  If you want**
16  **to continue this way, please do so.**
17       **But I'm warning you right now that if**
18  **you continue not to answer the question that**
19  **I've asked, I'm going to move to have this**
20  **deposition be conducted in front of the judge.**
21       **Do you understand me?**
22       A.  Understood.

19 (Pages 109 to 112)

Devin Conway - Vol. II

Page 113

1    Q.  Do you understand the question that's
2 posed?  I've now asked it five times.  Do you
3 want me to repeat it again for you?
4    A.  You asked the question if any
5 employee has been disciplined for --
6    Q.  Other than Ms. Kubas for failing to
7 clock in and clock out?
8    A.  I cannot recall any circumstance.
9 There may be paperwork of it.  But I cannot
10 recall any specific circumstance of an employee
11 being disciplined for any type of time clock
12 issue.  I cannot recall.
13        There could have been verbal
14 conversations, but there is no -- it's three
15 years later.  I don't have any memory of it.
16    Q.  You had indicated when I showed you
17 this text message from Ms. Kubas regarding
18 putting down 25 hours, that you didn't
19 understand why her hours were that high given
20 that she worked roughly eight to 10 hours
21 her per week, right?
22    A.  Correct, about two hours a day.

Page 114

1    Q.  If she working eight to 10 hours per
2 week, that means roughly on average she was
3 working between 16 to 20 hours per pay period,
4 right?
5    A.  Correct, I'd have to see the actual
6 pay period, but that sounds correct to me.
7    Q.  This is 331B 1284 through 1285.  I
8 just wanted to ask you about a particular text
9 message exchange.  This is a text message
10 exchange between yourself and Mr. Chisholm.
11 You ask him on June 20th, 2019, "Did you
12 already run adp?"  By the way just for your
13 reference, this is the day before Ms. Kubas was
14 terminated.  "Did you already run adp?  I just
15 realized I hadn't added Kim's 25 hours to it,"
16 this is that same 25 hours that we have been
17 talking about, right?
18    A.  It could have been.
19    Q.  Then you said, "Without having it
20 in front of me, I know we added the extra front
21 desk cleaning shift resulting in 30 more hours
22 a week and Bree and Kim have more hours after

Page 115

1 the club automation calls."
2    A.  It could have been.  I mean the club
3 automation calls fell within when Kim was
4 usually scheduled.  So I don't know if there
5 were more hours than that.  The club automation
6 calls were mainly my responsibility in terms of
7 -- the calls lasted about an hour, if that.
8    Q.  I didn't ask you anything about that,
9 but thank you for that.
10        The question is about your text
11 message here to Mr. Chisholm.  You said, "Bree
12 and Kim have more hours after the club
13 automation calls."  So my question for you,
14 sir, is it possible that she had an additional
15 five hours for that pay period due to the club
16 automation calls as you indicated in your texts
17 to Mr. Chisholm on June 20th, 2019?
18    A.  Incorrect, I said, "More hours."  I
19 did not give a definitive five.  So I'm not
20 sure if that would be considering the five
21 hours or if that was in reference to maybe Bree
22 having more hours.  Kim could have one more

Page 116

1 hour.  I'm not sure currently.
2    Q.  Would this have accounted for at
3 least some of the extra hours that might have
4 been included in Ms. Kubas' 25 hours that she
5 reported to you?
6    A.  Possibility, I can't say for sure.
7        MR. HORA:   We're going to take a
8 short five minute break.  We've been going
9 on for about an hour.
10    (Brief Recess)
11    (10:07 a.m. - 10:14 a.m.)
12    BY MR. HORA:
13    Q.  Mr. Conway, when you and Ms. Kubas
14 had that meeting in your office shortly after
15 the date of the benefit/open house, were you
16 angry at her for making this sort of accusation
17 that she had done with respect to your mother
18 and also to Ms. Beers?
19    A.  No, I was concerned about her.  I
20 mean she worked there for 10 years.  We've
21 never had an issue.  And then all of a sudden
22 she's acting out.  She's making these wild

## Devin Conway - Vol. II

Page 117

1  claims.  She's making things up.  She's getting
2  drunk and interacting with employees and
3  attacking other employees and talking bad about
4  me.  So I was just concerned.  I didn't know if
5  the managerial changes that had happened in the
6  past couple of weeks or whatever situation was
7  making her act this way.  So I was just more
8  concerned about her as an employee, what was
9  going on.
10      **Q.  Even though she's telling other**
11  **employees, one of them is your girlfriend, that**
12  **you were groping her in her office.  That**
13  **didn't cause you to be angry at her?**
14      A.  No, I'm shocked about it like I said.
15  She would make some up like that is ridiculous.
16  But I'm not going to like get mad or angry.  I
17  was concerned about her that like why are you
18  making these things up?  Why are you acting --
19  it's like a little kid acting out.  She's
20  acting out.  She's never had any disciplinary
21  problems before that.  Never any issues in the
22  five years I have known her there.  All of a

Page 118

1  sudden she's acting out.  She's making these
2  wild claims.  She's making up rumors.  She's
3  making up stories.
4        It seems like more of me as an
5  employer figuring out like what's going on with
6  my employee that she's acting this way --
7  that she's doing these things.  Like I said I
8  didn't know if it was managerial changes, if
9  there was something going on in personal life,
10  if she was having problems at home, what was
11  going on because she's never had any issues.
12       And her and I have always had a fine
13  work relationship.  Like we've always got along.
14  We've always done things.  I trained her for
15  four years.  I trained her son at the same
16  time.  So I'm not sure where it really came
17  from.  So that's why it was more out of a
18  concern.
19       Of course, a little ego -- you're
20  going to be upset egoically (sic).  But as an
21  employer you can't bring your ego into it.  You
22  got to think of --

Page 119

1      **Q.  Is that a word, "Egoically?"**
2      A.  It could be now.  It's on the record
3  right?
4      **Q.  With respect to Ms. Butler-Williams,**
5  **did you get along with her as well?**
6      A.  Similar situation.  I mean LaToya
7  always had a few issues throughout the years
8  that I was there in terms of members and things
9  like that.  Nothing ever documented.  Nothing
10  ever big.  But a few things like that.
11       I know she went through a rough time
12  for a period there as well.  Her and I always
13  got along great.  Like I said it wasn't until
14  the Ryan Brewer situation that I had to mediate
15  between her and Ryan Brewer, we were fine then.
16       It was after Ryan left then I'm in
17  charge and that's when issues came up there
18  too.
19      **Q.  You attribute the issues that Ms.**
20  **Kubas and Ms. Williams had to the fact that**
21  **they were unhappy with the fact that you had**
22  **become general manager, is that fair to say?**

Page 120

1      A.  Correct.
2      **Q.  When you first became the general**
3  **manager, was there an employee handbook in**
4  **place?**
5      A.  Yes.
6      **Q.  Who had crafted that employee**
7  **handbook, if you know?**
8      A.  It had been around for a little bit
9  before me.  I want to say it was either -- it
10  was probably Ryan VanBrackel, the GM before.  I
11  don't know if the GM before that was around
12  before then.  I remember Ryan VanBrackel did
13  kind of make a big instance about having a
14  formal updated handbook.  So I remember it
15  going throughout an email.  I remember we had a
16  meeting about it I'm pretty sure.  That's about
17  it.
18      **Q.  This would have been under the prior**
19  **ownership before 331B, LLC, Sid Saab and Mr.**
20  **Chisholm became the owners, right?**
21      A.  I would assume so.  But I can't give
22  you definitive dates.  I know Mr. VanBrackel

21 (Pages 117 to 120)

## Devin Conway - Vol. II

Page 153

1  in more money to cover the expenses, do you see
2  that text message?
3      A.  Yes.
4      Q.  This is 331B 1291.  Ms. Kubas
5  responds at 9:45 a.m., "I am at an appt for my
6  daughter right now.  As soon as I get to a
7  computer I will let you know the amount being
8  deposited.  And I will have them back by 2pm,"
9  I think "Bank" is what she meant, right?
10     A.  Yes.
11     Q.  Right, at 9:45?
12     A.  Yes.
13     Q.  Then you claim she clocked in at
14  10:03 according to your affidavit, right?
15     A.  Yes.
16     Q.  It looks like at 10:07 a.m. she
17  actually tells Mr. Chisholm, "The total that
18  will be deposited is $602.87.  Letting you know
19  in case you need to deposit more.  I will get
20  there as soon as I'm done with this appt,"
21  that's at what time, sir?
22     A.  10:07 a.m. but she's actually at the

Page 154

1  appointment.
2      Q.  My question is that if she was doing
3  work at the appointment like if she was able
4  to figure out stuff on her phone as to what
5  the deposits were and stuff like that -- if she
6  was actually working wouldn't it have been
7  appropriate for her to have clocked in at that
8  time in order for her to get that information
9  to Mr. Chisholm that he had requested and per
10  your previous text message with him, that when
11  she's working from home that she needed to
12  clock in?
13     A.  I would assume that she was probably
14  driving home from the doctor's office as well
15  and she remained clocked in to my knowledge.
16  Once again if you --
17     Q.  That's not the question, sir.
18         Again you are assuming things and I'm
19  asking you if at 10:03 that you see that she's
20  logged in and you inform Mr. Chisholm about it
21  and then four minutes later she is now giving
22  him the information that he said he needed

Page 155

1  urgently to know so that they could deposit
2  additional funds if necessary to cover
3  expenses, that she was actually properly on the
4  clock for those few minutes at least?
5      A.  I can't answer that question because
6  that's between her and Mr. Chisholm.  I simply
7  just told him that, "Hey, she's on the clock
8  right now."
9      Q.  If she's on the clock right now and
10  four minutes later she's actually performing
11  duties related to her work, was it appropriate
12  for her to clock in at the point?
13     A.  At that point that was between her
14  and Mr. Chisholm.  Like I said she was the --
15     Q.  You are her supervisor.  You are the
16  one telling her to clock in and clock out
17  appropriately.  So isn't it between --
18     A.  But I didn't --
19     Q.  Isn't it between you and her as well?
20     A.  I didn't give her permission to work
21  from home.  Mr. Chisholm was the one that gave
22  her the permission to work from home and they

Page 156

1  were directly communicating.
2      Q.  I'm not sure how that's relevant that
3  he gave her permission to work from home.  Let
4  me --
5      A.  Once again I didn't ask her to clock
6  in.  So I wasn't the person in charge of what
7  she was doing.  So I don't know.  I just
8  reported that she's clocked in.  A simple fact.
9      Q.  Sir, I'm not asking you about that.
10         Why don't we go back to this text
11  message again.  Maybe this will help.
12         You wrote on June 17th to Ms. Kubas,
13  "The call is at 1.  From now on you will have
14  to clock in/out when you are here and when you
15  are working from home.  No exceptions," you
16  wrote that, right?
17     A.  Yes, that's the text message.
18     Q.  You said when you are here or when
19  you are working from home, no exceptions,
20  right?
21     A.  Yes, from --
22     Q.  And now I've shown you where she has

MGB REPORTING, INC.
(301)983-9315 - mgbreporting.com

**Devin Conway - Vol. II**

Page 157

1   clocked in.  Then four minutes later she is
2   providing the information that's requested.
3   So she was working.
4        Was it appropriate for her to have
5   clocked in at that point based on your
6   instructions to her just four days before?
7        MR. BEEMAN:  Objection.
8        THE WITNESS:  Are you going to show
9   me if she clocked out?  Did she clock out
10   when she --
11        MR. HORA:  That's not the question.
12   BY MR. HORA:
13        Q.  I'm asking you at that moment she
14   clocked in and four minutes later she's giving
15   the information that's requested by the owner
16   and following your instructions per your text
17   message to her that she is to clock in and
18   clock out even when she's working from home,
19   no exceptions, was it appropriate for her to
20   have clocked in at that point?  I don't care
21   about clocking out.  I don't care about driving
22   home.

Page 158

1        Was it appropriate for her clock in
2   at that time per your instructions?
3        A.  Per my instructions, I technically
4   said, "Work from home."  But I guess working
5   from the doctor's would be between her and Mr.
6   Chisholm.  It's appropriate if it's between
7   them.  But technically yes, she clocked in to
8   do the work.  As long as she clocked back out
9   and didn't leave the time clock running, then
10   that could be appropriate.
11        MR. HORA:  We're going to take a
12   short restroom break.  We'll come back at
13   11:05.
14        (Brief Recess)
15        (10:59 a.m. - 11:05 a.m.)
16        BY MR. HORA:
17        Q.  I'm going to go back to Mr.
18   Chisholm's affidavit.
19        Correct me if I'm wrong, you have
20   reviewed Mr. Chisholm's affidavit, right?
21        A.  It's probably been -- when did they
22   get submitted, December of 2019?  So I probably

Page 159

1   haven't seen it since then until today when you
2   showed it to me.
3        Q.  I can show you a text message or
4   email if you want, but maybe we can shortcut it.
5        Mr. Chisholm sent it to you for your
6   review to make sure that what he had put in
7   there was accurate, correct?
8        A.  Possibly, I don't recall.
9        Q.  Let me find that for you.  Hold on.
10   I want don't want to say anything to you that
11   you don't think is accurate.
12        This is 331B 1285.  This is a text
13   message exchange between yourself and Mr.
14   Chisholm.  It's dated December 9th, 2019,
15   "Devin, I know you have a lot to accomplish
16   today including payroll so I would make this
17   request secondary but I need to send you my
18   affidavit for Kim Kubas for you to read and
19   confirm it is accurate.  I do not want to sign
20   it if something is not correct.  Do you mind
21   sending it to Bobbi as well or would you prefer
22   I send it?  I understand she's probably pissed

Page 160

1   off at me right now but I don't mind sending
2   it," does that refresh your recollection as to
3   whether or not Mr. Chisholm asked you to review
4   his affidavit?
5        A.  Yes, and it's right there in the
6   text.
7        Q.  Do you recall actually reviewing it?
8        A.  I can't actually recall.  I don't
9   remember reading the details or anything of it.
10   But if he asked me through text then it's about
11   all I got.
12        Q.  But you wouldn't have refused him, at
13   that point you were still working for him,
14   right?
15        A.  I guess.
16        Q.  Do you recall ever refusing to review
17   his affidavit?
18        A.  I don't recall accepting or refusing.
19   I really don't have a memory of that.
20        Q.  What was he referring to here that
21   Bobbi might be missed off at me right now?
22        A.  So back in December of 2019, I do

# EXHIBIT 3

**Brian Chisholm**

```
 1               UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MARYLAND

 3                    Northern Division

 4     ------------------------------x

 5     KIMBERLY KUBAS               :

 6               Plaintiff,         :

 7     vs.                          : Civil Action No.

 8     331B, LLC                    : 1:20-cv-2456

 9     (D/B/A ROCKWELL FITNESS)     :

10               Defendant.         :

11     ------------------------------x

12                         Potomac, Maryland

13                         Wednesday, July 28, 2021

14     Video Conference Deposition of:

15               BRIAN CHISHOLM

16     the witness, called for examination by counsel for

17     the plaintiff at MGB Reporting, 9805 Korman Court,

18     Potomac, Maryland, commencing at 9:32 a.m. before

19     Matthew Kwong, via video conference, Court Reporter

20     and Notary Public in and for the State of Maryland,

21     and present on behalf of the respective parties:

22
```

Brian Chisholm

Page 10

1   in the instructions.  If there's a question you
2   don't understand, feel free to let me know.
3   I'm happy to rephrase it for you, okay?
4       A.  Okay.
5       Q.  With respect to your comment that
6   you are, "by default running Rockwell Fitness,"
7   what did you mean by that?
8       A.  When we bought Rockwell Fitness, we
9   expected it to me a kind of secondary income,
10  not for us to be in there on a daily basis on
11  a day-to-day process, but through -- it's a
12  financial struggle.  It was a financial
13  struggle when we bought it due to some things
14  that weren't presented to us.
15      And when COVID hit, you might know --
16  I don't know if you've looked at the landscape,
17  but we've lost about 30% of our gyms across the
18  nation.  I think it's actually 32%.
19      So, I went in and started to try to
20  help out wherever I could.  Everything from
21  cleaning to hiring to running day-to-day kind
22  of operations inside the gym.

Page 11

1       So, it wasn't my vision that I would
2   be running the gym at this point.  But due to
3   such financial stress, my wife is also an
4   occupational therapist and she helps out where
5   she can in the group exercise department of
6   the gym.
7       Q.  Approximately how many employees does
8   Rockwell Fitness have currently?
9       A.  Currently, probably 16 W-2 employees,
10  which is our people that work the front desk
11  kind of the hourly people.
12      We do have some personal trainers that
13  work on a contractual basis, 1099, that sort of
14  thing that may work at three or four different
15  gyms at times and come in to train some of
16  their people in our facility.
17      Q.  How many 1099s would you say that you
18  have?
19      A.  Right now, we probably have --
20  because this includes group instructors who
21  might teach yoga or bodypump or one of those
22  types.  We probably have ten to 12.

Page 12

1       Q.  When did you purchase Rockwell
2   Fitness?
3       A.  August of -- I think it was actually
4   September 1st of 2018 is when it went into
5   operation.
6       Q.  At the time that Ms. Kubas was
7   employed at Rockwell Fitness, right prior to her
8   termination which we'll just say was in July of
9   2019, do you agree with that?
10      A.  Yeah, I think it was late June of
11  2019 is correct.
12      Q.  In that summer of 2019, approximately
13  how many employees did Rockwell have at that
14  point?
15      A.  It was much larger.  It was probably
16  35 to 40 people as W-2s because we were running
17  kid's club, which took quite a few different
18  employees.  Most of them being part-time with a
19  couple of that were considered full time, the
20  front desk manager, the general manager, the
21  personal training director.  So, 32 with those,
22  but I will you that our 1099s employees were

Page 13

1   quite larger then because we were running so
2   many group exercise classes.  We had more
3   personal trainers.  So, that was upwards of 40
4   to 50 if you were to take that whole span.
5       Q.  Is the kid's club no longer operating
6   at this point because of the pandemic?
7       A.  Not at this point.  We've tried to
8   open it up a couple of times and just have not
9   much of an attendance.  I don't know if that's
10  an environmental thing or more parents are home
11  right now.  We do hope to open some sort of a
12  kid's club back up in the future.
13      Q.  When were you elected as a state
14  delegate?
15      A.  I was elected in 2018.  November of
16  2018, I won the general election.
17      Q.  In terms of who owns Rockwell
18  Fitness, it's yourself and Mr. Saab, is that
19  correct?
20      A.  That is correct.
21      Q.  Mr. Saab is also a state delegate, is
22  that correct?

4 (Pages 10 to 13)

**Brian Chisholm**

Page 38

1  this was obviously prior to us purchasing the
2  business.
3      I think in 2015 -- and I don't want
4  to say that I have a copy because I recall
5  somebody saying we had a copy of it -- that she
6  had signed and confirmed email receipt of which
7  early on in that handbook, which I reviewed
8  several times.  I think it's in section 16
9  falsifying of documents can lead to dismissal.
10     Q.  It sounds to me like you don't have
11  any proof that she actually falsified any
12  documents other than your conjecture regarding
13  the statistically impossible nature of her
14  time metrics, correct?
15     A.  I think it's falsifying documents if
16  you are in a doctor's appointment and you check
17  in and were unaware.
18         Obviously, weeks leading up to that
19  I think in her own texts of which you have read,
20  "My time clock is all fucked up.  Can you fix
21  it?" was a text message from her to Devin.
22     Q.  Was she the only employee that you

Page 39

1  are aware of again around the time that she was
2  employed at Rockwell shortly before her
3  termination, so let's say in the 2019 timeframe,
4  was she the only employee that you are aware of
5  that had issues with clocking in and out?
6      A.  No, there were some times when people
7  at the front desk and the young kids would come
8  in and forget to check in.  But they were
9  required that day to tell the manager, "I
10  forgot to check in this morning," or "I just
11  left and I forgot to check out," and it had to
12  be recorded that day and marked in the system.
13  We certainly did not let employees go back and
14  say, "I worked 25 hours.  I forgot to check
15  in every one of those 25 hours, or out."
16     Q.  I'm going to show you a document.
17         Can you see this on your screen, sir?
18     A.  I can.
19     Q.  Can you see it clearly?
20     A.  Yes.
21     Q.  I'm going to be showing you some
22  documents throughout this deposition and I'm

Page 40

1  going to be identifying them using their bates
2  number, which is this number, do you see this
3  number down here, 331B 0032?
4      A.  I do.
5      Q.  This document is 331B, 32 through 39,
6  do you agree with me, sir?
7      A.  I do.
8      Q.  Is that your signature right there
9  dated 12/11/19?
10     A.  That is.
11     Q.  You swear and affirm under the
12  penalty of perjury that the foregoing is true
13  and correct upon your personal knowledge?
14     A.  That is my signature.
15     Q.  Do you recognize this document, sir?
16     A.  It's an affidavit.
17     Q.  This was an affidavit that you
18  submitted to the EEOC, is that correct?
19     A.  That is correct.
20     Q.  I'm going to go to paragraph 19.b.
21  of your deposition.  I will zoom in on it.  I
22  just want you to see where I am going and I

Page 41

1  will zoom in.
2      A.  Thank you.
3      Q.  You let me know when you can --
4      A.  Perfect.
5      Q.  Is that good?
6      A.  That will work.
7      Q.  Feel free to read this section right
8  here (indicating).  But the part I'm going to
9  focus on is 19.b.  Let me know when you are
10  done.
11     A.  (Reviewing).
12     Q.  While you are reviewing that, I'm
13  going to let you know that if you ever want to
14  look at anything before or after what I've
15  presented to you, feel free to ask me.  I'm
16  happy to accommodate that.
17     A.  Thank you, sir.
18     Q.  I don't want you to think that I'm
19  just showing you certain sections out of
20  context.  I'm just trying to be efficient and
21  we're not in a deposition where we are in a
22  conference room where I'm handing you an entire

MGB REPORTING, INC.
(301)983-9315 - mgbreporting.com

Brian Chisholm

Page 66

1  financial gym putting our own money in to pay
2  people's pay every month at times.  We
3  certainly wanted to know about them.
4      Q.  Let me just shortcut it to you this
5  way and maybe we can do it this way.
6      Are you aware of any person who has
7  been disciplined other than Ms. Kubas for
8  allegedly failing to clock in or clock out
9  correctly?
10     A.  I am aware of Tommie Parker being
11 orally disciplined.  I am aware of -- can you
12 go up, because I don't want to speak out of
13 turn.  I know Tommie Parker was warned.  Jack
14 Kriel was definitely warned.  Andrew was
15 probably orally warned.
16     Q.  "Probably," meaning you don't know
17 for sure?
18     A.  Yeah, I'm not going to say
19 definitively because once again, there were --
20     Q.  I'm only asking for the ones that you
21 have personal knowledge of, sir.
22     Do you have personal knowledge as to

Page 67

1  who received any form of discipline for
2  failing to clock in and clock out correctly, or
3  timekeeping in general?  That's the question.
4      A.  Okay, I just gave it to you.
5      Q.  Anybody else besides -- was it Tommie
6  Parker and Ryen Dill?
7      A.  That's correct.
8      Q.  Those are the only two people you
9  are aware of and of those two people, you
10 indicated that they were orally told to fix it,
11 right?
12     A.  They were told to clock in and clock
13 out.
14     Q.  Do you know when that oral warning
15 was given to either of these individuals?
16     A.  I do not have knowledge of the exact
17 time and date.
18     Q.  Do you know if it was before Ms.
19 Kubas was terminated or after Ms. Kubas was
20 terminated?
21     A.  On the ones you just showed me, it
22 was certainly after because that was all post,

Page 68

1  I believe, of what I was just looking at.  I
2  don't know if I'm correct on that or not.
3      Q.  You don't know when they were
4  informed orally that they needed to clock in
5  and clock out appropriately?
6      A.  On the document you just showed me?
7      Q.  Well, the document I showed you was
8  just them reporting that they have issues with
9  clocking in and clocking out.  I didn't see --
10     A.  That was --
11     Q.  Hold on, I'm sorry.  Let me just
12 finish the question again just so the court
13 reporter has a clean record.
14     I didn't see anything in there about
15 any sort of oral warnings or anything like
16 that, did you?
17     A.  I did not.
18     Q.  The question is:  If you know when
19 these individuals were actually warned about
20 their timekeeping issues?
21     A.  I do not.
22     Q.  Do you know for a fact that they were

Page 69

1  actually warned?
2      A.  I do.
3      Q.  Were you the one giving the warning?
4      A.  No, I was not.
5      Q.  Who did?
6      A.  Ryan Brewer.
7      Q.  Okay, so Ryan Brewer.
8      Are you aware if Mr. Conway ever
9  warned any other employee about their
10 timekeeping?
11     A.  Off the top of my head, I do not
12 recall.  When you said, "Any other," you meant
13 other than Ms. Kubas, correct?
14     Q.  Other than Ms. Kubas.  That's correct.
15     A.  Okay.
16     Q.  Yes, thank you for that clarification.
17 I just want to close the loop on this if that's
18 okay.
19     Ms. Kubas, we both discussed, was
20 terminated in June of 2019 and you will agree
21 with me that there are instances after her
22 termination, for example, September 3rd, Ryen

Brian Chisholm

Page 70

1   Dill is indicating that, "Conor McCann Watkins
2   was here at 5pm he clocked in late," Tommie
3   Parker, "I forgot to clock out yesterday,"
4   Tommie Parker, "I forgot to clock out 9/4 at
5   6pm," Ryen Dill, "I'm not sure what happened w
6   time clock yesterday but 1-7 if it didn't
7   work," Bree Moore is indicating that the day
8   before, Amber worked from, "4-5," Ms. Moore is
9   also indicating, "I forgot to clock out
10  yesterday.  I left at 10:05pm," that these all
11  occurred after Ms. Kubas had already been
12  terminated for allegedly failing to maintain
13  her time appropriately, correct?
14       A.   That is correct.  For the record, it
15  wasn't that -- she falsified where she was.  On
16  every one of those records you just showed me,
17  we didn't believe any of them were falsified.
18  They were just due out of not clocking in or
19  clocking out, but then letting us know.
20            MR. HORA:  We've been going for an
21       hour now.  I just want to take a five
22       minute break and we can reconvene.

Page 71

1        It's 10:41 according to my clock.  We can
2   reconvene at 10:46.
3        I should warn you, sir, that you are
4        not allowed to discuss any of your
5        testimony with your attorney during any of
6        these breaks.  You are still under oath for
7        all purposes even while we are on break,
8        alright?
9            THE WITNESS:  Yes, sir.
10           (Short Recess)
11           (10:41 a.m. - 10:49 a.m.)
12       BY MR. HORA:
13       Q.   I want to get back to your affidavit,
14  sir, to close the loop on this other issue that
15  we were talking about.
16            Looking at 19.b, this statement,
17  "The Email alleged that Mr. Conway was berating
18  Ms. Kubas for not clocking in even though other
19  employees frequently failed to clock in and
20  out, but there have been no issues with
21  employees failing to clock in and out, except
22  for Ms. Kubas," I wanted to ask if you would

Page 72

1   agree with me that this is an inaccurate
2   statement based on what we just looked at in
3   terms of the Slack channel?
4        A.   Once again, it's a definition of
5   issues.  An issue would have occurred if we
6   couldn't visually verify that somebody had been
7   there.  A manager could go back and look at the
8   clock and say, "Oh, alright.  Andrew was here
9   at 9 a.m." or, "Andrew did work," because we
10  had verifiable evidence.
11            If I would have found out that
12  somebody had clocked in and was not in the gym,
13  and then clocked out later not in the gym, then
14  it would have been an issue.
15            So, if we want to parse words, I
16  would say it's still an accurate statement
17  because I didn't feel like there was issues
18  where I felt like people were falsifying
19  documents.  If you want to say issues of we
20  need to reiterate they have to clock in and
21  clock out every time, I'll accept that as --
22       Q.   We're not trying to parse words.  I'm

Page 73

1   just using your words from your affidavit, sir.
2        Do you agree with me then in
3   paragraph 19.b., the word "fraud," or
4   "fraudulently," or anything of that sort is not
5   indicated in your statement?
6        A.   My statement was with issues.
7        Q.   Right, "...there have been no issues
8   with employees failing to clock in and out,"
9   you didn't write no issues with employees
10  failing to clock in and clock out and
11  fraudulently recording their time, right?  You
12  just said, "issues with employees failing to
13  clock in and out."  It's your opportunity, sir.
14       Do you agree with me that this
15  statement is incorrect based on the fact that
16  I've now shown you several instances in which
17  employees, and in certain cases in multiple
18  instances, have failed to clock in and clock
19  out appropriate?
20       A.   I will give you that we had employees
21  that failed to clock in and clock out.
22       Q.   We are going to move on to a

19 (Pages 70 to 73)

Brian Chisholm

Page 90

1  fired." She then filed for unemployment.
2      Q.  At the time that you asked about that
3  statement was allegedly made or exchanged
4  between yourself and Ms. Kubas, had you made
5  the determination that you were going to
6  terminate her?
7      MR. BUCKEL:  Objection. Counsel,
8  I'm sorry. I'm confused. What statement?
9  The statement that Mr. Chisholm just made
10  or the statements you're referring to in
11  the email?
12      MR. HORA:  Thank you for the
13  clarification. The statement that you
14  just made regarding at the time when I
15  indicated to you that Ms. Kubas ultimately
16  was fired, you said that you never fired
17  her, and you asked for an explanation
18  on the day that she was terminated,
19  correct?
20      THE WITNESS:  Correct.
21  BY MR. HORA:
22      Q.  At the time that you had that

Page 91

1  discussion with Ms. Kubas on the day of her
2  termination, were you intending on firing her?
3      A.  I had told Sid even though -- Mr.
4  Saab, that if she couldn't explain we may have
5  to fire her. He was the person I indicated
6  that to. Never once did I say, "You're fired."
7      Q.  Getting back to this email, there's
8  something that Ms. Kubas is nervous about
9  telling you because she's afraid that she would
10  be fire --
11      A.  Right.
12      Q.  -- and that, "If you said something
13  to him he would either deny it happened or flip
14  it around her the persuer," is it possible,
15  sir, that Ms. Williams was actually referring
16  to sexual harassment by Mr. Conway towards
17  individuals who are working at Rockwell
18  Fitness -- women who are working at Rockwell
19  Fitness?
20      MR. BUCKEL:  Objection to the extent
21  that it calls for speculation. The
22  witness may answer.

Page 92

1      THE WITNESS:  I agree, it's
2  speculation. I don't -- that's not the
3  way I looked at it that day.
4  BY MR. HORA:
5      Q.  You didn't interpret her discussion
6  with you or this follow-up email to have
7  anything to do with inappropriate behavior by
8  Mr. Conway towards women of the sexual nature?
9      A.  I do not believe so.
10      Q.  Do you still stand by your affidavit,
11  sir, that the first time that you learned about
12  any sort of issues with respect to Mr. Conway
13  and women was June 12th when Ms. Kubas first
14  approached you about it?
15      A.  I do. I believe that was the first
16  time that she had ever mentioned to me any
17  sexual harassment or whatever she had felt.
18      Q.  Ms. Williams' email states that Ms.
19  Kubas was, "Nervous about telling you because
20  she was afraid that she would either be fired,"
21  et cetera.
22      Do you understand that Ms. Kubas was

Page 93

1  afraid that if she disclosed something to you
2  at that point, that she feared that she could
3  lose her job?
4      MR. BUCKEL:  Objection to the extent
5  it calls for speculation. It's someone
6  else's mindset. To the extent that you can
7  answer, Mr. Chisholm. Please do.
8      MR. HORA:  I'm actually asking about
9  his mindset.
10      BY MR. HORA:
11      Q.  Did you understand that Ms. Kubas
12  after reading these words and having your
13  discussion with Ms. Williams on Friday, May
14  31st, that Ms. Kubas was nervous that she could
15  lose her job as a result of disclosing
16  something to you related to Mr. Conway?
17      MR. BUCKEL:  Same objection.
18      THE WITNESS:  I don't know if I
19  would have accepted that because on June
20  4th, all the way until the day of Ms.
21  Kubas leaving Rockwell Fitness, we had a
22  very solid, strong, almost a friend

24  (Pages 90 to 93)

**Brian Chisholm**

Page 94

1    relationship.  We trusted her with a lot
2    of stuff.  I would never have fired her.
3        There's no thought in my mind that I
4    would ever have fired her at that point or
5    even going forward because she was in
6    charge of some accounts and I consider Ms.
7    Kubas a friend all the way up until the
8    day in question when we found out she is
9    indeed falsifying documents.
10       So no.  I did not take that as --
11   Ms. Williams may have felt that way.  I
12   don't want to speak for how Ms. Kubas
13   felt, but I certainly didn't feel that
14   way.
15       BY MR. HORA:
16       **Q.  It's not so much her -- let me ask**
17   **the question again because maybe we can try it**
18   **a different way because, you know, regardless**
19   **of how you felt about it or Ms. Williams felt**
20   **about it, I'm asking you whether or not that at**
21   **least at this moment, June 4th, 2019, you were**
22   **aware that Ms. Kubas feared retaliation if she**

Page 95

1    **disclosed something to you regarding something**
2    **having to do with Mr. Conway?**
3        **That's all I'm asking.  Whether or**
4    **not you believe that she had a basis to do it**
5    **based on your relationship -- that's not really**
6    **relevant.**
7        **The question is whether or not at**
8    **this point on June 4th, 2019, you at least knew**
9    **that Ms. Kubas was afraid that she could lose**
10   **her job as a result of disclosing something**
11   **related to Mr. Conway?**
12       MR. BUCKEL:  Same objection as to
13   the basis of the --
14       THE WITNESS:  I was --
15       MR. BUCKEL:  -- Conway?
16       THE WITNESS:  I was aware that Ms.
17   Williams had been in communication with
18   Ms. Kubas.  What Ms. Kubas believed at
19   that time?  I don't know.
20       BY MR. HORA:
21       **Q.  But you at least knew that there was**
22   **a possibility that she was fearing for her job**

Page 96

1    **if she told you something about Mr. Conway?**
2        MR. BUCKEL:  Same objection as to
3    the basis for the question, of his
4    interpretation of what she thought.
5        MR. HORA:  Go ahead and answer.
6        MR. BUCKEL:  You can answer, Mr.
7    Chisholm.
8        THE WITNESS:  Can you repeat the
9    question?  I'm sorry.
10       MR. HORA:  Sure.
11       BY MR. HORA:
12       **Q.  As of this moment, you knew that at**
13   **least Ms. Kubas had communicated to Ms.**
14   **Williams that she was nervous about her job if**
15   **she disclosed something to you related to**
16   **Mr. Conway?**
17       A.  Yes, Ms. Kubas -- or Ms. Williams had
18   obviously communicated that to me through an
19   email.
20       **Q.  In between receiving this email, June**
21   **4th, 2019, and your conversation that you**
22   **referred to in your Affidavit at paragraph 9**

Page 97

1    **that you had conversation with Ms. Kubas on**
2    **June 12th -- so in between June 4th and June**
3    **12th, did you at all conduct any sort of an**
4    **investigation into any allegations raised by**
5    **Ms. Williams with respect to Mr. Conway?**
6        A.  I know that I asked several people
7    about the night of -- and I don't recall the
8    date -- that there was confrontation between
9    Ms. Kubas and Ms. Beers.
10       **Q.  Are you sure this occurred between**
11   **June 4th and June 12th prior to you having that**
12   **conversation with Ms. Kubas -- that first**
13   **conversation?**
14       A.  It may have been between -- I'm not
15   certain of the dates of those conversations or
16   finding out what happened that evening.
17       **Q.  Ms. Williams refers to an incident**
18   **between herself and Mr. Brewer.  Are you aware**
19   **of any incident involving Mr. Brewer and Ms.**
20   **Williams?**
21       A.  She did not like Mr. Brewer.
22       **Q.  Did this result with any sort of**

**MGB REPORTING, INC.**
**(301)983-9315 - mgbreporting.com**

Brian Chisholm

Page 110

1    A.  I did.
2    Q.  **What was his response?**
3    A.  He said, "Absolutely not."
4    Q.  **And you believed him?**
5    A.  I believed him but I still believed
6    it was my job to continue to investigate every
7    possible person or situation where somebody
8    could have knowledge of it.
9    Q.  **I guess I'm just curious to know.**
10   **What prompted your investigation, was**
11   **it Ms. Kubas' discussion with you on June 12th**
12   **or was it the issues that were raised by Ms.**
13   **Butler-Williams to you on or about May 31st,**
14   **2019?**
15   A.  I believe it was when Ms. Kubas told
16   me the allegations and what she felt.
17   Q.  **I'm willing to move on after this.  I**
18   **just got to know -- I want to make sure this is**
19   **clear.**
20   **When she said that she had told you**
21   **about how other ladies are talking about**
22   **leaving because they feel uncomfortable around**

Page 111

1    **Devin, you did not investigate that particular**
2    **allegation, correct?**
3    A.  I think I still wanted to know in
4    what reference was Devin now being viewed.
5    This is a gentlemen that has worked at that gym
6    for -- I can't remember when Devin came in, but
7    Devin had a solid relationship with Ms.
8    Williams, obviously with Ms. Kubas until a
9    certain point, and many of our members.  And if
10   they are saying that they are uncomfortable
11   around Devin because all of a sudden he's a
12   general manager yielding more authority, I
13   probably did want to find out has he changed,
14   is he doing his job --
15   Q.  **I'm not asking you, sir, what you**
16   **probably wanted to do.  I want to find out what**
17   **you actually did.**
18   A.  I'm sure I asked --
19   Q.  **I don't want to know about what**
20   **you're sure of.  I want to know what you**
21   **actually remember doing.  Anything else is**
22   **speculation.  So you're not doing yourself a**

Page 112

1    service by saying that.
2    I'm going to ask you again, what did
3    you do that you actually remember doing?  What
4    did you actually ask about, what did you
5    actually do?  Not what you think you might have
6    done or should have done or probably would have
7    done.  What did you actually do?
8    MR. BUCKEL:   I'd like to make a note
9    on the record, Mr. Chisholm has answered
10   the question and will continue to answer
11   on the verbiage that he sees fit.  And
12   Mr. Hora can take concerns of that as he
13   wants.  But go ahead, Mr. Chisholm.  Try
14   to answer the question to the best of your
15   ability.
16   THE WITNESS:   Without being 100%
17   accurate, I don't want to answer
18   incorrectly because I don't recall the
19   exact dates.
20   BY MR. HORA:
21   Q.  **But you recall actually having a**
22   **discussion with Mr. Conway about this?**

Page 113

1    A.  I do recall having a conversation
2    with Mr. Conway.
3    Q.  **Did Ms. Williams or Ms. Kubas ever**
4    **express to you that they wanted to be the**
5    **general manager?**
6    A.  I don't recall.  The only
7    recollection was Ms. Sheila White saying I
8    should hire one of those two to be the general
9    manager.
10   Q.  **This is a text message exchange**
11   **between Ms. Williams and Ms. Kubas.  I just**
12   **want to show you that on June 11th, Ms. Kubas**
13   **indicated that she, "Talked to Brian... he did**
14   **have a talk with Devin.  If you can call me..**
15   **if not I'll try to fill you..." and if you can**
16   **see, it's Tuesday, June 11th, do you see that**
17   **date there?**
18   A.  I'm going to take your word for it
19   because it's very small.
20   Q.  **I can zoom in.  How's that?**
21   A.  Okay, I don't see 12th, but I'll take
22   your word for it.

29  (Pages 110 to 113)

Brian Chisholm

Page 134

1  with Mr. Conway being sexually aggressive
2  towards her, meaning Ms. Kubas.
3          There's no connection in your mind
4  whatsoever, right?
5          MR. BUCKEL:  Objection to the
6  question.
7          THE WITNESS:  No, at that point I
8  believed after June 12th it had probably
9  more to do with Devin being the general
10  manager.  Much like the email that we
11  keep referring back to with Ms. Williams,
12  they didn't like his new position as the
13  general manager because Ms. Kubas had
14  worked with Mr. Conway for several years
15  without ever mentioning this.
16          BY MR. HORA:
17      Q.  My question though is that when she's
18  indicating to you that Mr. Conway's demeanor
19  towards her changed, right?
20          And then she's indicating here in her
21  written complaint, "Since then things have
22  gotten worse."

Page 135

1      A.  Right.
2      Q.  She's also said to you, "I have felt
3  highly uncomfortable around Devin since this
4  came to light, due to the fact he is singling
5  me out.  It is without a doubt related to my
6  bringing his sexual harassment to light,"
7  right, that he is now retaliating against her,
8  correct?
9          Does she express this sentiment to
10  you in her written complaint that she feels
11  like Mr. Conway is retaliating against her,
12  would you agree with that?
13          MR. BUCKEL:  Are you asking him to
14  read the email?
15          MR. HORA:  I'm asking whether or not
16  he agrees that she's expressing to him
17  that she felt like he was retaliating
18  against Ms. Kubas.
19          THE WITNESS:  Yes, absolutely.
20  These are her words.  I would agree that
21  this is what she put down.
22          MR. HORA:  That's all I'm asking.

Page 136

1          BY MR. HORA:
2      Q.  You interpreted this to mean that
3  Ms. Kubas at least felt that she was being
4  retaliated against for bringing Mr. Conway's
5  sexual harassment to light, correct?
6          MR. BUCKEL:  Objection.
7          THE WITNESS:  That's correct.
8          BY MR. HORA:
9      Q.  One of the ways in which Mr. Conway
10  had been harassing her was about the fact that,
11  according to her, was that he was berating her
12  about not clocking in appropriately, right?
13      A.  My investigation into that was to
14  interview the other person in the room, Ms.
15  Sara Krall (ph), who categorically denies him
16  berating her.  He just said, "You must clock
17  in.  Everybody else does.  You're better than
18  anybody else."  I do recall all of that.
19      Q.  Did you ever receive any other
20  complaints about Mr. Conway berating employees
21  for failing to clock in and clock out
22  correctly?

Page 137

1      A.  I don't recall Mr. Conway berating
2  anybody else.  And I don't recall Mr. Conway
3  ever berating Ms. Kubas.  I believe he told
4  Ms. Kubas in the same manner that he would tell
5  everybody else.  "You must clock in and out."
6      Q.  Ms. Kubas in a discussion says here,
7  "There are plenty of times staff forgets to
8  clock in, and he has never had an issue with
9  anybody else previously," right?
10      A.  That sounds correct.
11      Q.  You will agree with me based on the
12  Slack channel we reviewed in the other emails,
13  that this is in fact correct, that at least
14  plenty of times staff forgets to clock in,"
15  correct?
16      A.  They do forget to clock in, but we
17  have visual evidence of when they are there.
18      Q.  Even in the instances where I showed
19  you that these corrections were being made two
20  weeks after the fact, it's your testimony that
21  you had visual evidence that people were
22  actually present two weeks later when there is

MGB REPORTING, INC.
(301)983-9315 - mgbreporting.com

**Brian Chisholm**

Page 150

1    Q.  Do you recall, sir, me asking you the
2  question just a short while ago that when you
3  asked Mr. Conway as part of your investigation
4  whether or not he had inappropriately touched
5  Ms. Kubas based on her allegation of the same,
6  that that actually occurred during the time
7  that Ms. Kubas was employed by Rockwell
8  Fitness, you indicated that it was.
9      So that would lead me to believe that
10  you were aware of that issue prior to reading
11  it in the EEOC complaint, correct?
12    A.  I do recall her saying that he made
13  her feel sexually harassed.
14    Q.  We'll let the record speak for itself.
15      Going back to your statement where
16  you said that you told Ms. Kubas that you,
17  "took her concerns seriously," you standby
18  that, right?
19    A.  I do standby that.
20    Q.  Would you say that the whole issue of
21  having to deal with this investigation, Ms.
22  Kubas' claim, meeting with Ms. Williams, was

Page 151

1  that frustrating you at the time that this was
2  all occurring?
3    A.  Yes, there's a lot of angst and
4  dealing with all of these sort of employee
5  issues.
6    Q.  This isn't exactly what you had
7  anticipated having to deal with when you were
8  investing in a gym, right?
9    A.  Yes, it's not what I had anticipated.
10    Q.  You also had your state delegate
11  duties at that time, correct?
12    A.  Yes, that was 2019.  Yes.
13    Q.  Were you working as a full-time
14  mortgage -- I don't want to use the word,
15  "Broker," if that's incorrect.
16    A.  I was considered a part-time mortgage
17  lender for Capital Bank.
18    Q.  You also had to deal with your family
19  like everyone else and all those things and you
20  were now having to deal with these issues at
21  work, right?
22    A.  I was dealing with them, correct.

Page 152

1    Q.  That had caused you substantial
2  frustration, is that correct or incorrect?
3    A.  I don't know if frustration is the
4  right term.  It was a time consuming effort.
5    Q.  Were you resentful of that fact?
6    A.  No.
7      Except for Mr. Saab.
8    Q.  What do you mean, "Except for Mr.
9  Saab?"
10    A.  I'm sure he's going to -- Mr. Saab
11  knows I was frustrated that I was spending so
12  much time there.  But that was just our
13  business relationship.
14    Q.  Were you frustrated with Mr. Saab
15  more so that you had to deal with these issues
16  or that the issues were occurring?
17    A.  That I was the one doing the day-to-
18  day at the gym at that point.
19    Q.  Did you ever share your frustrations
20  with Mr. Conway around the time that all this
21  was happening?
22      MR. BUCKEL:  Objection as to the

Page 153

1  form of the question.  What frustrations?
2      MR. HORA:  The frustrations
3  associated that we just talked about with
4  respect to the fact that you were dealing
5  with these issues at the gym, with respect
6  to Ms. Kubas' allegations, meeting with
7  Ms. Williams, those kinds of things?
8      THE WITNESS:  I don't recall, but
9  I'm a very open and honest guy.  So I may
10  have shared the frustrations of the gym.
11      BY MR. HORA:
12    Q.  With Mr. Conway?
13    A.  I don't recall.
14    Q.  Let's see if I can help.
15      This is 331B 1247.  This is a text
16  message between yourself and Mr. Conway dated
17  June 18th, 2019 around 5:07 p.m.
18      Let me know when you are done
19  reviewing it.
20    A.  (Reviewing).
21      Okay.
22    Q.  You're expressing to Mr. Conway who

39 (Pages 150 to 153)

**Brian Chisholm**

Page 154

1  is again being accused of inappropriate
2  behavior by Ms. Williams and Ms. Kim, who is
3  Ms. Kubas, that, "I will try to call you later
4  on this evening because I want to again have
5  LaToya and Kim texting me wanting to talk and
6  to be quite honest with you I'm getting a
7  little sick of listening to them complain to me
8  about stupid crap," is that what you believe
9  Ms. Kubas' allegations to be, "Stupid crap?"
10     A.   This is completely about that
11  smoothie bar and Devin being mean.  It was like
12  handling a fifth grade complaint.  I recall how
13  the environment in there was at that point.
14        It had nothing to do with sexual
15  harassment claims or any type of claim like
16  that.
17     Q.   Was Ms. Kubas complaining about the
18  smoothie bar?
19     A.   No, Ms. Williams was.
20     Q.   In your text, you said, "I will try
21  to call you later on this evening because I
22  want to again have LaToya and Kim..." you agree

Page 155

1  with me that, "Kim," there is referring to
2  plaintiff, Ms. Kubas, right?
3     A.   Yes.
4     Q.   "... texting me wanting to talk and
5  to be quite honest with you I'm getting a
6  little sick of listening to them complain to me
7  about stupid crap," so if the stupid crap that
8  you were frustrated at with respect to Ms.
9  Williams had to do with the smoothie bar as you
10  allege just now, what was the "Stupid crap"
11  that you were sick of hearing about from Ms.
12  Kubas?
13     A.   Once again, probably the fifth grade
14  stuff of, "Devin is ignoring me.  He won't even
15  talk to me when I walk in the door," and I
16  think you have a record of that.
17        Obviously when it comes to the sexual
18  harassment, I took it very seriously to the
19  point that I interviewed and got affidavits
20  from several people that she mentioned.  Like
21  you failed to get affidavits from.
22     Q.   Your efforts to get affidavits were

Page 156

1  in support of your defense to the EEOC claim,
2  right?
3     A.   Yes, and to find the --
4     Q.   They were not done to investigate
5  Ms. Kubas' claims though, right?
6     A.   No, to investigate the claims I
7  interviewed all those people who later on gave
8  affidavits.
9     Q.   Okay.
10     A.   I took this claim very seriously.
11     Q.   What was the, "Stupid crap," that was
12  just about her complaining about Devin ignoring
13  her and not talking to her --
14     A.   Probably because --
15     Q.   -- complaining about his retaliation
16  towards her after disclosing the fact that he
17  was engaging in sexual harassment?
18        MR. BUCKEL:   Objection to the form
19  of the question.  I don't even --
20        THE WITNESS:   He never retaliated.
21        MR. BUCKEL:   -- understand the
22  question.  It's like three questions.

Page 157

1        MR. HORA:   Your testimony will speak
2  for itself.  Thank you.  I'll --
3        THE WITNESS:   No, I want to correct
4  it -- you just said something that was
5  absolutely incorrect in my opinion.  You
6  said he retaliated against her.  And
7  there's no proof that he retaliated
8  against her.
9        BY MR. HORA:
10     Q.   Here is an email exchange between
11  yourself and Mr. Saab dated June 19th, 2019.
12  It's 331B 1075.  This is the part I'm going to
13  ask you about, the lower section of this email
14  (indicating).
15        Let me know when you're done.
16     A.   (Reviewing).
17        Okay.
18     Q.   You wrote to Mr. Saab, "Looks good to
19  me," referring to something else that's not
20  really relevant here.
21        And then you said, "I spent two hours
22  there again today in a bitch-fest between

**MGB REPORTING, INC.**
**(301)983-9315 - mgbreporting.com**

**Brian Chisholm**

Page 178

1 that text to Ms. Kubas, you send him a text at
2 8:20 a.m. on June 21st, "Devin, I am asking Kim
3 to come in and make whatever deposits we have
4 so if you have anything please make sure she
5 gets it.  I just want to make sure we are
6 solvent," et cetera, right?
7     A.  I'm sorry.  Read that again?
8     Q.  It's right there.  Can you see that?
9 (indicating).
10     A.  Okay, gotcha.
11     Q.  So you're informing Mr. Conway that
12 you've asked Ms. Kubas to come in and make
13 these deposits, right?
14     A.  Correct.
15     Q.  Now we're going to flip back.
16         Ms. Kubas says at 9:53 a.m. -- is it
17 possible that you wrote, "Can I call you
18 later?"  Is it possible that she then tried to
19 call you?
20     A.  It is possible.
21     Q.  Then she indicates to you, "I am at
22 an appt for my daughter right now.  As soon as

Page 179

1 I get to a computer I will let you know the
2 amount being deposited," which is the
3 information that you need to know, right?
4     A.  Correct.
5     Q.  Because you were concerned that if
6 there wasn't enough money in the account, you
7 could potentially bounce a check or something
8 like that, right?
9     A.  Payroll, correct.
10     Q.  Payroll, I'm sorry.
11         She then indicates to you, "And I
12 will have them the back (sic) by 2pm," right?
13     A.  I think she meant, "Bank," I think
14 she corrects it, correct?
15     Q.  Yes, you're right, "Bank."  I will
16 have them at the bank by 2pm, correct?
17     A.  Correct.
18     Q.  But you are at least acknowledging
19 that you were expressing to her the urgency of
20 getting these deposits in due to the fact that
21 you had payroll coming, right?
22     A.  Correct.

Page 180

1     Q.  And you are expressing the same sort
2 of urgency to Conway that:  Hey, we need to get
3 this money deposited because we need to see if
4 there's anything that me and Mr. Saab need to
5 do to cover any sort of potential overage,
6 right?
7     A.  That's correct.
8     Q.  Then it looks like she texts you
9 back, "The total that will be deposited is
10 $602.87.  Letting you know in case you need to
11 deposit more.  I will get there as soon as I'm
12 done with this appt."  Right?
13     A.  Correct.
14     Q.  This is right after she texts you
15 that she's going to let you know what the
16 amount is, right?
17     A.  I believe so.
18     Q.  At 9:43 a.m.?
19     A.  Correct.
20     Q.  I'm sorry.  9:43 a.m. she tells you
21 she's at the doctor's appointment.
22     A.  Yes, I think she said the deposit was

Page 181

1 later.
2     Q.  Yes, the deposit was later.
3         Then if we look at your affidavit on
4 paragraph 28, says that, "Ms. Kubas responded
5 at 9:45 a.m. stating:  'I am at an appt (sic)
6 for my daughter right now.  As soon as I get
7 to a computer (sic) I will let you know the
8 amount being deposited.'"  Right?
9         Then you indicated on paragraph 29,
10 that she was clocked in remotely at 10:03 a.m.
11 --
12     A.  Yes.
13     Q.  Correct?
14     A.  Yes.
15     Q.  And that she sent you another text
16 message at 10:07 a.m., "...letting me know the
17 total amount to be deposited, and that she
18 would 'get there as soon as I'm done with this
19 appt (sic),'" correct?
20     A.  Correct.
21     Q.  At the time that she's figuring out
22 for you the amount that's going to be deposited

MGB REPORTING, INC.
(301)983-9315 - mgbreporting.com

**Brian Chisholm**

Page 194

1    Q.  At the time that Ms. Kubas then came
2    back to you in the office, as you instructed
3    her to do come see you, you were waiting for
4    her to explain to you why it is that she
5    remained clocked in, right?
6    A.  Correct.
7    Q.  At that point, you didn't know what
8    her explanation was, right?
9    A.  I did not know what her explanation
10   was.
11   Q.  How did you know that Ms. Kubas had
12   even clocked in?
13   A.  I was alerted that she's clocked in
14   right now.
15   Q.  How did you get alerted to that?
16   A.  Somebody at the front desk might have
17   told me.  I don't recall who told me that she
18   was clocked in, but I learned of it then that
19   morning.
20   Q.  This is going back to Mr. Conway's
21   affidavit, right?
22   A.  Yes.

Page 195

1    Q.  Let's like you had a discussion with
2    him, "Sometime after 10:00 a.m. on June 21st,
3    Mr. Chisholm informed me that Kim was occupied
4    with taking her daughter to the doctor but that
5    she would be making a bank deposit later that
6    afternoon.  I informed Mr. Chisholm that Kim
7    had clocked in at 10:03 a.m." do you see that?
8    A.  That's probably accurate then.
9    Q.  Mr. Conway is the one who is
10   informing you that she had clocked in, right?
11   A.  Based on his affidavit, yes.
12   Q.  Even though Ms. Kubas -- after she
13   had clocked in and given you the information
14   that you requested, you decided to disable her
15   access at that point, right?
16   A.  Yes, because she had not clocked back
17   out.  And once again --
18   Q.  You had made that -- hold on.
19   You had made that decision without
20   knowing why Ms. Kubas had clocked in and failed
21   to clock out, correct?
22   A.  That's correct.  I didn't even clock

Page 196

1    her out.  I just wanted her to come back and
2    explain to me why she was at her daughter's
3    doctor's office still charging Rockwell Fitness
4    for her time, which obviously to your point at
5    max was four minutes which she was never given
6    permission to work from a doctor's office or be
7    in a doctor's appointment.  Which our handbook
8    explicitly states out.
9    Q.  Just so we are clear on the timing,
10   12:14 p.m. she texts you, "I'm here trying to
11   do these deposits.  Looks like I'm blocked from
12   accessing any of the information that I need.
13   Did my permission level get changed?"
14   Do you want me to show you the text?
15   A.  No, I got that.
16   Q.  That's at 12:14 p.m. and that's on
17   331B 0046.  331B 0047 -- I'll show that to you.
18   If you can see where she says, "Did my
19   permission level get changed?"  You responded
20   at 12:27 p.m., "Yes, where are you now?"
21   right?
22   A.  Correct.

Page 197

1    Q.  Then she writes, "At the bank.  I am
2    depositing all I can.  I have two left that I
3    am unable to do," right?
4    A.  Correct.
5    Q.  You notice the time here where you
6    were asking her where she is now at 12:27?
7    A.  Correct.
8    Q.  This is a text message exchange
9    between yourself and Mr. Saab dated June 21st,
10   2019.  Do you see the time here?
11   A.  Yes.
12   Q.  12:27.
13   You wrote to Mr. Saab, "I am firing
14   Kim right now," correct?
15   A.  Correct.
16   Q.  Why did you send Mr. Saab that text
17   message?
18   A.  Because after the recent months of
19   her being asked to make sure she clocks in and
20   clocks out, then blatantly using this morning
21   to clock in once again.  Mr. Saab was very
22   concerned about finances as I was as well.

50 (Pages 194 to 197)

# EXHIBIT 4

**Said Saab**

Page 1

1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MARYLAND

3                     Northern Division

4      -------------------------x

5      KIMBERLY KUBAS,              :

6              Plaintiff,       :   Civil Action No.

7          v.                   :   1:20-CV-2456

8      331B, LLC                    :

9      (d/b/a ROCKWELL FITNESS), :

10             Defendant.       :

11     -------------------------x

12                        Friday, April 16, 2021

13                        Washington, DC

14     Deposition of:

15                    SAID SAAB,

16     the Witness, called for examination by counsel

17     for the Plaintiff, at the law offices of

18     Alderman, Devorsetz & Hora, PLLC, 1025

19     Connecticut Avenue, NW, Suite 615, Washington,

20     DC, commencing at 9:30 a.m., before Hedy D.

21     Blau, Court Reporter and Notary Public for the

22     District of Columbia, and were present on behalf

**Said Saab**

Page 38

1  has occurred?
2      A.  Recently.  Again, I can't answer the
3  question because I'm not involved in the day-to-
4  day operations of those things.  Those are not
5  something I really can --
6      Q.  I'm not asking you if you are involved
7  in the day-to-day operations.  I'm not asking
8  you for specifics.  I'm not asking you about any
9  other businesses.  I'm asking you with respect
10  to Rockwell Fitness, you've already indicated
11  that you are aware of instances where people are
12  forgetting to record their time.  All I'm asking
13  you is are you aware of instances in which
14  employees at Rockwell Fitness had not maintained
15  their time as they are required to do so.
16      A.  Not necessarily, no.
17      Q.  Are you aware of any instances in
18  which any employee has been disciplined at
19  Rockwell Fitness during your time as an owner
20  there, with respect to timekeeping issues other
21  than Ms. Kubas?
22      A.  I'm not aware.

Page 39

1      MR. BEEMAN:  Mr. Hora, I'm getting a
2  really bad echo of your speaking.
3      Said, are your speakers up really
4  loud?
5      THE WITNESS:  Yes.
6      MR. BEEMAN:  Can you maybe turn those
7  down a bit?
8      THE WITNESS:  I'm at 50 percent, 60
9  percent.
10      MR. HORA:  Can we go off the record
11  for a moment?
12      (Discussion held off the record.)
13      BY MR. HORA:
14      Q.  Are you aware of any other employees
15  at Rockwell Fitness ever being disciplined for
16  any reason other than Ms. Kubas's situation that
17  we'll get to?
18      A.  I'm not aware.
19      Q.  Are you aware of any employee at
20  Rockwell Fitness getting terminated other than
21  Ms. Kubas?
22      A.  Well, I mean, the use of the word

Page 40

1  "terminated."  I don't think Ms. Kubas was
2  terminated.  She walked out.  But with that
3  respect, we've never fired anyone or terminated
4  any employee at Rockwell Fitness.  Anybody
5  that's left, they left at their own will.
6      Q.  You indicated that you don't think
7  that Ms. Kubas was actually terminated, then?
8  You think she voluntarily resigned?
9      A.  I wasn't at the time, but that's what
10  I was informed after.  But I just wanted it
11  clear, because the word "terminated" means we
12  fired someone.  We told them you cannot come
13  back here.
14      Q.  So why don't you tell me exactly what
15  your understanding is as to how Ms. Kubas
16  separated from Rockwell Fitness.
17      A.  My understanding is that after Mr.
18  Chisholm confronted her about some
19  irregularities with her clocking in, where she
20  was, where she said she was, she came in and had
21  to explain to him why, you know, was she
22  working, was she not working.  And she couldn't

Page 41

1  explain to him.  Then he asked, if you can't explain to
2      Then he asked, if you can't explain to
3  me, you've got to be able to explain to me where
4  were you if you said you're on the clock, you're
5  working.  And then she walked out.
6      So the way I understand it is she was
7  not terminated, she left because she couldn't
8  give an explanation as to what his question was.
9      Q.  Were you involved in the decision to
10  promote Devin Conway to become the general
11  manager of Rockwell Fitness?
12      A.  I think at the time, I was involved
13  towards the very end when Mr. Chisholm felt that
14  Mr. Conway would be a good fit to be the general
15  manager.  We'd had a couple discussions.  I was
16  more at the tail end of it when we both felt
17  that he was a good trainer.  He's been at the
18  gym a long time.  He's a dedicated employee.  So
19  it was sort of a joint, you know, decision, that
20  we felt he is a good fit person for the
21  position.
22      Q.  In terms of making the decision, it

11 (Pages 38 to 41)

**Said Saab**

Page 106

1  itself, that she wanted to see you guys succeed?
2      A.  I mean, you know, we had just bought
3  the business.  We didn't understand a lot about,
4  you know, the business.  So, I mean, I know she
5  worked there for a long time, whether she worked
6  part time or full time.  But we've kept every
7  single employee.  When we bought the gym we
8  didn't go in, you know, and rock the boat or
9  fire anyone.  We have kept every single person,
10  and we wanted to keep every single -- we had the
11  intention of keeping every single that worked
12  for us at the gym.
13      Q.  So that wasn't the question.  My
14  question was whether or not, you know, if you
15  got the sense, because you said that you had
16  gotten to know Kim, and I think you said that
17  you liked her, that she was, you know, you
18  thought that she was a good person or whatever.
19  Did you get the sense that she was invested in
20  making sure that you and Brian were successful
21  in this business?
22      A.  It seemed that way.

Page 107

1      Q.  Was she going out of her say to help
2  you guys run the business by providing whatever
3  knowledge she could, you know, transferring her
4  knowledge to you guys to help you effectively
5  run the business?
6      A.  I would say she was, you know, trying
7  to be helpful to us, yes.
8      Q.  Were you aware of any issues regarding
9  her performance during the time that she worked
10  at Rockwell Fitness that you are aware of?
11      A.  We were new to the business.  And even
12  though I've been in business, this is a hard
13  business.  It was hard.  I mean, from what it
14  appeared to us, that she was, you know, but I
15  don't know, like it wasn't something I thought
16  about.
17      Q.  She appeared to be what?
18      A.  She appeared to be doing, you know,
19  the job that she was supposed to do.  Like I
20  said, again, I wasn't very involved in the day-
21  to-day operation type thing.  So it appeared to
22  me that she was doing her job.

Page 108

1      Q.  When you said that after she was
2  terminated or let go, whatever, and then she
3  never came back to you guys, do you know if you
4  or Brian ever went back to her to discuss what
5  led to her being terminated from Rockwell?  Did
6  you guys to back to her?
7      A.  I mean, I didn't.  Like I said, I am
8  involved in different businesses.  So it wasn't
9  something that I spent that much, you know, time
10  on because I'm busy with two or three other jobs
11  and my political job.  So I don't -- I know I
12  didn't.  I don't think Brian did either.  But,
13  like I said earlier, if she had come back to us
14  to explain, both of us would have been happy to
15  take her back.
16      Q.  You are aware, though, that she
17  applied for unemployment, right?
18      A.  Yes.
19      Q.  Did you have any discussion with Mr.
20  Chisholm about whether or not Rockwell would be
21  contesting her ability to collect unemployment?
22      A.  I left that up to Mr. Chisholm to make

Page 109

1  that decision.
2      Q.  So you weren't involved in that at
3  all?
4      A.  No.
5      Q.  And were you involved at all in
6  Rockwell's response from the Unemployment
7  Commission regarding their position as to
8  whether or not she was entitled to benefits?
9      A.  Mr. Chisholm handled all that.
10      Q.  Did you have any discussions with him
11  about that?
12      A.  I don't recall.
13      MR. HORA:  I have no further
14  questions.
15      MR. BEEMAN:  Mr. Saab, you have the
16  right to read and review a copy of the
17  transcript to correct any transcription errors.
18  An example I always give everyone is if you say
19  that you drive a blue truck, and the court
20  reporter takes down that you drive a new truck,
21  that's a transcription error.  That's something
22  that you can correct.

28 (Pages 106 to 109)

# EXHIBIT 5

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Kimberly M. Kubas v. Rockwell Fitness
EEOC Number: 531-2019-02904

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

**AFFIDAVIT OF DEVIN CONWAY**

COMES NOW, the Affiant, and hereby swears and affirms under penalty of perjury and upon personal knowledge that the following is true and correct:

1.      My name is Devin Conway. I am over the age of 18, a resident of Maryland, and I am competent to testify.

2.      I have worked at Rockwell Fitness ("Rockwell Fitness" or the "Gym"), a gym and health club in Severna Park, MD, since April of 2015.

3.      I began dating Bobbi Beers ("Bobbi") sometime around December of 2018 and, as of the date below, we are still together. Bobbi is a Personal Trainer at Rockwell Fitness.

4.      I was promoted to the position of General Manager in April of 2019. I report directly to Brian Chisholm ("Mr. Chisholm"), one of Rockwell Fitness' owners.

5.      My primary responsibilities as the General Manager are to oversee the staff and ensure the facility is operating smoothly.

6.      I first met Kimberly Kubas ("Kim") after I began working at Rockwell Fitness.

7.      In or around September of 2016 I began leading a group training class (the "Class") for six (6) individuals, including Kim.  I never instructed Kim in one-on-one training sessions; my only interactions with her as her trainer were during the Class.

8.      I continued training the Class until April of 2019 when I was promoted and asked Bobbi to take over the Class so that I could focus on my new responsibilities as General Manager.

1

9.      In or around the summer of 2017, Kim and I slept together. The encounter was entirely consensual, and it only happened the one time.

10.      Throughout the years that Kim and I worked together, she would often send me text messages inviting me out for drinks or flirting with me.  I tried to keep my communications with her professional and limited to matters relating to work or training sessions.

11.      Prior to May of 2019 I never encountered any problems with Kim.

12.      On May 11, 2019, Rockwell Fitness hosted an open house (the "Open House"), followed by a charity benefit that evening (the "Benefit").

13.      My mother, Connie Conway ("Mrs. Conway"), attended the Open House.  She later informed me that she had spoken with Kim at the Open House, and that Kim, not realizing who she was speaking to, spoke very negatively about me.

14.      Bobbi also attended the Open House and the Benefit. On May 12, 2019, Bobbi informed me that Kim had approached her at the Benefit, and that Kim was drunk and speaking very negatively about me.  She also told me that Kim had called her the morning after the Benefit to apologize.

15.      On May 13, 2019, at 10:35 a.m. I received a text message from phone number (410) 615-3407, which I know to be Kim's cell phone number, which read: "When you have a minute can you please talk to me? Thanks[.]" Kim and I met at 10:45 a.m. in my office. During the meeting:

      a.  I questioned Kim about her behavior at the Open House and Benefit and the statements she had made to my mother and Bobbi;

      b.  Kim admitted that she had been drinking before the benefit;

331B_0019

c.   We agreed to put the matter behind us and to remain professional moving forward.

16.     In or around mid-June of 2019, I noticed that Kim was not recording her time worked in the timekeeping system. Before I had the opportunity to confront Kim about her time records, she sent me a text message on June 17, 2019 at 10:03 a.m. The text message read: "Hey Devin. Just realized my time clock is completely fucked up, had been forgetting to clock in for meetings, work from home, etc. Can you put me down for 25 hours. [sic] I'll make any adjustments to next pay. Also, I'll be in around 1130 [sic] today. Is our call at 1?"

17.     I responded to Kim via text message stating: "The call is at 1. From now on you will have to clock in/out when you are here and when you are working from home. No exceptions."

18.     I found it odd that Kim claimed to work 25 hours that pay period, given that she seldom worked more than 20 hours in a pay period. Mr. Chisholm agreed to give Kim the benefit of the doubt and pay her for the full 25 hours that pay period.

19.     Kim did not clock in or clock out on June 17th and did not clock in on June 18th.

20.     On June 18, 2019, I conducted a manager meeting at Rockwell Fitness, which Kim attended. After the meeting, I asked Kim to stop by my office. When she arrived, I asked her why she still wasn't clocking in and out. Kim became defensive, claiming that my June 17th text message directing her to clock in and out with "no exceptions" was "hostile".  While I do not recall the exact words I used during our meeting, I recall saying something along the lines of: "You are responsible for clocking in and out just like every other employee. You are not above or better than any other employee and you are not allowed to make up hours as you please." Kim then informed me that she had the ability to go into the system and manually edit her time entries. She also accused me of targeting her and of being visibly rude to her in the manager meeting.

3

21.     During my time as General Manager, I have not experienced problems with any other employee failing to clock in and out, except for Kim.

22.     On June 19, 2019, Kim and another employee, LaToya Butler Williams ("Ms. Williams"), requested a meeting with me and Mr. Chisholm. During the meeting Kim accused me of targeting her for falsifying her hours and refusing to clock in.  I responded that if she would simply clock in and out, then we would not have any problems. Kim then stormed out of the meeting.

23.     On June 20, 2019, Mr. Chisholm informed me that Kim had filed a complaint accusing me of sexual harassment. This was the first I ever heard of the complaint and I was shocked by the allegations.

24.     On June 21, 2019, around 6:00 a.m., Andrew Smith ("Andrew"), another employee of Rockwell Fitness informed me that a member of the Gym had approached him in the free-weight room and asked if I was being fired for sexually harassing Kim.  Andrew was under the impression that the member he spoke with had heard the rumor from Billy D. Williams ("Mr. Williams). Mr. Williams is a member of the Gym and Ms. Williams' husband.  I called Mr. Chisholm around 7:00 a.m. to fill him in on the rumor situation.

25.     Sometime after 10:00 a.m. on June 21st, Mr. Chisholm informed me that Kim was occupied with taking her daughter to the doctor but that she would be making a bank deposit later that afternoon. I informed Mr. Chisholm that Kim had clocked in at 10:03 a.m.

26.     Kim remained on the clock for several hours until arriving at the Gym sometime after noon.

4

27.     Aside from her accusations on June 18, 2019 that my text message was "hostile"

and on June 19, 2019 that I was "targeting her", Kim never voiced any concerns to me about our

interactions.

28.     I have never harassed Kim, sexually or otherwise.

29.     I have never referred to Kim as "hot buns."

30.     I have never groped or touched Kim in an unwanted matter.

31.     I have never threatened or berated Kim.

**I HEREBY SWEAR AND AFFIRM UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND ACCURATE UPON MY PERSONAL KNOWLEDGE.**

_____        12/20/19
Devin Conway                                      Date

5

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Kimberly M. Kubas v. Rockwell Fitness
EEOC Number: 531-2019-02904

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

### AFFIDAVIT OF BRIAN CHISHOLM

COMES NOW, the Affiant, and hereby swears and affirms under penalty of perjury and upon personal knowledge that the following is true and correct:

1.      My name is Brian Chisholm. I am over the age of 18, a resident of Maryland, and I am competent to testify.

2.      I, along with my partner, Sid Saab ("Mr. Saab"), own and manage Rockwell Fitness ("Rockwell Fitness" or the "Gym"), a gym and health club in Severna Park, MD.

3.      Mr. Saab and I took ownership of Rockwell Fitness in September of 2018. At the time, we offered jobs to all the individuals already working there. This included Devin Conway ("Mr. Conway") and Kimberly Kubas ("Ms. Kubas").

   a.   Mr. Conway was the full-time Personal Training Manager and Coordinator; and

   b.   Ms. Kubas was a part-time Bookkeeper working, on average, eight (8) to ten (10) hours per week.

4.      Shortly after acquiring the Gym, and as part of an organization restructuring, Ms. Kubas' title was changed to Administrative Assistant. As the Administrative Assistant, Ms. Kubas continued to work approximately eight (8) to ten (10) hours per week and her primary responsibilities included: running reports, following-up on declined credit card payments and negative account balances, running sales reports, responding to billing concerns, corresponding with members regarding the status of their membership, and making bank deposits.

5.      In March of 2019, the General Manager of the Gym resigned.

1

**331B_0032**

6.      In April of 2019, Mr. Conway was selected from a pool of internal and external applicants to fill the General Manager role. Mr. Conway was selected, in part, because of his bachelor's degree in Kinesiology, his professional certifications in the health and wellness field, and his demonstrated capabilities working at the Gym.  Ms. Kubas did <u>not</u> apply for the General Manager position.

7.      On May 11, 2019, the Gym hosted two events:

    a.  a daytime open house (the "Open House") to promote the Gym and the services offered there; and

    b.  a charity benefit (the "Benefit") in the evening to raise money on behalf of a Rockwell Fitness employee who was sick.

8.      Mr. Conway's mother, Connie Conway ("Mrs. Conway") is a member of the Gym. Mrs. Conway attended the Open House as a volunteer helping with the event.

9.      On June 12, 2019, Ms. Kubas asked to speak with me via phone.  I called her and she proceeded to tell me that she felt Mr. Conway was being mean to her and ignoring her. She also told me that Mr. Conway had made her, and other female employees feel uncomfortable.  This was the first complaint I ever received concerning Mr. Conway.

10.     I informed Ms. Kubas that I took her concerns seriously and would investigate. I asked Ms. Kubas for specific details, to which she responded:

    a.  Mr. Conway had made her feel uncomfortable in a "sexually harassing way", specifically that he had gone into her office and said, "I can lock the door;" and

    b.  Mr. Conway had made other suggestive comments and flirted but had never touched in an unwanted way.

2

11.     I also asked Ms. Kubas for names of other individuals, if any, who could provide additional information or corroborate her claims. She stated that Bobbi Beers ("Ms. Beers") and Bree Moore ("Ms. Moore") had similar experiences with Mr. Conway and/or had witnessed the behavior Ms. Kubas was complaining of.

12.     On or around June 14, 2019 I met with Mr. Conway privately in his office. I did not disclose that a complaint had been brought against him, but took the opportunity to remind him that as the General Manager, he was in a position of authority requiring him to maintain the utmost care in how he conducted himself with employees and members of the Gym. I reiterated the need for him to create and maintain a safe and comfortable work environment for all employees. Mr. Conway was very receptive and agreeable.

13.     Between June 12, 2019 and June 20, 2019, I interviewed Ms. Beers and Ms. Moore the two (2) employees identified by Ms. Kubas as witnesses. Each of them unequivocally denied Ms. Kubas' allegations and insisted that they had never experienced or witnessed any problems with Mr. Conway.

14.     When I spoke with Ms. Moore, the Assistant Manager of the Gym, she was surprised and bewildered. She assured me that Mr. Conway had never intimidated or harassed her or made her feel uncomfortable.

15.     Ms. Beers is a Personal Trainer at the Gym.  She was insulted by the insinuation that Mr. Conway had ever harassed her, or anyone for that matter. Ms. Beers then informed me of her interactions with Ms. Kubas at the Benefit. Ms. Beers stated that a very drunk Ms. Kubas had approached her at the Benefit and went on a rant of insulting and defaming Mr. Conway, carrying on about how she thought Mr. Conway was "a bad person" and that she believed Ms. Beers "deserved better."  At no point during this encounter did Ms. Kubas raise allegations of sexual

3

harassment.  Ms. Beers informed me that she believed Ms. Kubas was trying to get Mr. Conway fired because she was jealous of him being promoted to the General Manager position.

16.     I also interviewed Trista Chandler ("Ms. Chandler"), another Personal Trainer. Although not named as a witness by Ms. Kubas, I thought it appropriate to seek feedback from Ms. Chandler because of her extensive interactions with Mr. Conway at the Gym. Ms. Chandler, like the others, had no concerns or complaints concerning Mr. Conway.

17.     On June 15, 2019, I received a phone call from my brother Bob Chisholm ("Bob") concerning Ms. Kubas. Bob owns a boat which he keeps docked at a slip at The Point in Arnold, MD and had been hanging out on the boat with his wife Sandi Chisholm ("Sandi") the previous night (Friday night, June 14, 2019). Bob and Sandi are friends with LaToya Butler Williams ("Mrs. Williams"), an employee and member of Rockwell Fitness. Mrs. Williams was at The Point with Ms. Kubas Friday evening, and ended up hanging out with Bob and Sandi on their boat. Bob called me to relay his concerns that Ms. Kubas had been very drunk Friday night while on the boat and that she had been ranting about Mr. Conway, making fun of his physical attributes and complaining that he did not deserve to be the General Manager of the Gym.  At no point during this encounter did Ms. Kubas raise allegations of sexual harassment.

18.     On June 19, 2019 Ms. Kubas and Mrs. Williams requested a meeting with me and Mr. Conway.  During the meeting Ms. Kubas accused Mr. Conway of targeting her for falsifying her hours and refusing to clock in.  Mr. Conway responded that if she would simply clock in and out, then we would not have any problems. Ms. Kubas then stormed out of the meeting.

19.     At 6:14 p.m. on June 19th, I received an email from Ms. Kubas addressed to Mr. Saab and myself, formally documenting Ms. Kubas' complaint (the "Email").  The details of the

4

Email differed slightly from that which Ms. Kubas had relayed to me verbally in our June 12th phone call, but also drastically contradicted the information gleaned from my investigation:

       a.  The Email alleged that Ms. Beers had approached Ms. Kubas claiming that Mr. Conway had been sexually harassing her, but Ms. Beers expressly refuted this;

       b.  The Email alleged that Mr. Conway was berating Ms. Kubas for not clocking in even though other employees frequently failed to clock in and out, but there have been no issues with employees failing to clock in and out, except for Ms. Kubas; and

       c.  The Email alleged that two (2) other women had approached Ms. Kubas to complain about Mr. Conway, but the other women Ms. Kubas identified in our June 12th phone call expressly refuted this claim.

20.    In the Email, Ms. Kubas requested she be allowed to work from home. I granted this request because I needed to speak with Mr. Saab and Mr. Conway to determine how to proceed. In my email granting her request to work from home, I reiterated that Ms. Kubas was required to clock in and out for any work performed.

21.    On June 20, 2019 I met with Mr. Saab and Mr. Conway to discuss Ms. Kubas' complaint and the investigation. This was the first time I made Mr. Conway aware of the complaint. I asked Mr. Conway to think and reflect on his interactions with all employees and members of the Gym; Mr. Conway could not recall anytime that he had acted inappropriately. I reinforced the importance of his role as General Manager in creating and fostering a safe and comfortable workplace.

22.    Having thoroughly investigated Ms. Kubas' complaint I concluded that: (i) there was no corroboration of Ms. Kubas' allegations; (ii) the witnesses identified by Ms. Kubas credibly

5

denied and refuted her allegations; and (iii) Ms. Kubas' complaint appeared baseless and motivated by professional jealousy. It was my belief at the time, albeit naïve, that we would be able to have Ms. Kubas return to work without incident.

23.     On June 20, 2019 at 6:27 p.m. Ms. Kubas sent another email addressed to Mr. Saab and myself in which she explicitly stated: "I just want to make it clear that I am not requesting that Devin [Conway] be let go, or anything of the sort. I simply want to be treated with common courtesy, and basic respect."

24.     I responded to Ms. Kubas at 7:09 p.m. informing her that Mr. Saab and I had investigated her concerns and met with Mr. Conway to discuss the work environment of the Gym. I assured her that I did not believe there would be any problems moving forward and further directed her to immediately inform either Mr. Saab or myself if she felt uncomfortable or unsafe. I ended the email with some information regarding membership costs and tasks for Ms. Kubas to work on the following day.

25.     Ms. Kubas responded at 8:20 p.m. stating: "I appreciate you speaking out today regarding the issues at hand. I am prepared to put this behind me, with the assumption all is well moving forward."

26.     Around 7:00 a.m. on Friday, June 21, 2019, I received a phone call from Mr. Conway informing me that members in the Gym were discussing a rumor that he [Mr. Conway] was getting fired for sexual harassment. Mr. Conway specifically identified Billy Williams ("Mr. Williams") as the member spreading the rumor. Mr. Williams is also a friend of mine and is married to Mrs. Williams.

27.     I sent a text message to Ms. Kubas at 8:17 a.m. asking her to make bank deposits as soon as possible because we had a lot of expenses to cover.

6

28.    Ms. Kubas responded at 9:45 a.m. stating: "I am at an appt [sic] for my daughter right now. As soon as I get to a computer [sic] I will let you know the amount being deposited." Ms. Kubas further instructed that she would get to the bank by 2:00 p.m.

29.    Ms. Kubas clocked in remotely at 10:03 a.m. She sent me another text message at 10:07 a.m. letting me know the total amount to be deposited, and that she would "get there as soon as I'm done with this appt [sic]."

30.    Upon realizing that Ms. Kubas was on the clock while attending to personal matters, I disabled her access to our accounts so that I would know when she tried to access it for work.

31.    Ms. Kubas remained clocked in until 12:14 p.m. when she texted me again, informing me that she was at the bank trying to make the deposit. I asked her to come into the Gym to see me.

32.    I met with Ms. Kubas upon her arrival and asked her why she had been clocked in for over two (2) hours while she was not working.  Ms. Kubas immediately became flustered and defensive. I also asked her if she knew anything about the rumor among members that Mr. Conway was being fired for sexually harassing her. I made a comment about how these types of rumors could "spread like a cancer" and were very harmful to the Gym.

33.    Ms. Kubas offered no response regarding the origin of the rumor or her whereabouts that morning, rather she asked me: "Am I being fired?" I responded that she was only being fired if she could not explain why she had been clocked in over two (2) hours while not working.  Ms. Kubas said nothing but began to collect her belongings.

34.    Ms. Kubas' employment was terminated because she was in effect stealing from the Gym by being clocked in while attending to personal matters and not performing work on behalf of Rockwell Fitness.

7

**331B_0038**

I HEREBY SWEAR AND AFFIRM UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND ACCURATE UPON MY PERSONAL KNOWLEDGE.

_____     _____12/11/19_____
Brian Chisholm                      Date

8

**331B_0039**

Brian Chisholm <bc@rwfitness.com>

## Since we spoke on Friday
1 message

**LaToya Butler-Williams** <peaches52996@gmail.com>                                                      Tue, Jun 4, 2019 at 3:16 PM
To: Brian Chisholm <bc@rwfitness.com>

Good Afternoon Brian,

Since we spoke on Friday some other things are coming about that have me wondering if I want to even stay through June let alone to July. First I want to say that when I mentioned to you on Friday about how the other ladies are talking about leaving because they feel uncomfortable around Devin what I didn't tell you was that I knew about the incident that involved Kim but it was not my place to tell you this information and Kim was nervous about telling you. Kim had told me about it a couple weeks ago when she came in that Monday or Tuesday morning after the Spring Fair & benefit for Pete I noticed she seemed upset. We talked later that evening and that is when she told me about what happened. I told her then that she and the others needed to tell you and to tell you everything because he can not continue to get away with this and if the wrong person found out it would look bad for you and Sid. She said she was nervous about telling you because she was afraid that she would either be fired or if you said something to him he would either deny it happened or flip it around and make her the persuer. The reason I didn't tell you is because I didn't want you to think or feel like after things happened between Ryan Brewer and I, that in some way I was going after Devin or that I was devising a plan to get him out. That is not nor has it ever been the case and you know that I was a big support of him in the GM position but now I regret my decision to back him as the GM. Like I told you on Friday I have been noticing things going on as far as the front desk and the smoothie bar are concerned as well as other happenings throughout the club and that I am deliberately being left out of things by Devin.

I will start with the smoothie bar first since everything that is happening is literally pushing me out of a managers position and undoing everything that I worked hard to put in place. He has chosen to redo the entire smoothie board the way he wants, getting rid of the seasonal column all together and leaving me out of all decisions for the smoothie bar boards. I didn't know about any of this until this morning when Alexa asked me if he had spoken to me about getting rid of the seasonal smoothies all together. I looked at her and told her no that I had no idea about this evening taking place. She said she didn't think I did since she was getting conflicting information. A few weeks ago Andrew left me a note that Devin told them that they were to stop doing the cup counts unless they bring up a new sleeve which I was never told about until Andrew informed me. The cup counts helped to track all the cups that are being used for smoothies and if that number is not matching the number of smoothies that were made then cups are disappearing and that leads to money being lost. Then yesterday he tells me we don't need to do the smoothie inventory sheet because he can just look up the smoothie sales in the system. I attempted to inform him that the number will be off because of the smoothies of the month and the employee smoothies. Again he tells me we don't need the sheets to just look up each employee smoothie and see what was ordered. This is a process that is going to be a waste of time that could be spent doing more important things. We have been doing the tracking in this method since we have had the smoothie bar and it has helped to track missing cups, smoothies of the month & employee smoothies that are not going to be rung under the name of the smoothie.

Things dealing with the front desk are so unorganized that it is starting to show and that's not good. I have been left out of details and happens within the club unless Kim or Bree say something to me about it. I can't say for sure but it feels like I am deliberately being pushed out the door by Devin and I can't really figure out why. He has changed everything to the way he wants it to be and knows that it is going to be a mess to try and put everything back in place that he has undone. July 22nd I am suppose to be off of probation according to him and that I am suppose to take back all the duties of front desk manager which from everything that I am seeing going on is going to be ore stress and headache than it was before which wasn't all that bad if at all. Please keep this email conversation between you and I as what it contains if disclosed to Devin he may try to say otherwise to make it seem like he isn't doing this and that I am just making up stuff or say that he did tell me stuff. I have no reason to lie to you nor do I plan to start. This has been on my mind since I got off work this morning and just wasn't sure how to word everything without it coming off as me being a head hunter. Thank you again for hearing me out on Friday and today.

LaToya

# hourcorrection

@Ryan Brewer created this channel on April 18th, 2019. This is the very beginning of the **hourcorrection** channel. Description: Correct hours if you forget to sign in/out post date and accurate times

**April 18th, 2019**



**Ryan Brewer**  4:00 PM
joined #hourcorrection.



**Ryan Brewer**  4:00 PM
set the channel description: Correct hours if you forget to sign in/out post date and accurate times



**Andrew**  4:00 PM
was added to #hourcorrection by Ryan Brewer, along with 7 others.

**May 1st, 2019**



**Andrew**  11:33 AM
Stephanie in kids club was here on Friday 4/12/19 from 8:15-11:30 but she forgot to clock in. She just wanted to confirm that her hours were correct. Thanks!



**Cydney Moore**  4:57 PM
was added to #hourcorrection by Rockwell management, along with 6 others.

**May 6th, 2019**



**Kim Kubas**  10:52 AM
Hey Devin..my hours this pay are 20.22 . (used vaca day for Mon 4/22/19)

**May 15th, 2019**



**Evan Taub**  5:27 PM
Clocked in late for 4-10 shift was here at 4

**May 17th, 2019**



**331B_0206**

**Ava Fratus**  12:31 PM
joined #hourcorrection.

**June 3rd, 2019**



**Kim Kubas**  11:59 AM
Devin, left you a note about my hours on your desk

**June 9th, 2019**



**Evan Taub**  8:45 AM
Here since 6:50 had some trouble with mindbody

**June 10th, 2019**



**Bree Moore**  5:02 PM
9-5 today

**June 14th, 2019**



**Bree Moore**  3:35 PM
8:29-3:35 today

**June 15th, 2019**



**Ryen Dill**  6:55 AM
1-6 Thursday

**June 17th, 2019**



**Bree Moore**  11:52 AM
Abby's - 6/3 6/5 9-12 and then 6/7 9- 12:15

**June 18th, 2019**



**Evan Taub**  10:02 PM
5-10 Tuesday

**June 23rd, 2019**



**Evan Taub**  12:07 PM
Saturday shift clocked in late

**June 26th, 2019**



**Tommie Parker**   12:55 PM
Worked 11-2. But clocked in at 11:30

**July 3rd, 2019**



**Andrew**   9:23 AM
7/3/19: I clocked in at 9:15am but I was here at 9am

**July 9th, 2019**



**Evan Taub**   10:21 PM
Forgot to clock out for my 5-10

**July 14th, 2019**



**Evan Taub**   12:35 PM
Clocked in at 7:20 was here at 7

**July 16th, 2019**



**Bree Moore**   10:16 AM
9-3 on Friday 7/12

Rachel- 7/3 9-12

10:18

**July 30th, 2019**



**Andrew**   9:00 AM
I forgot to clock out at 2pm on 7/29. Clocked in at 9:00 am on 7/30.

**August 9th, 2019**



**Andrew**   8:30 AM
Jon Souders is here from 7-9am for training. Just wanted to have a note of his hours since he can't clock in yet.



**Cydney Moore**   4:53 PM
I got here at 4:45 on 8/9. WiFi is down so I can't clock in

**August 13th, 2019**



**Tommie Parker**  11:40 AM
Yesterday clock in didnt go through from 1-3:30.
Today clocked in through mindbody at 10 instead of Club Automation, clocked in club automation at 11:15.

**August 14th, 2019**



**Andrew**  5:05 AM
Got here at 4:50am 8/14/19. Pin didn't work for clock in.

**August 15th, 2019**



**jackhenrykriel**  1:54 PM
was added to #hourcorrection by Rockwell management.

**August 17th, 2019**



**Christina Kasmer**  12:59 PM
I can't clock in. Here at 1am

1pm sorry                                                        12:59



**Christina Kasmer**  7:07 PM
Clocking out 7:07pm

**August 18th, 2019**



**Christina Kasmer**  12:02 PM
Still can't log in, here from 6:50am to 12:02

**August 21st, 2019**



**Bree Moore**  9:50 AM
Aaliyahs log in still not working - 8/16 5:50-8

Aaliyah-8/17- 7:50-12                                           9:50

**August 25th, 2019**



**lexi richardson**  9:18 AM
can't sign in...here at 9:15

**August 26th, 2019**



**Bree Moore**  2:00 PM
Juila Worked 8/23- 10-11:30 Jasmine worked 8/19 9:50-12pm and 8/20 9-12 Ciara worked 8/19- 5pm-7pm

**September 2nd, 2019**



**Cydney Moore**  8:57 AM
Steve P. worked Friday the 28th from 9-2.  I arrived at 9 but wasn't able to punch in until 9:15.

**September 3rd, 2019**



**Conor McCann Watkins**  4:56 PM
was added to #hourcorrection by Rockwell management.



**Ryen Dill**  6:14 PM
@Conor McCann Watkins was here at 5pm he clocked in late

**September 4th, 2019**



**Tommie Parker**  4:59 PM
Forgot to clock out yesterday at 4:45 (9/3/19)

**September 6th, 2019**



**Tommie Parker**  3:13 PM
forgot to clock out 9/4 at 6pm

**September 9th, 2019**



**Ryen Dill**  5:04 PM
Not sure what happened w time clock yesterday but 1-7 if it didn't work

**September 17th, 2019**




**Bree Moore**  11:56 AM
Amber- 9/16 4-5

**September 21st, 2019**



**Cydney Moore**  8:08 AM
Riley checked in at 8 but timeclock isn't letting her clock in

**September 22nd, 2019**



**Sydney Krazinsky**  3:31 PM
joined #hourcorrection.



**Sydney Krazinsky**  3:33 PM
The time clock wasn't working for me this morning but I was working from 6:45am - 1:15pm

**September 24th, 2019**



**Cydney Moore**  2:50 PM
I forgot to clock out yesterday. I left at 10:05pm - Sydney Krazinsky (edited)



**Ryen Dill**  5:58 PM
took me a second to pull up clock Sunday:  Sunday 1-6

**October 1st, 2019**



**Jarrod**  12:22 PM
was added to #hourcorrection by Rockwell management.

**October 2nd, 2019**



**Cydney Moore**  10:04 AM
i forgot to clock in this morning. I got here at 4:45 am - Sydney Krazinsky

**October 6th, 2019**



**lexi richardson**  7:25 AM
forgot to clock in i got here at 6:50

**October 7th, 2019**



**Bree Moore**  11:11 AM
forgot to clock out on 10/5- 11:30

**October 13th, 2019**



**lexi richardson**  7:24 AM
forgot to clock in...got here at 6:45

**October 14th, 2019**



**Cydney Moore**  5:36 AM
Couldn't log onto timeclock. got here at 4:50 (Jon) (edited)



**Cydney Moore**  8:12 AM
Stephanie Fridly got here at 8:12.

**October 15th, 2019**



**Jarrod**  7:14 PM
@Rockwell management
Monday 10/14 8:20-7:24 (time clock down)
Tuesday 10/15 9-7:30 (am b2b prospecting)

**October 17th, 2019**



**Adrian Hall**  12:49 PM
joined #hourcorrection.



**Jon Souders**  9:30 PM
I forgot to clock out on the 16th. I left at 10:05

**October 20th, 2019**



**Evan Taub**  8:10 AM
Forgot to clock, been here since 6:45



**Jarrod**  2:09 PM
@Rockwell management 10/20. 8am-1 took a while to get computer up and running this morning. (edited)

**October 30th, 2019**



**Adrian Hall**  10:05 AM

 Adrian Hall

Hola, I think I forgot to clock in. I started at 8:45am and finished at 1:38pm

Thread in #frontdesk | Oct 26th, 2019 | View message

**October 31st, 2019**



**Bree Moore**  11:59 AM

Chuck- 10/31- 11:59-4 (edited)

**November 1st, 2019**



**Cydney Moore**  3:43 PM

taylor- 3:43

**November 2nd, 2019**



**Bree Moore**  9:18 AM

Candace- 11/2- 845Am   10/30- 9-12 10/25-9-12 (edited)

**November 3rd, 2019**



**Cydney Moore**  6:40 AM

time clock not working- got here at 640

 **1 reply**

1 year agoView thread

**November 4th, 2019**



**Bree Moore**  9:57 AM

Ignore the message above



**Bree Moore**  11:52 AM

candace- 11/4 9-11:51

**November 7th, 2019**



**Jarrod**  12:58 PM

@Rockwell management 11/06 7:30-1

**November 8th, 2019**



**Jon Souders** 2:49 PM
I was there at 4:50 today but couldn't clock in until 6:30

**November 11th, 2019**



**Adrian Hall** 5:46 PM
10/30 10:00-4:00pm

**November 16th, 2019**



**Connor Killeen** 7:53 AM
Got here at 6:50 this morning but didnt clock in untill 7:50

**November 23rd, 2019**



**Allie Myers** 7:02 AM
was added to #hourcorrection by Cydney Moore.

**November 26th, 2019**



**Cydney Moore** 5:11 PM
Hey Devin! My hours thus far: 11/11, 12:30-4 pm; 11/19, 3:55-10:30 pm; and today (11/26) I forgot to clock-in when I first came in, but I arrived at 3:52 pm. Thank you! @Allie Myers (edited)

**November 30th, 2019**



**Cydney Moore** 6:55 AM
Got here at 6:40am 11/30/2019 no idea how to get to the clock in screen. -Taylor



**Jarrod** 10:09 AM
Daycare Staff
Clock down today
Amber Heverly 8:40-12
Amanda Saucier 8-12



**Cydney Moore** 12:22 PM
Taylor 6:40am-1pm 11/30/2019 (time clock is down)



**Connor Killeen**  3:23 PM
clock down: Connor K. 1pm to 7pm 11/30/19

**December 3rd, 2019**



**Cydney Moore**  5:27 PM
@Allie Myers forgot to add my time out on 11/26, which was 10:18 pm. thank you!

**December 4th, 2019**



**Jon Souders**  8:56 PM
The internet is off right now so I cant clock out but I'm leaving at 8:56

**December 7th, 2019**



**lexi richardson**  6:48 AM
internet won't work...for here at 6:46

**December 14th, 2019**



**Cydney Moore**  6:46 AM
Hey I was here at 6:40. The clock in screen isn't up and I don't remember how to get it up



**Cydney Moore**  12:59 PM
Left at 1:00

**December 19th, 2019**



**Bree Moore**  11:31 AM
Alexa- 12/19 820-1130

**January 1st, 2020**



**Rockwell management**  9:25 AM
dylan 1/1-8:28

**January 3rd, 2020**



**Emily Wilson**  6:47 PM
Hours: December meeting- 6:00-7:00
12/16: 12:45-4:00
12/18: 12:56-4:00
1/4: stared shift at 3:50



**Emily Wilson**  10:17 PM
1/3: 3:50-9:10

**January 16th, 2020**



**Bree Moore**  10:16 AM
Annie- Jan 15th 4-7

**January 17th, 2020**



**Christiana Austin**  11:13 AM
was added to #hourcorrection by Cydney Moore.



**Christiana Austin**  11:15 AM
Didn't clock in.
Was here from 10-4 Jan 17
And 8-10:30 Jan 16.
:)

**January 19th, 2020**



**Cydney Moore**  1:01 PM
Riley worked 6:45-1pm

**February 2nd, 2020**



**lexi richardson**  7:05 AM
Lexi started at 6:45....forgot to sign in

**February 7th, 2020**



**Jon Souders**  10:04 AM
Forgot to clock in. I was here 4:50-10:00

**February 21st, 2020**



**Cydney Moore**  9:04 PM
Hey Devin it's @Allie Myers, I completely forgot to clock-in for my evening shift tonight, but I did remember to clock-out just after 9 pm! Sorry for the inconvenience and thank you!

**February 25th, 2020**



**Cydney Moore**  6:57 PM
Hey, @Allie Myers again, was not able to sign in due to front desk being busy when I got here, but came in at 4:50 pm today--thank you!!

**March 2nd, 2020**



**Cydney Moore**  9:58 AM
Schylar b. 10-4

**March 14th, 2020**



**Cydney Moore**  12:45 PM
Aailiyah Johnson from Kid's Club accidentally forgot to clock out before she started her workout today (3/14/20) She worked from 9-12

**March 16th, 2020**



**Cydney Moore**  5:09 AM
timeclock isn't showing
Laura was in at 4:45am on 3/16

**June 20th, 2020**



**Jon Souders**  12:09 PM
I forgot to clock in today. 7am-12

**June 25th, 2020**



**Cydney Moore**  1:59 PM
Landon Hernandez got here at 2



**Cydney Moore**  8:08 PM
Landon left at 8:08

**June 30th, 2020**



**Cydney Moore**  1:59 PM
Landon Hernandez in at 10 left at 2



**Conor McCann Watkins**  2:21 PM
I worked 10-2 last Monday and 12-4 on Saturday

**July 1st, 2020**



**Cydney Moore**  10:01 AM
Landon Hernandez in at 5 left at 10

**July 2nd, 2020**



**Cydney Moore**  10:02 AM
Landon Hernandez in at 5 left at 10

**July 5th, 2020**



**Conor McCann Watkins**  1:32 PM
Still not system, worked 9-1 today

**July 21st, 2020**



**Cydney Moore**  3:57 PM
Gillian Bradtmueller was here from 2-4

**August 12th, 2020**



**Cydney Moore**  1:59 PM
Gillian forgot to clock out today. She left at 10am

**August 14th, 2020**



**Jon Souders**  1:38 PM
I didnt clock out yesterday. I left at 1:30

**August 20th, 2020**



**Cydney Moore**  11:16 AM
Katie Russel was here for training from 10-11:15



**Cydney Moore**  1:57 PM
Jon Souders forgot to clock in today. I was here at 10

**August 21st, 2020**



**Cydney Moore**  11:19 AM
Andrea Bush was here from 2-3 yesterday



**Jon Souders**  2:09 PM
I forgot to clock in today. I was here from 10-2

**August 25th, 2020**



**Cydney Moore**  10:49 AM
Andrea Bush was here from 5am-10am

**August 26th, 2020**



**Jon Souders**  2:21 PM
Andrea Bush worked from 10-2 today

**August 27th, 2020**



**Cydney Moore**  5:15 AM
paper towel machine in weight room has been busted off the wall. 1 screw holding it up. need another screw to latch the other side back
on                                                                                    -Andrew



**Jon Souders**  3:03 PM
Andrea Bush worked from 10-2 today

**August 31st, 2020**



**Cydney Moore**  2:04 PM
Katie Russell worked from 10-2:04 today

**September 9th, 2020**



**Katie Russell**  9:37 AM
was added to #hourcorrection by Jon Souders.

**September 21st, 2020**



**Cydney Moore**  8:35 PM
For @Allie Myers, I guess the time clock didn't go through when I clicked it earlier today, so please add my hours for 9/21 from 2:50 pm to 8:30 pm. So sorry! Not sure what happened...thank you!!

**October 6th, 2020**



**David Dyck**  5:32 PM
was added to #hourcorrection by Jon Souders.



**Jon Souders**  7:13 PM
David Dyck was here for training from 5-6:50

**October 26th, 2020**



**Katie Russell**  8:12 PM
forgot to clock out, left like 3 min ago

**November 2nd, 2020**



**David Dyck**  9:06 PM
Forgot to clock in today

9:06

Clock out at 845

**November 11th, 2020**



**Grant Jackson**  12:20 PM
was added to #hourcorrection by Jon Souders, along with Ryan Sullivan.
**December 14th, 2020**



**Cydney Moore**  2:45 PM
forgot to clock out Friday -Katie



**Katie Russell**  8:13 PM
forgot to clock out, 8 is fine

**Saturday, January 2nd**



**Katie Russell**  10:30 AM
my hours didn't log yesterday



**Cydney Moore**  3:00 PM
Colin left @ 12:30 and Katie got here @ 12:30



**Katie Russell**  6:12 PM
leaving rn

**Wednesday, January 6th**



**Katie Russell**  10:09 AM
I left last night at 8:45

10:10

i definitely clocked out but the system has been acting up



**Cydney Moore**  2:50 PM
Andrea left at 10:30

**Monday, January 18th**



**Christopher Brown**  7:31 PM
was added to #hourcorrection by Jon Souders, along with Fatorma Bolay III.

**Saturday, January 30th**



**Cydney Moore**  12:47 PM

Katie clocked out yesterday at 3 yesterday

**Wednesday, February 10th**



**Katie Russell**  5:05 AM
got here are 4:45

**Monday, February 15th**



**Katie Russell**  4:47 AM
mindbody won't log in for whatever reason, I got here at 4:45



**Brian Chisholm <bc@rwfitness.com>**

## I need to talk to you in private
1 message

**LaToya Butler-Williams** <lwilliams@rwfitness.com>                    Fri, May 31, 2019 at 5:41 AM
To: Brian Chisholm <bc@rwfitness.com>

Good Morning Brian,

If you have time today I would like to meet with you as I need to talk to you about something private. I have been trying to figure out how to talk to you about this and haven't really come to a conclusion as to how I want to say it. I have been going through some personal things as you know over the past month but during that time I have been really think about somethings along with some other stuff. I would like to talk to you away from the club and would like our conversation to stay between us as what I need to talk about no one else knows and I would like for it to stay that way until I am ready to tell them myself. Please let me know when would be a good time for you today if it is at all possible that we could meet up as you know I get off around 10AM so any time after that would be fine.

Thank you for your time and I will talk to you soon,

LaToya

**331B_1072**



Brian Chisholm <bc@rwfitness.com>

---

## Fwd: B&H Quote, ATT: BH_810262470.pdf

2 messages

---

**ssaabs1@aol.com** <ssaabs1@aol.com>                        Wed, Jun 19, 2019 at 1:03 PM
To: bc@rwfitness.com

This is for the same exact set up for about $4100 for both room Jane quote was $5400 plus shipping and tax. We may not need the mount that they have a get a less expensive one.


-----Original Message-----
From: sales <sales@bhphotovideo.com>
To: ssaabs1 <ssaabs1@aol.com>
Sent: Wed, Jun 19, 2019 11:46 am
Subject: B&H Quote, ATT: BH_810262470.pdf


Sent on: 06-19-19-11:46:37-
   This email contains an attached file: BH_810262470.pdf,
with the details of our 'Quote'.
B&H Photo & Video,
Quote Department
-----------------------

To view the attachment you must have Acrobat Reader from Adobe Inc. installed on your computer.
Download the free Adobe Acrobat Reader from Adobe's website:
http://www.adobe.com/products/acrobat/readstep.html

---

 **BH_810262470.pdf**
18K

---

**Brian Chisholm** <bc@rwfitness.com>                        Wed, Jun 19, 2019 at 1:42 PM
To: Ss Ss <ssaabs1@aol.com>

Looks good to me. I spent two hours there again today in a bitch-fest between LaToya and Kim against Devin. They all understand that I am not putting up with any of it anymore and they are to be nice and respectful to one another and more so to the members, do their jobs and stop all the immature gossip.

I am working on figures now so I will send you a breakdown shortly.

[Quoted text hidden]

--
**Brian A Chisholm**
**Rockwell Fitness**
*Owner/Operator*
443-995-1520 Cell
bc@rwfitness.com

331B_1075

Messages - Devin Conway                                                        +14439951520

iMessage
8/25/19 9:34:20 AM EDT

Time clock is not working

6/19/19 5:18:14 PM EDT

Devin Conway (+14108044972)

Just finished and saved. I had to make further corrections to Ryen dill,
Conner K, and Lexi R. Sending over the corrected time clock now

331B_1244

Messages - Sid Saab

+14439951520

iMessage
6/19/19 7:42:16 PM EDT

Long day dealing with her and LaToya. Only to have LaToya's Mom come in to talk to me and almost demand I fire Devin. I can handle them all but this shit is stopping right now. I think Kim is just jealous and think Devin is fine. I will call you on the AM.

7/9/19 6:30:23 PM EDT

We can talk about it tomorrow but she was fired.

331B_1264

Messages - Devin Conway                                                                                +14439951520

iMessage
6/12/19 11:37:09 AM EDT

> Devin, can you make sure that commission check from active is deposited today please. You can just give it to Kim. Secondly, I've been working from home and I have this site up for our sports supplement performance drinks but I can't find the username and password. It looks like the only way to order is for us to fax them a form. Are you fine with us doing away with that company all together? I only ask because I think we can order just about everything we need through Amazon or elsewhere. Just my thought. I did talk to LaToya and now it looks like she wants to stay through August so do you and I will have to discuss how we handle her and decisions.

6/12/19 12:07:28 PM EDT

Devin Conway (+14108044972)

Idk where Kim is today, she never came in today and I haven't heard from her but I can take the check over to the bank.
Yeah I am on board for doing away with them. All we need to do is get a fridge and then we can order from whoever.
Maybe you her and I can sit down for a meeting and discuss her giving her best effort for her the next few months if she does plan to stay

6/12/19 12:09:52 PM EDT

> I talked to Kim yesterday and I told her I would try to help with the data backup but we have not spoken yet

6/18/19 5:07:41 PM EDT

> Devin, I'm getting ready to walk into a 5 PM meeting and once I'm done here I have to head to an event in Edgewater. I will try to call you later on this evening because I want to again have LaToya and Kim texting me wanting to talk and to be quite honest with you I'm getting a little sick of Listening to them complain to me about stupid crap. I told LaToya I would come in tomorrow in the morning to discuss so I wanted to talk to you before hand.

6/20/19 8:13:26 AM EDT

Devin Conway (+14108044972)

Did you already run adp? I just realized I hadn't added Kim's 25 hours to it

6/20/19 8:21:02 AM EDT

Devin Conway (+14108044972)

Without having it infront of me, I know we added the extra front desk cleaning shift resulting in 30 more hours a week and Bree and Kim have more hours after the club automation calls

**331B_1284**

Messages - Sid Saab                                                                    +14439951520

iMessage
6/19/19 7:42:16 PM EDT

Long day dealing with her and LaToya. Only to have LaToya's Mom come in to talk to me and almost demand I fire Devin. I can handle them all but this shit is stopping right now. I think Kim is just jealous and think Devin is fine. I will call you on the AM.

6/19/19 7:43:39 PM EDT

This was from Sarah a couple hours ago. At least she is happy. It actually only seems to be LaToya and Kim.

Hi Brian
I just left the gym and the spin room looks awesome!! I think it's going to be so great!

Also, spoke to Devin about all of the nonsense today. No need to reply to me I know you've had enough, but I just want you to know I think Devin is doing a really great job! He's fair and very easy to work with.
I'm sure you could never imagined all the drama you would encounter but things are good and getting better all the time. I truly don't understand what those two are doing.
Thanks for all you are doing to make Rockwell a better place.

6/19/19 7:44:41 PM EDT

Sid Saab (+12404641495)

I'm surprised more with Kim.

6/21/19 12:27:51 PM EDT

I am firing Kim right now.

7/15/19 2:05:34 PM EDT

Sid Saab (+12404641495)

Do you remember what day kim was let go

7/18/19 9:24:11 AM EDT

Hey brother, I just noticed I missed your call at some point last night. I also wanted to let you know that Kimberly filed a discrimination suit against us I will forward the email

8/19/19 10:25:04 AM EDT

FYI- got this on Friday at the gym. Kim must be appealing her denial from unemployment.

331B_1295

Messages - Sid Saab                                                                    +14439951520

iMessage
6/2/19 2:16:31 PM EDT

No, I was there twice this morning for different reasons but you should go check it out. The painter is there now and Andi should be hanging some drywall. I need to go over a couple things with you as far as the drop ceiling and air-conditioning and one other thing. You and I are going to have to have a serious talk about how to handle a certain situation which is imperative that you and I do together because it involves sensitive sexual issues at the gym. If you have time you should come over my house and have a drink and eat a burger or some hotdogs. It is just the Chisholm family so you're certainly welcome

**331B_1337**

# EXHIBIT 6



Devin C >

Add and share your name and photo
Set Up...

Wed, Apr 24, 5:50 PM

Hey I'm doing payroll, what are your hours?

Give me a minute and I'll check



iMessage



PL Production 0008



Mail body: Fwd: Document 3

Sent from my iPhone

Begin forwarded message:

**From:** Kimberly Kubas <kmkubas@hotmail.com>
**Date:** August 21, 2019 at 3:51:37 PM EDT
**To:** Kimberly Kubas <kmkubas@hotmail.com>
**Subject: Document 3**

→ General manager

ATTN: HEARING EXAMINOR

Evidence

Kimberly Kubas
APPEAL # 1910571
Hearing - 8/23/19
@ 9am

SSN - 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

Sent from my iPhone

APPEAL # 1910571

1



ɪɪ AT&T 🌐   2:38 PM   @ 71% ▭

< 1

L

Latoya >

Tue, Jun 18, 11:46 AM

Omg. So over this shit. So Devin calls me in his office and tries to reprimand me for the time clock thing. Asking do I think I'm better than everyone, and saying I didn't clock in just to piss him off. He is delusional. I don't know what to do. About to 😢

Did you confront him like Brian said to do? And this episode needs to be told to Brian. It is getting to the point that they are going to be struggling for staff

I tried to. I told him I spoke with Brain about my hours, and he has no problem with it. And I told Devin he is not paying me, Brian is, so back off. And I told him I don't appreciate him ignoring me on purpose and meddling in my job. Once I mentioned I spoke to Brian, he changed his tune. Trying to give

    Text Message   

       

PL Production  0031

all AT&T 5G E        1:43 PM        @ 56% 🔋

‹ 2

**L**

Latoya ›

Wed, Jun 19, 10:06 AM

Is Brian on his way

He said he would be here in 5 mins

Ok... just text me when I should come up

Ok

I think he just drove up

Ok. Running to the bathroom and I'll be up

Ok

He is here

Wed, Jun 19, 6:45 PM

Hey just wanted to check on you and see how your are feeling. My phone has a low battery so I can only text

I sent Brian/Sid an email. Can I forward it to you? If so, what email?

⭕ Ⓐ    ( Text Message        ⬆ )

PL Production  0033



.ıll AT&T 5G E     🔒 2:39 PM     @ 71% 🔋

‹ 1     L     Latoya ›

Good for Billy. I Don't blame him at all. I wrote this email so I have proof if I ever need it. I am in fight mode. Which never happens, but enough is enough.

It is. And the thing is the way Brian is handling this sends the message that he condones having a sexual predator on staff and doesn't care about the female staff or members

Thu, Jun 20, 7:10 AM

OMG he is attempting to fucking kiss Billy's so damn bad I think Billy may be chaffed

Thu, Jun 20, 8:24 AM

Haha! I have to go in there at some point to get my work to bring home. I have been so stressed since yesterday, and dread even having to run into Devin at this point



Text Message

On Thu, Jun 20, 2019 at 6:27 PM Kim Kubas <kkubas@rwfitness.com> wrote:
Hello Brian and Sid,

Thank you for your responses. I just want to make it clear that I am not requesting that Devin
be let go, or anything of the sort.

I simply want to be treated with common courtesy, and basic respect. I am not sure what the
answer is either, but I trust that you two want to ensure this as well.

I truly appreciate both of you, and the opportunity you have given me to work with the
company. I went in today to take all my work home, as well as the deposits, and will bring
those to the bank tomorrow.

Let me know if you have any questions.

Take care,
Kim

On Wednesday, June 19, 2019, Sid Saab <ssaabs1@aol.com> wrote:
Kim,

I am also sorry for this. Brian and I will discuss this and talk to you the next couple of dayss.

Sent from my iPhone

On Jun 19, 2019, at 6:38 PM, Brian Chisholm <bc@rwfitness.com> wrote:

Hello Kim

Thank you for the detailed description of the events. It is our primary
responsibility as owners to provide a safe and healthy enviroment for our
employees and members. We will continue to take this situation very seriously
and investigate to the best of our ability.

As I stated earlier today, I am good with you working from home. Please do
clock in everyday so we can avoid any possible conflict between you and Devin.

I will be in touch over the next couple days and I am really sorry that you are in
this situation and mindset.


On Wed, Jun 19, 2019 at 6:14 PM Kim Kubas <kkubas@rwfitness.com> wrote:
Dear Brian and Sid,

I am writing to formally document the recent weeks series of events and
what has led to where I am at the present moment.

PL Production  0080

I want to start by saying, I truly am invested in Rockwell's profitability and success as a gym. Having been with the company for 13 years, I have formed great relationships with members as well as staff, that keeps me coming back each day with a smile. It was a pleasure to meet you two, and I can see both of you have a financial,  as well as emotional investment in the gym as well.

This all started May 11, 2019, after the benefit for Pete. Bobbi Beers asked me if I could give her any advice on how to handle Devin. She told me he has been acting aggressive (sexually) towards her, and she does not trust him. She stated she was afraid of losing clients if she stood up to him. I told her that she needs to trust her instinct, and that I have personally witnessed him doing the same to others, including myself.

That Monday, May 13, Devin did not acknowledge me at all. I said hello, he ignored me. I asked to meet with him, at which point he demanded that I keep it all a secret, it never happened, and to sweep it under the rug. In addition, he berated me for coming clean to Bobbi. I felt badly for her, and my sole intention was to let her know she is not trapped with this situation.

Since then things have gotten worse. I did reach out to you, Brian. And I thought and thought about it, debating if it was the right thing to do. I was nervous and scared, but I did.

There are at least 2 other women who have approached me with similar stories, and if need be I can contact them and disclose their identities, if they wish.

I have felt highly uncomfortable around Devin since this came to light, due to the fact he is singling me out. It is without a doubt related to my bringing his sexual harassment to light. He berated me about my error in clocking in. There are plenty of times staff forgets to clock in, and he has never had an issue with anybody else  previously.

I had not clocked in properly, due to the the schedule of   our software conference calls, and  providing care for my daughter during those times.  He called me in his office on June 18, and accused me of thinking I'm better than everyone, and not clocking in just to get him upset.

 He also admitted talking to other staff about this situation. (Bree and Sarah). That is when I felt the most embarrassed and upset. I have kept this whole situation private, between you (Brian) and Devin. I have gone out of my my to make sure this situation is protected and anonymous, and I feel let down.

I have been feeling dread and anxiety anytime I have to communicate with Devin, and it is taking a toll on me.

Due to the current situation, I am requested the ability to work from home for the next two weeks, until I figure out how to proceed. Bobbi

PL Production  0081

i look forward to hearing from you.

Take care,

--
**Kimberly Kubas**
Administrative Assistant
**Rockwell Fitness**
410-432-6140

--
**Brian A Chisholm**
**Rockwell Fitness**
*Owner/Operator*
443-995-1520 Cell
bc@rwfitness.com

--
**Kimberly Kubas**
Administrative Assistant
**Rockwell Fitness**
410-432-6140

--
**Brian A Chisholm**
**Rockwell Fitness**
*Owner/Operator*
443-995-1520 Cell
bc@rwfitness.com

PL Production  0082

CONFIDENTIAL - Produced Pursuant to Protective Order

STATE OF MARYLAND
DEPARTMENT OF LABOR LICENSING AND REGULATION
DIVISION OF UNEMPLOYMENT INSURANCE

AGENCY FACT-FINDING REPORT

Close Window        Print

Social Security Number:
Claimant Name: KIMBERLY M. KUBAS
BYB: 06/30/2019
Claimant Phone Number:  410-615-3407

Employer Name:  331B LLC
Employer Account Number:  96585942
Employer Phone Number:  240-464-1495

Sequence Number:  002
Tran Code:  A03
Issue Established:  50
Issue Resolved:  40

APPOINTMENT HISTORY

| SR6 Date Mailed | Interview Date | Interview Time | Type |
|---|---|---|---|
| 07/12/2019 | 07/19/2019 | 09:00 AM | INITIAL INTERVIEW |

CLAIMANT INITIAL CLAIM INFORMATION
Reason for Separation:  50
First Day of Work:  05/15/2006
Last Day of Work:  06/21/2019
Return to Work Date:  N/A

CLAIMANT STATEMENT
Fact Finding
Conducted Date: 07/19/2019        Time: 9:47am

Declaration
I will begin this fact-finding interview by asking you specific questions regarding the issue at hand. Once we have obtained your statement, I will read it to you and make changes if you disagree. If you agree, the information you provide will become part of the unemployment insurance record and may be used as evidence in any future unemployment insurance proceedings.

Occupation:  administrative assistant
Rate of Pay:  $14/hour

What is the name and title of the person who discharged you and what reason did this person give you for the discharge?
I was discharged by Brian Chisolm, owner.

What was your last physical day of work?
6/21/2019

On what date did the final incident occur and did it take place on company property, during work hours or while you were using company equipment? If yes, please designate which of these apply.
6/21/2019

Provide details of the final incident that led to your discharge and explain what you did to prevent this final incident from happening?
He didn't provide a final incident or reason.

Does your employer have a policy regarding this type of behavior? If yes, what is the policy?
I didn't violate any company policy.

Were you previously warned/suspended for this type of behavior? If yes, prior to the final incident, what is the date of the most recent warning/suspension and what is the name and title of the person who issued it?
Devin, general manager, told me to clock in and out.  If I'm there then I have to physically clock in and out but if I'm at home I can use the web based program.

If the most recent disciplinary action was a warning, was it verbal or written and what were the specifics of the warning? What is the total number of warnings you have received in the past year for this same type of behavior?
REBUTTAL:  I didn't clock in physical that morning because I was working at home.  I had started working at home that Monday, 6/21/2019.  I had told the owner, Brian Chisolm, about an incident of sexual harassment with Devin Conway, General manager.  He told me that I could work out of my home via email.  He said this would be for two weeks while he investigated the situation.  The general manager was mistreating me once he got wind that I had reported him.
I had the deposits with me and was going to the office to retrieve the deposit from the safe.  The Wednesday before we had a conversation in which we agreed that I would be working at home.

Appeal Rights:
As a result of this fact-finding interview you will receive a written decision in the mail. If you disagree with the decision you may file an appeal within 15 days. Instructions will be included with the decision.

Scheduled Rebuttal
Examiner advised claimant that he/she would be contacted on 06/24/2019 between 3-5:30pm

CLAIMANT REBUTTAL
Attempts to Contact
I called the claimant for rebuttal at (410) 615-3407 and left the following message on an answering machine: This is Yvonne with the Division of Unemployment insurance calling KIMBERLY M. KUBAS for additional information. It is 5:07pm on 07/24/2019. I will make one more attempt today.

Conducted Date:        Time:
I was at my daughter appointment when I called at or around 9:45am and I came to work after the appointment was finished.  I had clocked in early that morning because I planned to do the deposits for my employer.

EMPLOYER SEPARATION INFORMATION
207 Sent: 07/08/2019
207 Due: 07/16/2019
207 Received w/indicator: 07/15/2019 S
Reason for Separation:  51
First Day of Work:  09/01/2018
Last Day of Work:  06/21/2019
Return to Work Date:  N/A
Official Completing Separation Information:  N/A
Contact Person:  Sid Saab
Contact Phone:  240-464-1495        Extension:  N/A

PL Production  0106

CONFIDENTIAL - Produced Pursuant to Protective Order

**Email Address:** ssaabs1@aol.com
**Gross Wages Since 04/01/2019:** $1,708.00

**Pension Indicator:** N

**Profit Sharing Indicator:** N

**Bonus/Special Pay Indicator:** N

**Severance Pay Indicator:** N

**Vacation/Holiday Pay Indicator:** N

**EMPLOYER STATEMENT**
**Fact Finding**
**Conducted Date:** 07/15/2019      **Time:** 2:04pm

**Declaration**
I will begin this fact-finding interview by asking you specific questions regarding the issue at hand. Once we have obtained your statement, I will read it to you and make changes if you disagree. If you agree, the information you provide will become part of the unemployment insurance record and may be used as evidence in any future unemployment insurance proceedings.

**Primary Contact Name:** Sid                          **Title:**                          **Phone:** (240) 464-1495
**Secondary Contact Name:** Brian Chisolm          **Title:** co-owner                **Phone:** (443) 995-1520
**Claimant Occupation:** admin
**Claimant Rate of Pay:** $14/hour

**What is the name and title of the person who discharged the claimant and what reason did this person give the claimant for the discharge?**
She was discharged by Brian Chisolm, manager.

**What was the claimant's last physical day of work?**
6/21/2019

**On what date did the final incident occur and did it take place on company property, during work hours or while the claimant was using company equipment? If yes, please designate which of these apply.**
6/21/2019.

**Provide details of the final incident that led to the claimant's discharge.**
She clocked herself in at 10:07am but then texted me ten minutes later to say she wasn't going to be in for awhile. She has the ability to clock in remotely.  She didn't get to the office until around 1pm.

**Do you have a policy regarding this type of behavior? If yes, what is the policy? How, when and by whom was the claimant made aware of this policy?**
yes.  policy states you need to clock in when you get here.  She was advised of the policy when hired.

**Was the claimant previously warned/suspended for this type of behavior? If yes, prior to the final incident, what is the date of the most recent warning/suspension and what is the name and title of the person who issued it?**
yes.  She was verbally warned by the general manager, Devin Conway,  on 6/5/2019 that from now on she would be required to physically clock in.  She would no longer allowed to tell us an hour amount at the end of the pay period but would need to physically clock whenever she had to work in the office. She had told Devin that she worked 25 hours but never clocked in.

She wasn't told her job was in jeopardy.

**If the most recent disciplinary action was a warning, was it verbal or written and what were the specifics of the warning? What is the total number of warnings the claimant received in the past year for this same type of behavior?**
If you have any further questions please contact Brian Chisolm ast (443) 995-1520.

**Appeal Rights:**
As a result of this fact-finding interview you will receive a written decision in the mail. If you disagree with the decision you may file an appeal within 15 days. Instructions will be included with the decision.

**EMPLOYER REBUTTAL**
**Attempts to Contact**
I called (443) 995-1520 (Alternate Number Source: Brian Chisolm, co-owner,) for rebuttal and left the following message on an answering machine: This is Yvonne  with the Division of Unemployment Insurance calling for additional information on KIMBERLY M. KUBAS. It is 10:18am on 07/19/2019. Please return my call by 10:30am on 07/23/2019. If the return call is not received by that date and time, the issue will be resolved with the available information and you will receive a decision in the mail.

**Conducted Date:**                **Time:**
She was supposed to work in the office that day.  We needed to make deposits.  She told me by text that she was still at her daughters doctor's appointment but was trying to make it in as soon as possible.  The deposits that she needed to make were in the office. The BBT where we make deposits is right next to the office. She was required to tell us beforehand if she was working at home. She never told me that she was working at home that day.

I told her why she was being let go. I showed her the text messages that she had sent and that she had logged in while out of the office after being told she must physically clock in at the office.

**ADDITIONAL INFORMATION**
Examiner's note: unable to self-serve because this was the last employer.

See attached a text chain between the claimant and Brian Chisholm sent to the examiner by Brian Chisholm.

On 6/21/2019 at:17am the employer text the clamant asking her to make some bank deposits.   She responded at 9:45am I'm at an appointment for my daughter right now. As soon as I get to the computer I will let you know the amount being deposited and I will have them back to you at 2pm.

He text her back Thanks.  At 10:07am she texted him back. The total to be deposited is $602.87. Letting you know in case you want to deposit more.  I will get there as soon as I'm done with this appointment.

[Per Brian Chisholm. She had checked herself into work this per the time sheet at 10:03am.  So she stayed on the clock for the next two hours  until 12:14pm when I heard from her next.  Our deposits are typically all cash and take no more than five minutes to complete.  Why did she stay clocked in this whole time.  She reported that she was making the deposit at 12:29pm.

**ATTACHMENTS**

| | Source | Content | Redet/JAVA | Date Received | File Name | Attached Timestamp |
|---|---|---|---|---|---|---|
| | | | | | | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| View | Employer | SIDES Response 07/15/2019 2:49 PM | | 07/15/2019 | | |
|------|----------|-----------------------------------|--|------------|--|--|
| View | Employer | Emp Records | | 07/21/2019 | Text chain between Kimberly Kubas and Brian Chisholm (1).docx | 7/29/2019 2:42:17 PM |
| View | Employer | Emp Records | | 07/24/2019 | Fax Received Kimberly Kubas.pdf | 7/24/2019 5:09:29 PM |

DETERMINATION SUBMITTED TO MABS ON 07/29/2019 AT 2:35 PM
First Affected Week Ending: 07/06/2019
Issue Established : 50
Issue Sequence: 002
Issue Resolved: 40
Original Examiner ID: ewcp18
Detected Date: 07/05/2019
Count? Y
JAVA?
Penalty? Y   Start Date: 06/16/2019   Disqualification Weeks: 57
OP Source:
OP Fault:
Employer Number: 96585942
Employer Sequence: 1
Charge? N   N/C Start: 06/30/2019
Federal Pension Amount:          Effective Date:          Contributory:
Other Pension Amount:          Effective Date:          Contributory:
Bonus/Special Pay Amount:
Profit Sharing Pay Amount:          Contributory:
Severance Pay Amount:
Lump Sum Pension Amount:          Contributory:
Gross Weekly Wage:          Last Day of Work:
Vac/Hol Pay 1 Amount:          Week Ending:
Vac/Hol Pay 2 Amount:          Week Ending:
Vac/Hol Pay 3 Amount:          Week Ending:

Statement Number: 0684
THE CLAIMANT WAS DISCHARGED OR SUSPENDED AS A DISCIPLINARY MEASURE BY
ROCKWELL FITNESS    ON 06/21/2019 BECAUSE OF FAILING TO FOLLOW
INSTRUCTIONS. AS A RESULT, IT IS DETERMINED THAT THE CLAIMANT'S ACTION WAS A
DELIBERATE AND WILLFUL DISREGARD OF STANDARDS OF  BEHAVIOR, WHICH HIS/HER
EMPLOYER HAD A RIGHT TO EXPECT, SHOWING  A  GROSS INDIFFERENCE  TO HIS/HER
EMPLOYER'S INTEREST AND THE ACTION IS CONSIDERED GROSS MISCONDUCT  IN
CONNECTION WITH THE WORK WITHIN THE MEANING OF SECTION 8-1002 OF THE MARYLAND
UNEMPLOYMENT INSURANCE LAW.

Examiner ID: ewcp18


REDETERMINATION SUBMITTED TO MABS ON          AT
Reason:
BYB: 06/30/2019
Additional Fact Finding Date:          Time:

First Affected Week Ending: 07/06/2019
Issue Established: 50
Issue Sequence: 002
Issue Resolved:
Original Examiner ID: ewcp18
Detected Date: 07/05/2019
Count?
JAVA?
Penalty?     Start Date:          Disqualification Weeks:
OP Source:
OP Fault:
Employer Number: 96585942
Employer Sequence: 001
Charge?     N/C Start:
Federal Pension Amount:          Effective Date:          Contributory:
Other Pension Amount:          Effective Date:          Contributory:
Bonus/Special Pay Amount:
Profit Sharing Pay Amount:          Contributory:
Severance Pay Amount:
Lump Sum Pension Amount:          Contributory:
Gross Weekly Wage:          Last Day of Work:
Vac/Hol Pay 1 Amount:          Week Ending:
Vac/Hol Pay 2 Amount:          Week Ending:
Vac/Hol Pay 3 Amount:          Week Ending:

Statement Number:

Examiner ID:


Print

▲ TOP

PL Production  0108

# EXHIBIT 7



can call you on my way there.

Thanks so much. Sorry to take up so much of your time with all this.

No worries

Wed, Jun 19, 10:52 AM

I'm sorry. Didn't mean to walk out. I

mean to walk out. I apologize, but I can't make the club automation call today. Thanks for taking your time to meet us.

Fri, Jun 21, 8:17 AM

Kim, can you please go in first thing this AM and make any deposits

thing this AM and make any deposits we have right now. We are stretched very thin and I want to know if Sid and I need to deposit more money in there right now. The lights, construction, extra payroll and two new programs all





get there as soon as I'm done with this appt.

Ok thanks    10:23

Fri, Jun 21, 12:14 PM

I am here trying to do these deposits. It looks like I am blocked from accessing any of the information I    12:14

need. Did my permission level get changed?

Yes, where are you now?    12:27 PM

Delivered

At the bank. I am depositing all I can. Have two left that I am unable to do    12:29 PM

What is going on?    12:34 PM

# EXHIBIT 8



001



# EXHIBIT 9

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-2245**

TRACY SEMPOWICH,

       Plaintiff – Appellant,

   v.

TACTILE SYSTEMS TECHNOLOGY, INC., d/b/a Tactile Medical,

       Defendant – Appellee,

-------------------------------

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

       Amicus Supporting Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever III, District Judge.  (5:18-cv-00488-D)

Argued:  October 27, 2021                     Decided:  December 3, 2021

Before WILKINSON, NIEMEYER, and MOTZ, Circuit Judges.

Vacated and remanded by published opinion. Judge Motz wrote the opinion, in which Judge Wilkinson and Judge Niemeyer joined.

**ARGUED:** Kathryn F. Abernethy, NOBLE LAW FIRM, PLLC, Chapel Hill, North Carolina, for Appellant.  Julie Loraine Gantz, EQUAL EMPLOYMENT OPPORTUNITY

COMMISSION, Washington, D.C., for Amicus Curiae.  Kristin Berger Parker, STINSON LLP, Minneapolis, Minnesota, for Appellee.  **ON BRIEF:**  Carroll Theresa Wright, STINSON LLP, Minneapolis, Minnesota; Theresa Sprain, Jonathon D. Townsend, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellee. Sharon Fast Gustafson, General Counsel, Jennifer S. Goldstein, Associate General Counsel, Elizabeth E. Theran, Assistant General Counsel, Office of General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

————————————

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal arises from the district court's grant of summary judgment to Tactile Systems Technology, Inc. on former employee Tracy Sempowich's discrimination, retaliation, and Equal Pay Act claims. Because the court applied an incorrect legal standard to the Equal Pay Act claim and erred in holding that there are no genuine issues of material fact precluding summary judgment on the other claims, we must vacate its judgment and remand for further proceedings consistent with this opinion.[1]

<div style="text-align:center">I.</div>

<div style="text-align:center">A.</div>

Tactile, a medical device company, sells compression devices to treat chronic swelling and wounds. In 2007, Tactile hired Tracy Sempowich — a woman — as a field sales employee, a position known at the company as a "product specialist." Sempowich briefly left full-time employment in 2009 but continued to work with Tactile as an independent contractor during that time. In 2010, Tactile rehired her as a full-time product specialist and subsequently promoted her to a senior product specialist.

Four years later, Tactile again promoted Sempowich — then forty-nine years old — to be the regional sales manager for the Mid-Atlantic region. In this role, Sempowich

---

[1] In granting Tactile's motion for summary judgment, the district court also granted Tactile's motion to strike Sempowich's proffered expert testimony and dismissed as moot Sempowich's own motion for partial summary judgment and motion to strike Tactile's responsive statement of material facts. As discussed below, we vacate the grant of Tactile's motion to strike Sempowich's proffered expert testimony and remand for further proceedings consistent with this opinion. On remand, the district court should also reconsider and decide Sempowich's motions that it dismissed as moot and any motions that may otherwise be revived.

<div style="text-align:center">3</div>

supervised a sales team of up to fifteen people for a region then consisting of Maryland, North Carolina, part of South Carolina, and Virginia.  Later that year, Tactile hired Greg Seeling — a forty-six-year-old man — to be the regional sales manager for the Southern region, consisting of Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, part of South Carolina, Tennessee, and West Virginia.

<div align="center">B.</div>

The above facts are undisputed, but the record is rife with other facts that are in serious dispute.  The disputed facts relate primarily to Sempowich's performance as a regional sales manager, about which Tactile and Sempowich have offered starkly different testimony and documentary evidence.

On one hand, Tactile maintains that Sempowich failed to meet the company's performance goals.  Tactile's Senior Vice President of Sales, Bryan Rishe, testified that Sempowich oversaw lagging year-over-year growth, high employee turnover, and slow hiring in her region, and that there was a "lack of professional development of [her region's] personnel."  He further testified that these issues "had challenged the region since 2015" and that he had discussed them with Sempowich "on a number of occasions" and "tried to assist her with recruitment," to no avail.  Tactile also points out that Sempowich stated on a call with Rishe that she "couldn't grow the way" that he was "measuring [her] on from last year with the fact that there was a lot of things that were out of [her] control from a business perspective."  And in a business action plan, Sempowich acknowledged that her region's "biggest hur[d]le has been headcount and the ability for expansion," noting that hers was "the only tenured region that has not maximized expansion

<div align="center">4</div>

opportunities or had increase of territory."  Rishe testified that he and the company's CEO "concluded [that] a change of management was needed to turn around performance of the Mid-Atlantic Region."

On the other hand, Sempowich testified and offered documentary evidence showing that Tactile consistently viewed her as a top performer.  She testified that Vice President Rishe never "explicitly" told her she had "performance deficiencies" that she needed to work on to keep her position.  In fact, she offered documentary evidence that in two of Tactile's recent annual evaluations of her performance, Rishe listed her as having "[e]xceptional [s]trengths" in people development, team building, leadership, and planning, organization, and execution skills.  Sempowich also testified and offered documentary evidence that Tactile repeatedly gave her awards, including a Regional Manager Sales Leadership Award three years in a row for exceeding the revenue plan in her region and, at the national sales meeting on January 21–24, 2018, an award for Sustained Excellence (an honor that, according to Sempowich, no other current regional sales manager received at that time).  In addition, she testified that in January 2018, Tactile informed her that it would give her a discretionary equity grant of $40,000 and a $10,000 salary raise effective February 1, 2018.

Moreover, Sempowich offered evidence that Tactile viewed her not only as a top performer but also as a better performer than Seeling.  In their 2015 evaluations, Tactile rated Sempowich as a Key Contributor (the third-highest possible rating) and Seeling only as a Contributor (the fourth-highest); and in their 2016 evaluations, Tactile rated

Sempowich as a Major Contributor (the second-highest) and Seeling only as a Key Contributor (the third-highest).

Nevertheless, on February 12, 2018, Rishe informed Sempowich that she would no longer be a regional sales manager, that Tactile would reassign her region to Seeling, and that Seeling would be promoted to area director (a step above regional sales manager). Tactile offered Sempowich a newly created position as a market development manager for its "head and neck" business, in which she would retain the same base salary.  But Sempowich viewed this offer as a demotion — she saw the new position "more like a sales job" with only a nominal title as manager, especially because she would no longer have any employees reporting directly to her.  And the formal offer letter that Tactile later provided did not mention a plan that would allow her to earn incentive compensation after the expiration of a six-month guarantee.

Ten days later — on February 22, 2018 — Sempowich submitted a complaint to Tactile's Human Resources department, alleging that Tactile had discriminated against her on the basis of sex and age.  On March 23, Tactile's counsel informed Sempowich's counsel that if she failed to accept the offer to become a market development manager, her employment with Tactile would cease effective March 30.  Sempowich did not accept, and on March 30 her employment ended.

Sempowich then sued Tactile in state court, alleging: (1) Title VII disparate treatment on the basis of sex and sex-plus-age; (2) wrongful termination under North Carolina state law; (3) Title VII retaliation; and (4) a violation of the Equal Pay Act.  Tactile removed the case to federal court.  Once in federal court, Tactile moved for summary

6

judgment on each of Sempowich's claims. The district court granted the motion. Sempowich then noted a timely appeal to this court.

We review a district court's grant of summary judgment de novo, "applying the same legal standards as the district court and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020). Of course, summary judgment is appropriate *only* if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## II.

To survive a motion for summary judgment on a Title VII disparate treatment claim, a plaintiff must either proceed under the mixed-motive framework or the *McDonnell Douglas* burden-shifting framework. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 206 n.4 (4th Cir. 2019); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Here, the district court held that Sempowich failed to present the direct evidence required to proceed under the mixed-motive framework, a contention that Sempowich has not challenged on appeal. Accordingly, the court analyzed her claims under the *McDonnell Douglas* burden-shifting framework.

Under the burden-shifting framework, a plaintiff must first offer a prima facie case. *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007). To do so, a plaintiff must show that (1) she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a

reasonable inference of unlawful discrimination, including because the employer left open the position or replaced the plaintiff with someone outside the protected class. *Id.*; *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 n.8 (4th Cir. 2020). Once a plaintiff makes out a prima facie case, the burden shifts to the employer to put forth a nondiscriminatory explanation for its actions. *Lettieri*, 478 F.3d at 646. If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation was "actually a pretext for discrimination." *Id.* (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)).

The district court held that Sempowich failed to make out a prima facie case because she was not fulfilling Tactile's legitimate expectations at the time the company reassigned her. It then held that, even if she had made out a prima facie case, Tactile had put forth a nondiscriminatory explanation for reassigning her, and no rational jury could find that Tactile's explanation was a pretext for discrimination.

## A.

On Sempowich's prima facie case, the only factor at issue before this court is whether Sempowich was fulfilling Tactile's legitimate expectations at the time it took an adverse action against her. To satisfy this factor, a plaintiff need not "show that [s]he was a perfect or model employee. Rather, a plaintiff must show only that [s]he was qualified for the job and that [s]he was meeting [her] employer's legitimate expectations." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019).

Tactile asserts that we may solely consider the "perception of the [employer]" on this factor, "not the self-assessment of the plaintiff," and that "an employer is free to set its

own performance standards." Br. of Appellee at 21–22 (first quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000); then quoting *Beall v. Abbott Lab'ys*, 130 F.3d 614, 619 (4th Cir. 1997)).   It is not clear that Tactile is correct — although we have held that we must focus on the employer's perception in the context of the *pretext* stage, we have not so held with respect to a plaintiff's prima facie case.   *See, e.g.*, *Hawkins*, 203 F.3d at 279–80; *Beall*, 130 F.3d at 619–20; *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998).   But even assuming that we must focus on just the employer's perception at the prima facie stage, a plaintiff may still introduce "evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 517 (4th Cir. 2006).

Viewing the evidence in the light most favorable to Sempowich, there is an issue of material fact as to whether Tactile's asserted expectations were legitimate or genuine. Sempowich presented substantial evidence that they were not.   If an employer genuinely believed that one of its employees was performing poorly on metrics the employer perceives as critical (as Tactile claims here), it seems likely that it would at the very least not rate the employee's performance highly or give her awards, a salary raise, or an equity grant.   And yet there is evidence that Tactile (1) consistently rated Sempowich's overall performance highly (and notably, higher than the employee who it reassigned to her position); (2) repeatedly gave her awards, including one for Sustained Excellence three weeks before it told her that it would reassign her position; (3) told her that it would give her a salary raise three weeks before it told her that it would reassign her position; and

(4) gave her a discretionary equity grant twelve days before it told her that it would reassign her position.

We have previously held that similar evidence was sufficient to survive summary judgment.  In *Haynes v. Waste Connections*, we held that a plaintiff had "raise[d] the reasonable inference . . . that he was performing at a satisfactory level" because there was evidence that the employer had given the plaintiff bonuses for the period in question and told him "mere weeks before his termination" that "everything looks good" and that he had "nothing to worry about."  922 F.3d at 225.  As in *Haynes*, there is evidence that Tactile signaled to Sempowich that it viewed her overall performance positively.

Tactile argues that here we cannot consider the performance evaluations, awards, salary raise, or equity grant because they relate to Sempowich's performance *prior* to the time it reassigned her.  But some of Sempowich's evidence relates to events that occurred three weeks or even *twelve days* before Tactile informed her of the reassignment.  And the two annual evaluations that Sempowich points to are Tactile's most recent annual evaluations of her; not only is there no more-recent negative annual evaluation for us to consider, but there is no more-recent annual evaluation *at all*.  Somewhat inexplicably, Vice President Rishe nevertheless testified that he believed Sempowich's supposed weaknesses had been apparent "since 2015."  Given the awards, salary raise, and equity grant that Tactile has given Sempowich since 2015, a reasonable factfinder could find this testimony not credible.  And if Tactile asserts that it reassigned Sempowich's position due to weaknesses she supposedly demonstrated throughout most of her tenure, it cannot

10

simultaneously argue that the court should ignore evidence about her performance during that same period.

This does not mean that Sempowich is entitled to summary judgment or even that a factfinder will ultimately find in her favor on the disparate treatment claims.  Our holding is simple — a court cannot grant a party summary judgment when there are genuine issues of material fact, and here the record reveals factual disputes as to one of the key elements of Sempowich's prima facie case.

## B.

The record is similarly replete with genuine issues of material fact that go to the heart of the pretext issue.  The district court erred in analyzing pretext not only by failing to account for those disputes but also by incorrectly applying the same-actor inference.[2]

First, the district court erred in holding that there is no genuine issue of material fact as to pretext.  "[T]o show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on

---

[2] Sempowich also argues that the district court incorrectly applied the pretext-plus standard that the Supreme Court abrogated in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).  In *Reeves*, the Supreme Court held that "[i]n appropriate circumstances, the trier of fact can reasonably infer" pretext "from the falsity of the [employer's] explanation," but that there may be instances in which such evidence is insufficient, for example, "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision."  *Id.* at 147–48.  The record is unclear as to whether the district court failed to follow *Reeves*.  But regardless, the district court erred in holding that Sempowich could not rely solely on the falsity of Tactile's articulated explanation to show pretext.  This is so because this is not a case in which "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision."  *Id.* at 148.  As a result, we need not address other evidence that Sempowich proffers to attempt to show a discriminatory motive.

11

mistakes of fact." *Haynes*, 922 F.3d at 225. "Once the plaintiff offers such circumstantial evidence, the case must be decided by a trier of fact and cannot be resolved on summary judgment." *Id.* Here, Sempowich has introduced a good deal of evidence suggesting that Tactile's explanations for its decisions were false or inconsistent over time. Much of this evidence has already been discussed above in considering Sempowich's prima facie case. But she has also introduced other evidence that supports her assertion of pretext. For example, the fact that Tactile replaced her with Seeling is certainly evidence of pretext. This is so because a jury might well conclude it unlikely that an employer who reassigned an employee solely because it believed that she performed poorly would replace her with an employee whose performance it *consistently rated as worse*.

Sempowich has also introduced evidence that challenges the accuracy of the statistics Tactile used to measure its chosen performance standards. Sempowich testified that Tactile removed Maryland and part of Virginia from her region in January 2017, even though she had previously told Vice President Rishe that "most of the Region's significant sales growth over the next two years would likely come from [those] territories." And yet Tactile's year-over-year growth statistics may have failed to account for this external factor. *See Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005) (observing, in a different statutory context, that a rational jury could find that by reducing an employee's sales territory and increasing her quotas, the employer's actions "set her up for the failures that he later used to make the case for her termination"). The same logic applies here — an employer may be free to choose its own performance standards, but it cannot measure those

12

standards with distorted data that fails to account for factors over which the plaintiff had no control.[3]

Tactile argues that none of this evidence shows that its stated reasons were false or inconsistent, but rather merely reflects that Sempowich disagrees with the usefulness of its chosen performance standards.  Tactile points out that in *Hawkins v. PepsiCo, Inc.*, we held that a plaintiff must offer evidence that an employer's assessment is "dishonest or not the real reason for her termination," rather than merely "dispute[] the merits of [the employer's] evaluations."  203 F.3d at 280.  It is true that courts must defer to the company's business judgment with regard to legitimate criteria it chooses to measure successful employee performance.  *Id.*  We are not free to substitute criteria of our own.  But Sempowich has done more than challenge the criteria or merits of Tactile's evaluations.  Sempowich has done what the plaintiff in *Hawkins* failed to do — "supply evidence that [*her employer*] actually believed her performance was good."  *Id.* at 279 (emphasis added).  This evidence is the employer's own words and actions — the

_____

[3] Sempowich also offered an expert report, and later a supplemental declaration, by a certified public accountant who "investigate[d] what is actually being measured by" Tactile's year-over-year growth statistics.  The district court excluded both the report and declaration, holding that the report was not relevant and that Sempowich had not previously disclosed the opinions laid out in the declaration.  The court abused its discretion in doing so.  The report is clearly relevant because it could help a factfinder understand the accuracy of Tactile's statistics — in the report, the expert stated that Tactile's statistics "did not isolate and track any particular action over which a Regional Sales Manager could reasonably be expected to exert control."   And Sempowich did previously disclose the opinions in the declaration by outlining them in the earlier report, in which the expert "opine[d] on whether Tactile's year-over-year growth statistics are reproducible and statistically valid" by stating that, "[d]espite working with several different types of reports generated by Tactile, [she] was unable to reproduce the statistics shown in Exhibit 38."

performance ratings, awards, salary raise, and equity grant. Each of these pieces of evidence indicates that Tactile not only thought that Sempowich was performing satisfactorily, but that her performance was of such a high quality that it deserved repeated praise.

The district court also erred in applying the same-actor inference to dispose of Sempowich's claim. Under the same-actor inference, if the plaintiff's "hirer and the firer are the same individual and the termination of employment occurs within a *relatively short time span* following the hiring, a strong inference exists that discrimination was not a determining factor." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) (emphasis added). But Rishe did not reassign Sempowich "within a relatively short time span" after he rehired her — far from it. In *Proud*, the time span was less than six months. *Id.* at 798. Here, Rishe reassigned Sempowich approximately *eight years* after he rehired her and four years after he promoted her. Moreover, there is a genuine issue of material fact as to whether Rishe rehired and promoted Sempowich under protest: although Rishe ultimately approved rehiring Sempowich, she testified that he told her that he was "not in favor" of doing so. And when Rishe learned that Sempowich wanted to be promoted to regional sales manager, he told her that he "didn't think [she] wanted to get into management." Under these circumstances, the same-actor inference cannot support a grant of summary judgment to the defendant.

14

Because the record is replete with genuine issues of material fact as to both the prima facie case and pretext, we vacate the grant of summary judgment on the disparate treatment claims and remand for further proceedings consistent with this opinion.[4]

III.

Sempowich also claimed that Tactile violated Title VII by retaliating against her for submitting her discrimination complaint.  To establish a prima facie case of retaliation under the burden-shifting framework, a plaintiff must show:  "(i) 'that [she] engaged in protected activity,' (ii) 'that [her employer] took adverse action against [her],' and (iii) 'that a causal relationship existed between the protected activity and the adverse employment activity.'"  *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (alterations in original) (quoting *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)). The burden then shifts to the employer to demonstrate that "its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason."  *Id.*  If the employer does so, the burden shifts back to the plaintiff to show that "the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Hill*, 354 F.3d at 285).

---

[4] The district court also granted Tactile's motion for summary judgment on Sempowich's state law wrongful termination claim "for the same reason" as her Title VII disparate treatment claims.  Because we vacate the grant of summary judgment on the Title VII disparate treatment claims, we also vacate the district court's holding as to the state law wrongful termination claim and remand for further proceedings consistent with this opinion.  We need not reach aspects of the state law claim that the district court did not address.  *See Hulsey v. Cisa*, 947 F.3d 246, 252 (4th Cir. 2020) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below," especially if doing so "would require extensive analysis of issues never addressed by the district court." (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976))).

As to the prima facie case, the district court assumed without deciding that Sempowich engaged in protected activity and that Tactile took an adverse action against her.  But it then held that no rational jury could find that a causal relationship existed, reasoning that (1) temporal proximity alone cannot establish a causal relationship; and (2) no temporal proximity existed in Sempowich's case.  The court erred on both counts.

First, the court erred by holding that temporal proximity alone cannot establish a causal relationship.  We have made abundantly clear that temporal proximity suffices to show a causal relationship.  We explained this in *Strothers v. City of Laurel*, 895 F.3d 317 (4th Cir. 2018).  A plaintiff may establish a causal relationship "simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee *soon after* becoming aware of such activity."  *Id.* at 336 (emphasis added).

Second, the district court erred by holding that there was not temporal proximity in Sempowich's case.  The court reasoned that, because Vice President Rishe told Sempowich on February 12 that Tactile would reassign her region, and Sempowich did not submit her internal discrimination complaint until February 22, Tactile's adverse actions could not have been *caused* by Sempowich's internal complaint.  But there is a genuine issue of material fact as to whether Rishe made clear on February 12 that her employment with Tactile would end if she did not accept the reassignment.  It was not until March 23 — about a month after Sempowich submitted her internal complaint — that Tactile stated that, if she did not accept the offer of reassignment, her "employment with Tactile [would] end effective March 30."

16

Tactile relies largely on *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299 (4th Cir. 2006), to assert that there is no temporal proximity.  In that case, we held that, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  *Id.* at 309 (quoting *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).  But in Sempowich's case, the adverse actions were far from "gradual"; nor did they begin "well before" she engaged in protected activity.  A reasonable factfinder could find that after Sempowich submitted an internal complaint, Tactile decided to take the more drastic approach of telling her that her employment would end if she failed to accept the reassignment offer.

IV.

Unlike her Title VII claims, Sempowich's final claim — an asserted violation of the Equal Pay Act — does not turn on whether there was a genuine issue of material fact.  On the Equal Pay Act claim, there are few, if any, material facts in dispute.  Rather, the claim turns on the appropriate legal standard for determining whether an employer has violated the Act.

 To establish a prima facie case of an Equal Pay Act violation, a plaintiff must demonstrate that "(1) the defendant-employer paid different wages to an employee of the opposite sex (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions."  *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018).

17

In Sempowich's case, the district court assumed without deciding that Sempowich had demonstrated the second and third factors of her prima facie case. But it then held that Sempowich had failed to demonstrate the first factor, even though neither party disputes that, in 2015, 2016, and 2017, Tactile paid Seeling a higher annual base salary than Sempowich. The court reasoned that, in 2016 and 2017, Sempowich earned more in sales commissions than Seeling, such that when combining their salaries and commissions, Sempowich earned more in total wages than Seeling in each of those two years.

This dispute thus centers on the proper metric for determining wage discrimination under the Equal Pay Act. Sempowich argues that the proper metric is the *rate* at which an employer pays the plaintiff. Amicus the Equal Employment Opportunity Commission (EEOC) agrees. In contrast, Tactile argues that the proper metric is the employee's *total wages*.

The text of the Equal Pay Act unambiguously states that an employer may not "discriminate . . . between employees on the basis of sex by paying wages to employees . . . *at a rate* less than the *rate* at which he pays wages to employees of the opposite sex." 29 U.S.C. § 206(d)(1) (emphasis added). This critical portion of the statute says nothing about total wages; it places all the emphasis on wage *rates*. As a result, we need not even

decide whether we should defer to the EEOC's interpretation of the statute — the statute itself makes clear that wage rate is the proper metric.[5]

The district court incorrectly stated that total wages is the proper metric under the regulations. This error apparently arose from a misreading of the EEOC's definition of the term "wages." The regulations define "wages" as including "all forms of compensation . . . whether called wages, salary, profit sharing, expense account, monthly minimum, bonus . . . or some other name." 29 C.F.R. § 1620.10. As a result, the district court reasoned that "wages" must include commissions, and thus that the proper metric is to compare total wages. But this definition is beside the point. The term "wages" includes commissions because, just as with salary, an employer could not pay commissions to a female employee at a lower *rate* than a similarly situated male employee. This does not mean that all types of remuneration should be combined into one lump sum when comparing the earnings of a male and female employee.

Rather, the statute and the EEOC's regulations make clear that an employer violates the Equal Pay Act if it pays female employees at a *rate* less than that of similarly situated male employees. A hypothetical illustrates the point: "As a matter of common sense, total remuneration cannot be the proper point of comparison. If it were, an employer who pays

---

[5] We note, however, that the EEOC's regulations reach the same conclusion. Under those regulations, "an employer would be prohibited from paying higher hourly rates to all employees of one sex and then attempting to equalize the differential by periodically paying employees of the opposite sex a bonus." 29 C.F.R. § 1620.19. Although this regulation refers to bonuses rather than commissions, the logic is the same: an employer may not pay a female employee a lower salary than a similarly situated male employee and then hope to avoid liability if the female employee works hard enough to earn extra money through commissions or bonuses.

19

a woman $10 per hour and a man $20 per hour would not violate the [Equal Pay Act] . . .
as long as the woman negated the obvious disparity by working twice as many hours."
*Ebbert v. Nassau County*, No. 5 Civ. 5445, 2009 WL 935812, at *3 (E.D.N.Y. Mar. 31,
2009).

<div align="center">V.</div>

For the foregoing reasons, we vacate the judgment of the district court and remand
for further proceedings consistent with this opinion.

*VACATED AND REMANDED*