**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

KIMBERLY KUBAS,                              *
                                            *
Plaintiff,                                  *
                                            *
v.                                          *        Civil Action  MJM-20-2456
                                            *
331B, LLC                                   *
d/b/a ROCKWELL FITNESS,                     *
                                            *
Defendant.                                  *
                          * * * * * * * * * * *

**MEMORANDUM OPINION AND ORDER**

Kimberly Kubas ("Plaintiff") commenced this civil action against her former employer,

331B, LLC, d/b/a Rockwell Fitness ("Defendant"), under Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e, *et seq.* ("Title VII") alleging that Defendant terminated her employment in

retaliation for reporting sexual harassment by another employee.[1] Currently pending is

Defendant's motion for summary judgment (ECF No. 51). The Court has reviewed Defendant's

memoranda in support of the motion, Plaintiff's memorandum in opposition, and documents

attached to the memoranda. A hearing on the motion is not necessary. Loc. R. 105.6. For the

reasons explained below, Defendant's motion for summary judgment is DENIED.

**I.      Factual Background**

Plaintiff began working as a childcare attendant at Sport Fit, a gym located in Severna Park,

Maryland, in May 2006. (Kubas Dep. 7:10–8:5, ECF No. 53-1 at 3). Defendant, a Maryland limited

liability company owned by Brian Chisholm and Sid Saab, purchased the gym in September 2018.

(Def.'s Br. Summ. J. 2; Chisholm Dep. 13:17–20, ECF No. 53-1 at 40). By that time, Sport Fit had

---

[1] The parties have consented to proceed before a United States magistrate judge pursuant to 28 U.S.C. §
636(c). (ECF Nos. 17 & 22).

re-branded as Rockwell Fitness (the "Gym"), and Plaintiff had transitioned to the position of part-time bookkeeper. (Chisholm Aff.[2] ¶ 3, ECF No. 53-1 at 62). Shortly thereafter, Plaintiff's title was changed to Administrative Assistant, and her primary responsibilities included running sales reports, following up on declined credit card payments and negative account balances, responding to billing issues, corresponding with gym members regarding the status of their memberships, and making bank deposits. (Chisholm Aff. ¶ 4, ECF No. 53-1 at 40).

### A. Sexual Harassment Allegations

Plaintiff met Devin Conway when he began working for Rockwell Fitness as a personal trainer in April or May 2015. (Conway Aff. ¶¶ 2, 6, ECF No. 53-1 at 57; Conway Dep. 10:10–17, ECF No. 53-1 at 28). In or around September 2016, Conway began leading a group training class that included Plaintiff. (Conway Aff. ¶ 7, ECF No. 53-1 at 57). In May 2017, Conway became the personal training director of the Gym. (Conway Dep. 10:18–11:5, ECF No. 53-1 at 28). In the summer of 2017, Plaintiff and Conway had a consensual sexual encounter at Conway's home. (Kubas Dep. 8:13–9:12, ECF No. 53-1 at 3).

Plaintiff testified at her deposition that, during 2017 and 2018, Conway sexually harassed her at work. (Kubas Dep. 10:7–19:17, ECF No. 53-1 at 4–6). Specifically, Plaintiff testified to the following: Conway would intentionally collide with Plaintiff in the hallway at Gym to rub up against her. (*Id.*) During their group training class, Conway would rub himself against Plaintiff, call her "hot buns," and sexualize exercises, which Plaintiff, the only woman in the class, found offensive. (*Id.*; Kubas Dep. 27:14–28:6, 35:7 – 41:7, ECF No. 53-1 at 7–9). On two occasions,

---

[2] The parties have submitted affidavits apparently prepared in connection to Plaintiff's EEOC complaint (*Kimberly M. Kubas v. Rockwell Fitness*, EEOC Number 531-2019-02904), including affidavits from Brian Chisholm, dated December 11, 2019 (ECF 53-1 at 62–69; ECF No. 55-2 at 12–16); Devin Conway, dated December 20, 2019 (ECF 53-1 at 57–61); and Breanna Moore, dated December 23, 2019 (ECF No. 55-2 at 9–11); and what appears to be a three-page unsigned and undated affidavit attributed to Bobbi Beers (ECF No. 51-5 at 3–4; ECF No. 55-2 at 7–8).

Conway came into Plaintiff's office, closed the door, and groped her breasts from behind. (Kubas Dep. 10:13–11:11, ECF No. 53-1 at 4). Plaintiff would protest Conway's behavior to him verbally after some of these incidents, (Kubas Dep. 12:11–13:10, ECF No. 53-1 at 4), but she did not report these incidents to anyone at the Gym during the 2017–2018 time period for fear of losing her job, (Kubas Dep. 20:14–20, ECF No. 53-1 at 6). Conway has signed an affidavit denying Plaintiff's allegations of sexual harassment. (Conway Aff. ¶¶ 28–31, ECF No. 53-1 at 61).

Sometime around December 2018, Conway began dating Bobbi Beers, a personal trainer at the Gym, and that relationship lasted at least to December 2019. (Conway Aff. ¶ 3, ECF No. 53-1 at 57, 61; Beers Aff. (unsigned) ¶ 4, ECF No. 55-2 at 7). Conway continued to instruct the group training class that included Plaintiff until late April 2019, when he became the General Manager and Beers took over the class. (Conway Aff. ¶ 8, ECF No. 53-1 at 57; Chisholm Aff. ¶ 6, ECF No. 53-1 at 63; Beers Aff. (unsigned) ¶ 6, ECF No. 55-2 at 7).

On the evening of May 11, 2019, Rockwell Fitness hosted a charity benefit. (Chisholm Aff. ¶ 7, ECF No. 53-1 at 63). Plaintiff testified that the following transpired between her and Beers at the benefit: Beers approached Plaintiff for advice on how to handle Conway, explaining that Conway was interested in her and that the two were possibly dating, but Conway was making Beers feel uncomfortable. (Kubas Dep.43:12–49:13, ECF No. 53-1 at 10–11). Beers told Plaintiff that Conway had harassed her in ways similar to Plaintiff's alleged experiences with Conway and showed up at Beers's home unannounced, which Beers found creepy. (*Id.*) Because Conway oversaw the assignment of clients to trainers at Rockwell Fitness, Beers was worried that reporting Conway's behavior would impact her livelihood. (*Id.*) Plaintiff revealed her own experiences with Conway to Beers, including the alleged sexual harassment of Plaintiff. (*Id.*; Beers Aff. (unsigned) ¶ 8, ECF No. 51-5 at 3) Although Plaintiff had declined to disclose her experiences with Conway

3

to anyone else because she felt under his control, she advised Beers not to be intimidated but to report Conway's conduct. (Kubas Dep.43:12–49:13, ECF No. 53-1 at 10–11).

According to Conway, the next day, on May 12, 2019, Beers informed Conway that Plaintiff spoke negatively about Conway at the benefit. (Conway Aff. ¶ 14, ECF No. 53-1 at 58).

Upon returning to work on Monday, May 13, 2019, Plaintiff felt that something was "off" with Conway, so she requested a meeting with him, and the two met in Conway's office. (Kubas Dep. 70:11–20, ECF No. 53-1 at 12; Conway Aff. ¶ 15, ECF No. 53-1 at 58). According to Plaintiff, Conway was visibly angry at the meeting, telling her that Beers told him (Conway) about the discussion between Beers and Kubas, that he "d[id] not want this situation to get out[,]" "we need to sweep it under the rug right now[,]" he "[did not] want to hear another word about it[,]" and "there would be consequences" if he learned that Kubas was telling anyone about what she and Beers discussed. (Kubas Dep. 71:21–73:2, ECF No. 53-1 at 12).

According to Conway, during his meeting with Plaintiff on May 13, 2022, he questioned Plaintiff's behavior at the benefit and statements she made to Beers, and he and Plaintiff agreed to put the matter behind them and to remain professional moving forward. (Conway Aff. ¶ 15, ECF No. 53-1 at 59). According to Moore, Plaintiff came to talk to her after the meeting with Conway and said that everything was fine and that they were going to be professional and move on. (Moore Aff. ¶ 8, ECF No. 55-2 at 10).

On June 4, 2019, LaToya Butler-Williams, a front desk manager at Rockwell Fitness, sent an email to co-owner Brian Chisholm referencing a conversation that the two had a few days prior, on May 31, 2019. According to the email, during the conversation on May 31st, Butler-Williams told Chisholm that female employees were "talking about leaving because they feel uncomfortable around [Conway] . . . ." (ECF No. 53-1 at 70). On June 2, 2019, Chisholm sent a text message to

co-owner Sid Saab stating, "You and I are going to have to have a serious talk about how to handle a certain situation which is imperative that you and I do together because it involves sensitive sexual issues at the gym[,]" and inviting Saab to Chisholm's house. (ECF No. 53-1 at 94). Butler-Williams's June 4th email to Chisholm discussed "the incident that involved [Plaintiff]" and a discussion Butler-Williams had with Plaintiff about the incident a few days after the May 11th benefit. According to the email, Plaintiff was "nervous about telling [Chisholm]" for fear that she would be fired or Conway "would either deny it happened or flip it around and make her the persuer [*sic*]," but Butler-Williams told Plaintiff that "she and the others needed . . . to tell [Chisholm] everything because [Conway] can not [*sic*] continue to get away with this and if the wrong person found out it would look bad for [Chisholm] and [Saab]." (ECF No. 53-1 at 70).

B. Verbal Complaint

During a telephone conversation on June 12, 2019, Plaintiff told Chisholm that Conway had engaged in sexual harassment and made Plaintiff and other female employees feel uncomfortable. (Kubas Dep. 100:20–101:12, ECF No. 53-1 at 14; Chisholm Aff. ¶¶ 9–11, ECF No. 53-1 at 63–64). She provided some specifics about her experiences with Conway, such as the alleged groping and incidents during the group training class. (*Id*.) Plaintiff also disclosed to Chisholm her one-time consensual sexual encounter with Conway and her conversation with Beers at the May 11th benefit, and claimed that Conway had been treating her poorly at work since the benefit. (*Id*.) Plaintiff reported that Beers and Moore "had similar experiences with Mr. Conway and/or had witnessed the behavior [Plaintiff] was complaining of." (Chisholm Aff. ¶ 11, ECF No. 53-1 at 64). Chisholm told Plaintiff that he took Plaintiff's complaints seriously and would

investigate her allegations. (Chisholm Aff. ¶ 10, ECF No. 53-1 at 63). (This conversation between Plaintiff and Chisholm is referred to as the "Verbal Complaint," hereinafter.)[3]

On or around June 14, 2019, Chisholm met with Conway to remind him that, as General Manager, he should be sure to "maintain the utmost care in how he conducted himself with other employees and members of the Gym" and "maintain a safe and comfortable work environment for all employees." (Chisholm Aff. ¶ 12, ECF No. 53-1 at 64). Chisholm did not disclose to Conway that a complaint has been brought against him.

C.  Timekeeping Issues

During the relevant time period, Rockwell Fitness used web-based timekeeping software to record employees' work time when they clocked in and out via phone or computer. (Chisholm Dep. 33:13–19, ECF No. 55-5 at 1; Kubas Dep. 266:19–267:2, ECF No. 53-1 at 22).

Conway affirms in his affidavit that, in or around mid-June of 2019, he "noticed that [Plaintiff] was not recording her time worked in the timekeeping system." (Conway Aff. ¶ 16, ECF No. 53-1 at 59). Subsequently, on June 17, 2019, at 10:03 a.m., Plaintiff sent a text message to Conway saying that she just realized that there was a problem with her timekeeping, requesting that Conway record 25 hours for her, and promising to "make any adjustments to next pay." (ECF No. 53-1 at 98). Conway responded to Plaintiff, stating in part, "From now on you will have to clock in/out when you are here and when you are working from home. No exceptions." (*Id*.). Conway states that he "found it odd that [Plaintiff] claimed to work 25 hours that pay period, given that she seldom worked more than 20 hours in a pay period[,]" but "Chisholm agreed to give [Plaintiff] the benefit of the doubt and pay her for the full 25 hours that pay period." (Conway Aff. ¶ 18, ECF No. 53-1 at 59).

---

[3] Chisholm claimed that the Verbal Complaint "was the first complaint I ever received concerning Mr. Conway." (Chisholm Aff. ¶ 9, ECF No. 53-1 at 63).

According to Conway, Plaintiff "did not clock in or clock out on June 17th and did not clock in on June 18th." (Conway Aff. ¶ 19, ECF No. 53-1 at 59). On June 18, 2019, Conway asked Plaintiff to meet in his office after a manager meeting. (Conway Aff. ¶ 20, ECF No. 53-1 at 59). When he asked why Plaintiff was failing to clock in and out, she "became defensive, claiming that [Conway's] June 17th text message directing her to clock in and out with 'no exceptions' was 'hostile.'" (*Id.*) After Conway admonished Plaintiff about her responsibility to clock in and out, according to Conway, Plaintiff accused him of "targeting her and of being visibly rude to her in the manager meeting." (*Id.*)

Plaintiff testified at her deposition that, after having worked at the Gym for 13 years with the "same" hours, the first time that timekeeping issues were raised with her was the week of the aforementioned text messages and meeting with Conway. (Kubas Dep. 140:2–21, ECF No. 53-1 at 18).

On June 18th, at 11:46 a.m., Plaintiff exchanged text messages with Butler-Williams complaining about Conway raising timekeeping issues with her. (ECF No. 53-1 at 99). In response, Butler-Williams stated in part, "[T]his episode needs to be told to [Chisholm]." (*Id.*) Later that day, at 5:07 p.m., Chisholm sent a text message to Conway stating in part that Butler-Williams and Plaintiff were "texting [Chisholm] wanting to talk" and that he was "getting a little sick of [l]istening to them complain to [him] about stupid crap." (ECF No. 53-1 at 92).

The following day, on June 19, 2019, Plaintiff and Butler-Williams met with Chisholm and Conway, and during the meeting, Plaintiff expressed concerns about being targeted by Conway for failing to clock in. (Kubas Dep. 112:2–116:11, ECF No. 53-1 at 16–17). In an email to Saab at 1:42 p.m., Chisholm wrote, "I spent two hours there again today in a bitch-fest between [Butler-Williams] and [Kubas] against [Conway]. They all understand that I am not putting up with any

7

of it anymore and they are to be nice and respectful to one another and more so to the [gym] members, do their jobs and stop all the immature gossip." (ECF No. 53-1 at 89).

    D. <u>Written Complaint and Investigation</u>

Later, during the evening of June 19, 2019, Plaintiff emailed Chisholm and Saab, in her words, to "formally document the recent weeks series of events and what has led to where I am at the present moment." (ECF No. 53-1 at 102–04). The email recounted Plaintiff's alleged conversation with Beers at the benefit on May 11th, stating that Beers told Plaintiff that Conway "ha[d] been acting aggressive (sexually) towards [Beers]," and Beers "was afraid of losing clients if she stood up to him." (*Id*.) Plaintiff stated further that she told Beers that she had "personally witnessed [Conway] doing the same to others, including [Plaintiff herself]." (*Id*.) The email recounted Conway's alleged "berat[ing]" of Plaintiff for discussing this matter with Beers and alleged demand that Plaintiff "keep it all a secret" and "sweep it under the rug." (*Id*.) Plaintiff stated that at least two other women approached her with "similar stories," and offered to contact these women "and disclose their identities, if they wish." (*Id.*) The email expressed Plaintiff's anxiety and fear about reporting this issue to Chisholm and her discomfort around Conway "since this came to light, due to the fact he [was] singling [her] out." (*Id*.) Plaintiff attributed Conway "berat[ing]" her about her timekeeping errors to her allegations of sexual harassment, stating that "staff forgets to clock in" "plenty of times" but Conway "never had an issue with anybody else previously." (*Id*.) Plaintiff attributed her failure to clock in to the "schedule of our software conference calls" and "providing care for [her] daughter during those times." (*Id*.) The email then recounted the meeting between Plaintiff and Conway on June 18th and expressed Plaintiff's embarrassment and upset upon learning at that meeting that Conway had discussed "this situation" involving Plaintiff with other staff members. (*Id*.) The email noted Plaintiff's effort to "ke[ep] this

whole situation private, between [Chisholm] and [Conway,]" and "protected and anonymous," but Plaintiff "fe[lt] let down." (*Id*.) Plaintiff finally requested permission to work from home for two weeks due to the "dread and anxiety" she felt interacting with Conway. (*Id*.) (This email is referred to as the "Written Complaint," hereinafter.)

In response, Chisholm granted Plaintiff's request to work from home and indicated that he and Saab would "continue to take this situation very seriously and investigate to the best of [their] ability." (*Id*.) He also asked Plaintiff to "clock in everyday" to "avoid any possible conflict" between her and Conway. (*Id*.) Chisholm then sent a text message to Saab, stating, in part, "I think [Plaintiff] is just jealous and think [Conway] is fine." (ECF No. 53-1 at 91).

Chisholm states in his affidavit that, between June 12, 2019, and June 20, 2019, he interviewed Beers and Moore, and each denied that Conway had harassed her or made her feel uncomfortable. (Chisholm Aff. ¶¶ 13–15, ECF No. 53-1 at 64–65; Beers Aff. (unsigned) ¶¶ 11–13, ECF No. 55-2 at 8; Moore Aff. ¶¶ 9–11, ECF No. 55-2 at 10). According to Chisholm, Beers and Moore each denied that she had told Plaintiff or anyone else that Conway harassed her or made her uncomfortable in any way and that she had ever witnessed Conway harassing anyone. (*Id*.) Chisholm interviewed another female personal trainer, because of her extensive interactions with Conway at the Gym, and this trainer expressed "no concerns or complaints concerning Mr. Conway." (Chisholm Aff. ¶ 16, ECF No. 53-1 at 65). Chisholm concluded that Plaintiff's allegations lacked corroboration, witnesses she identified credibly denied and refuted her allegations, and her complaint "appeared baseless and motivated by professional jealousy." (Chisholm Aff. ¶ 22, ECF No. 53-1 at 66–67).

On June 20, 2019, Chisholm met with Saab and Conway to discuss Plaintiff's complaint and the investigation. (Chisholm Aff. ¶ 21, ECF No. 53-1 at 66). This was the first time Chisholm

made Conway aware of Plaintiff's sexual harassment complaint. (*Id*.; Conway Aff. ¶ 23, ECF No. 53-1 at 60). Conway states in his affidavit that he was shocked by Plaintiff's allegations and that he never harassed Plaintiff sexually or otherwise, never referred to her as "hot buns," never groped or touched her in an unwanted matter, and never threatened or berated her. (Conway Aff. ¶¶ 23, 28–31, ECF No. 53-1 at 60–61).

On the same date, Chisholm sent an email to Plaintiff stating that he had met with Conway and Saab to discuss "the culture and the overall environment of the gym" "in very general terms" and that he did not believe "this will be any sort of a concern going forward[,]" and asking Plaintiff to let him or Saab know if she felt uncomfortable or unsafe. (ECF No. 51-8 at 3). Chisholm also requested that Plaintiff run a report including particular information regarding the Gym's membership. (*Id*.) In response, Plaintiff stated that she was prepared to put her issues with Conway behind her "with the assumption all is well moving forward." Plaintiff further stated that she would provide the reports Chisholm requested the next day, explaining that some of the requested information would need to be determined manually. (*Id*.)

E.  Termination

The next day, on June 21, 2019, around 6:00 a.m., a Rockwell Fitness employee informed Conway that a gym member had approached him asking about Plaintiff's sexual harassment claims against Conway. (Conway Aff. ¶ 24, ECF No. 53-1 at 60; Chisholm Aff. ¶ 26, ECF No. 53-1 at 67). The employee was under the impression that the member had heard the rumor from Butler-Williams's husband. (*Id*.) Conway called Chisholm around 7:00 a.m. to inform him about the rumor. (*Id*.)

At 8:17 a.m., Chisholm sent a text message to Plaintiff directing her to "go in first thing this AM and make any deposits we have right now[,]" and explaining, "We are stretched very thin

and I want to know if [Saab] and I need to deposit more money in there right now." (ECF No. 53-1 at 109–11). At 9:45 a.m., Plaintiff texted Chisholm informing him that she was at a doctor's appointment for her daughter, that she would tell Chisholm the deposit amount as soon as she could get to a computer, and that she would have the deposit at the bank by 2:00 p.m. (*Id.*) Plaintiff testified that, although she initially intended to work on the deposits when she got home, she decided to log in at the doctor's appointment to give Chisholm the deposit amount, due to the sense of urgency conveyed in Chisholm's request. (Kubas Dep. 286:10–287:2, ECF No. 53-1 at 25). Since she was performing work at the doctor's office and had been instructed to clock in when she started working, Plaintiff clocked in remotely at 10:03 a.m. (Kubas Dep. 267:3–268:5, ECF No. 53-1 at 22; Conway Aff. ¶ 25, ECF No. 53-1 at 60; Chisholm Aff. ¶ 29, ECF No. 53-1 at 68).

At 10:07 a.m., Plaintiff texted Chisholm informing him the total amount to be deposited and promising to complete the deposit immediately after the doctor's appointment. (ECF No. 53-1 at 110). Plaintiff testified that she then drove home to retrieve the deposits and prepare them to be deposited at the bank, and, while at home, she also began working on the gym membership reports Chisholm had requested the day prior. (Kubas Dep. 268:6–269:1, ECF No. 53-1 at 22). She then realized that there were two additional deposits in the safe at the Gym that she needed to retrieve before going to the bank. (*Id.*) Plaintiff noticed at some point that her software "froze," so she thought she "might as well go to the office now since the computer [at home] was not working for [her] and [she] wanted to finish the deposits." (Kubas Dep. 269:2–13, ECF No. 53-1 at 22).

Unbeknownst to Plaintiff at the time, the reason for her computer failure was that Chisholm had disabled her access to Rockwell Fitness's system. According to Conway, sometime after 10:00 a.m., Chisholm notified him that Plaintiff took her daughter to the doctor and would be making a bank deposit later that afternoon. (Conway Aff. ¶ 25, ECF No. 53-1 at 60). Conway informed

Chisholm that Kubas had clocked in at 10:03 a.m. (*Id.*) Sometime after receiving Kubas's 10:07 a.m. text message about the amount to be deposited, Chisholm decided to disable her access "[b]ecause she had not clocked back out." (Chisholm Dep. 195:12–20, ECF No. 53-1 at 51).

Unaware that her access had been disabled, Plaintiff went to Rockwell Fitness and attempted to log in from there but could not access the software. She then texted Chisholm at 12:14 p.m. informing him that she was "blocked from accessing the information [she] need[ed]" and asking whether her permission level had been changed. (ECF No. 53-1 at 111; Kubas Dep. 269:14– 271:14, ECF No. 53-1 at 22–23). Plaintiff took the deposits she was able to complete to the bank. (Kubas Dep. 270:15–273:11, ECF No. 53-1 at 22–23). Chisholm texted Plaintiff at 12:27 p.m. confirming that Plaintiff's permission level had been changed and inquiring of her whereabouts. (ECF No. 53-1 at 111). Around the same time, Chisholm texted Saab, "I am firing [Plaintiff] right now." (ECF No. 53-1 at 93).

Chisholm asked Plaintiff to come see him at the Gym. (Chisholm Aff. ¶ 31, ECF No. 53-1 at 68). They met in Plaintiff's office upon her arrival, and Chisholm asked her about her activities that morning and inquired why she had been clocked in for over two hours while she was not working. (Kubas Dep. 273:12–276:11, ECF No. 53-1 at 23–24; Chisholm Aff. ¶ 32, ECF No. 53-1 at 68). Chisholm also asked Plaintiff if she knew anything about the rumor concerning her allegations against Conway, indicating that such rumors were harmful to the Gym. (Kubas Dep. 273:19–276:11, ECF No. 53-1 at 23–24; Chisholm Aff. ¶ 33, ECF No. 53-1 at 68). Plaintiff testified that she told Chisholm she was trying to prepare the deposits at her daughter's doctor's appointment that morning and that she had "no idea about the rumor." (Kubas Dep. 273:19– 276:11, ECF No. 53-1 at 23–24). According to Chisholm, however, Kubas offered no response regarding the origin of the rumor or her whereabouts that morning, but asked him whether she was

being fired. (Chisholm Aff. ¶ 33, ECF No. 53-1 at 68). Chisholm states in his affidavit that when

Plaintiff asked him, "Am I being fired?" he told Plaintiff that she was only being fired if she could

not explain why she had been clocked in over two hours while not working. According to

Chisholm, Plaintiff said nothing in response but began to collect her belongings and left the Gym.

(Chisholm Aff. ¶ 33, ECF No. 53-1 at 68).

Around this time, at 1:21 p.m.,[4] Chisholm sent a text message to Butler-Williams's

husband, who was a friend of Chisholm, asking him "not to discuss very serious issues that have

not been confirmed with other members or staff" at the Gym. (ECF No. 53-1 at 113–14).

According to Chisholm, Plaintiff's employment "was terminated because she was in effect

stealing from the Gym by being clocked in while attending to personal matters and not performing

work on behalf of Rockwell Fitness." (Chisholm Aff. ¶ 34, ECF No. 53-1 at 68). Both Chisholm

and Conway admitted during their depositions, however, that they could recall no Rockwell Fitness

employee, besides Plaintiff, who was terminated or even disciplined for any type of timekeeping

issue, even though this was a frequent issue among employees. (Conway Dep. 93:18–110:20, ECF

No. 53-1 at 29–33; Chisholm Dep. 38:22–39:15, 66:4–69:14, 73:14–21, 137:11–17, ECF No. 53-

1 at 41–43, 47; ECF No. 53-1 at 71–87).

Kubas subsequently applied for unemployment benefits, and the state agency fact-finding

report includes the following summary of statements attributed to Chisholm:

> She was supposed to work in the office that day. We needed to make
> deposits. She told me by text that she was still at her daughters doctor's
> appointment but was trying to make it in as soon as possible. The deposits
> that she needed to make were in the office. The BBT where we make
> deposits is right next to the office. She was required to tell us beforehand if
> she was working at home. She never told me that she was working at home
> that day.

---

[4] It is not clear whether Chisholm sent this text message before, during, or after his conversation with
Plaintiff on June 21, 2019.

> I told her why she was being let go. I showed her the text messages that she
> had sent and that she had logged in while out of the office after being told
> she must physically clock in at the office.

(ECF No. 53-1 at 106). The report further provides the following, "[p]er Brian Chisholm":

> [Plaintiff] had checked herself into work this [*sic*] per the time sheet at
> 10:03am. So she stayed on the clock for the next two hours until 12:14pm
> when I heard from her next. Our deposits are typically all cash and take no
> more than five minutes to complete. Why did she stay clocked in this whole
> time[?] She reported that she was making the deposit at 12:29pm.

(*Id*.)

Plaintiff also filed a complaint with the Equal Employment Opportunity Commission

("EEOC"). (Def.'s Br. Summ. J. 9, ECF No. 51-1 at 9). On June 2, 2020, EEOC issued to Plaintiff

a Notice of Right to Sue. (*Id*.) She filed the instant lawsuit on August 25, 2020.

## II.      **Legal Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall grant a party's

summary judgment motion "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168

(4th Cir. 2020). To avoid summary judgment, the non-moving party must demonstrate that there

is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter

of law. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *see also Matsushita Elec. Indus. Co.,*

*Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585–86 (1986); *Gordon v. CIGNA Corp*., 890 F.3d 463,

470 (4th Cir. 2018). "[T]he mere existence of some alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–

48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue as to material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Sharif v. United Airlines*, *Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

To defeat the motion for summary judgment, "the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson*, 477 U.S. at 248). "Unsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is likewise insufficient to overcome a defendant's motion for summary judgment. *Anderson*, 477 U.S. at 252. A plaintiff opposing summary judgment must present "evidence on which the jury could reasonably find for the plaintiff." *Id.*

Summary judgment is proper if "a party fails to establish the existence of an element essential to that party's case" or "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Perkins*, 936 F.3d at 205 (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)). The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587, but the court is not to weigh the

15

evidence, make credibility determinations, or decide the truth of disputed facts, *Anderson*, 477 U.S. at 249; *see also Wilson v. Prince George's Cty.*, 893 F.3d 213, 218–19 (4th Cir. 2018); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). In the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

## III.      <u>Analysis</u>

### A.   <u>Title VII Retaliation</u>

Title VII of the Civil Rights Act of 1964 prohibits an employer, *inter alia*, from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2; *see also Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 117 (4th Cir. 2021). Section 704(a) of Title VII expressly prohibits retaliation by an employer against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII]," or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). The former clause is known as the "opposition clause," and the latter is the "participation clause." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900 (4th Cir. 2017). The participation clause "provides absolute protection to a limited range of conduct[,]" even when such participation activities are plainly "unreasonable" or "irrelevant." *Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018) (citing

*Glover v. S.C. Law Enf't Div.*, 170 F.3d 411, 414 (4th Cir. 1999)). The opposition clause, on the other hand, "provides qualified protection to a wide range of conduct." *Id.* at 937. It protects legitimate reports and complaints to an employer of Title VII violations occurring within the workplace. *See, e.g., Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 277–78 (2009); *Villa*, 858 F.3d at 901; *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981). But the opposition clause does not protect unreasonable conduct or fabricating false allegations of Title VII discrimination. *See, e.g., Netter*, 908 F.3d at 937–38; *Villa*, 858 F.3d at 901–02. For both participation and opposition claims, the plaintiff bears the burden of establishing that unlawful retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

When pursuing any claim under Title VII, a plaintiff can prove her case either "through direct and indirect evidence of retaliatory animus" or through a burden-shifting "pretext" framework derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015); *see also Netter*, 908 F.3d at 938 ("In the context of a retaliatory discharge, this means an employee may proceed by showing directly that she was fired in retaliation for protected activity, or by proving that any non-retaliatory justification for the firing was pretextual."). The choice is "left to the plaintiff's discretion." *Foster*, 787 F.3d at 249. In this case, both parties focus on elements of the *McDonnell Douglas* burden-shifting framework.

Under the *McDonnell Douglas* framework, a *prima facie* case of retaliation requires proof that (1) the plaintiff engaged in protected activity, (2) the plaintiff suffered a "materially adverse" employment action, and (3) there was a "causal connection between the protected activity and the adverse action." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019) (citing *Burlington N.*

*& S.F.R. Co. v. White*, 548 U.S. 53, 61–68 (2006)). If the plaintiff "establish[es] a *prima facie* case of retaliation, the burden shifts to the [employer] to articulate a legitimate, non-retaliatory reason for the adverse employment action." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 407 (4th Cir. 2005). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). If the employer meets this burden of production, the plaintiff must prove by a preponderance of the evidence that the defendant's articulated reasons are a mere pretext for retaliation. *Id.* at 726; *see also Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 210 (4th Cir. 2014) (applying *McDonnell Douglas* framework to Title VII retaliation claim). Despite this burden-shifting framework, "[t]he ultimate burden of persuading the trier of fact remains with the employee at all times." *Westmoreland*, 924 F.3d at 726 (internal quotation marks omitted).

B. Protected Activity

Defendant argues that Plaintiff cannot establish a *prima facie* case of retaliation because she made knowingly false allegations that lack evidentiary support and therefore cannot prove that she engaged in a protected activity. (Def.'s Br. Summ. J. 18). The Court disagrees.

"Protected activity under Title VII includes complaints of discrimination based upon race, color, religion, sex or national origin." *Roberts*, 998 F.3d at 122 (citation and internal quotation marks omitted). Complaints of sexual harassment raised formally or informally through internal company procedures are recognized as protected activity. *Id.* "The opposition clause [of 42 U.S.C. § 2000e–3(a)] has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (citation omitted). Notwithstanding, "[t]he opposition clause does

18

not protect the making of a knowingly false allegation." *Villa*, 858 F.3d at 901. The making of a false report or complaint of a Title VII violation does not actually "oppos[e] any practice made an unlawful employment practice by [Title VII]." *Id.* (quoting 42 U.S.C. § 2000e–3(a)). "[F]or an employee's report of information purportedly relating to a Title VII violation to be protected under the opposition clause, the employee must subjectively believe that the facts she is reporting are true." *Id.*; *see also Netter*, 908 F.3d at 937–38 ("[F]or an employee's activity to constitute protected "opposition," she must show (1) that she reasonably believed that the employment action she opposed constituted a Title VII violation, . . . and (2) that her conduct in opposition was reasonable.") (citations omitted).

Relying on *Villa*, Defendant argues that Plaintiff did not engage in a protected activity because she made allegations of sexual harassment and retaliation that she knew to be false and therefore was not opposing any actual Title VII violations. However, genuine disputes remain regarding the truthfulness of Plaintiff's complaints of sexual harassment and retaliation and whether she subjectively understood her complaints to be true. These disputes cannot be resolved on a motion for summary judgment because that would require an assessment of the credibility of Plaintiff's testimony against that of other witnesses. *See Wilson*, 893 F.3d at 218–19.

### 1. Reports of Sexual Harassment of Plaintiff

First, in both the Verbal Complaint and Written Complaint, Plaintiff reported to her employer that Conway had engaged in forms of sexual harassment against her at the Gym, including groping Plaintiff and sexually aggressive behavior during group training sessions. (Kubas Dep. 100:20–101:12, ECF No. 53-1 at 14; Chisholm Aff. ¶¶ 9–11, ECF No. 53-1 at 63–64; ECF No. 53-1 at 102–04). Plaintiff has testified that her reports to Chisholm were true. Conway denies these allegations. (Conway Aff. ¶¶ 23, 28–31, ECF No. 53-1 at 60–61). The dispute between

the witnesses concerns material facts. If Conway is correct, then Plaintiff could not subjectively believe her allegations of sexual harassment to be true and therefore would not be engaging in a protected oppositional activity by reporting these allegations to her employer. *See Villa*, 858 F.3d at 901. But if Plaintiff is correct, then her complaints of sexual harassment to Chisholm would constitute protected activity. *See Roberts*, 998 F.3d at 122. The dispute is also genuine, in that it is supported by the testimony of a person with first-hand knowledge of whether the reported incidents occurred: Plaintiff herself. The only conflicting evidence in the record is the sworn statement of another person with first-hand knowledge: Conway. The Court cannot resolve the conflict between Plaintiff's and Conway's accounts on a motion for summary judgment. It would require an impermissible—and indeed impossible—weighing of Plaintiff's allegations against Conway's denial. *See Wilson*, 893 F.3d at 218–19; *Richardson v. Mahon*, 697 F. App'x 249, 250 (4th Cir. 2017) (per curiam) (vacating summary judgment where "the district court made an impermissible credibility determination" on "a classic swearing contest between two litigants") (citing *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). This is a matter for the jury to decide.

Defendant points out that, notwithstanding Plaintiff's claims that she suffered sexual harassment from Conway during a group training class at the Gym, she remained a member of that class until some point after Conway was promoted to general manager and the class was taken over by another instructor. A jury may well consider this fact, along with all of the other evidence presented to it, in assessing the credibility of Plaintiff's sexual harassment claims, but Plaintiff's continued participation in the class does not, without more, render her claims incredible.

Defendant also argues essentially that Plaintiff's testimony about her experiences with Conway should be set aside because she has failed to produce any witnesses from the group training class to corroborate her. Notably, however, some of the sexual harassment Plaintiff alleges

she suffered from Conway occurred in private, after Conway allegedly closed the door to Plaintiff's office. In any event, Defendant fails to cite any authority for the proposition that a plaintiff's testimony to facts about her own experiences strictly requires corroboration in order for legal claims based on those facts to survive summary judgment, when a jury could reasonably credit her testimony. *See Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017) (rejecting "the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving'") (quoting *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)); *Richardson*, 697 F. App'x at 250 (citing *Payne*, 337 F.3d at 770). Here, a reasonable jury could credit Plaintiff's testimony over Conway's—or it could credit Conway's testimony of Plaintiff's. The matter cannot be resolved on summary judgment.

## 2. Reports of Sexual Harassment Against Other Women

Second, Plaintiff reported to her employer allegations that other women had suffered sexual harassment by Conway at the Gym. In the Verbal Complaint of June 12, 2019, Plaintiff reported to Chisholm that other female employees of Rockwell Fitness, including Beers and Moore, had experiences with Conway similar to her own and that Conway made them feel uncomfortable. (Chisholm Aff. ¶ 11, ECF No. 53-1 at 64). On June 19th, by email to both owners of Rockwell Fitness, Plaintiff reported that Beers told Plaintiff that Conway had been sexually aggressive with Beers, and that at least two other women approached Plaintiff with "similar stories." (ECF No. 53-1 at 102–04). Plaintiff's deposition indicates that she believed the statements she made to Chisholm about Beers to be true, based upon what she was told by Beers herself. (Kubas Dep. 44:9–46:4, ECF No. 53-1 at 10–11).

Defendant has submitted an affidavit from Moore and an unsigned affidavit attributed to Beers denying Plaintiff's allegations. (Moore Aff. ¶¶ 10–12, ECF No. 55-2 at 10; Beers Aff.

(unsigned) ¶¶ 12–14, ECF No. 51-5 at 3–4).[5] Specifically, according to the affidavits, Moore and Beers each deny telling Plaintiff that Conway harassed them or made them feel uncomfortable. (*Id.*) Moore and Beers also denied Plaintiff's allegations during Chisholm's investigation of Plaintiff's complaints, with Moore responding with surprise and bewilderment at Plaintiff's assertions, and Beers taking offense at them. (*Id.*; Chisholm Aff. ¶¶ 13–16, ECF No. 53-1 at 64–65).

Thus, genuine factual issues remain as to the truthfulness of Plaintiff's statements regarding what she was told about Conway's behavior toward other women and whether she subjectively believed what she reported to Chisholm and Saab about Conway, Moore, and Beers to be true. The dispute is genuine, in that it is supported by Plaintiff's testimony and Written Complaint, and the only conflicting evidence in the record are Chisholm's and Moore's sworn statements and the unsigned affidavit attributed to Beers. The Court cannot resolve these disputes on a summary judgment motion, as it would require an assessment of the witnesses' credibility. *See Wilson*, 893 F.3d at 218–19; *Lovett*, 700 F. App'x at 212; *Richardson*, 697 F. App'x at 250. Determining the truthfulness of Plaintiff's complaints to the owners of Rockwell Fitness is the jury's province.

### 3. Reports of Retaliation

Third, Plaintiff reported to her employer that Conway mistreated her after she complained about his alleged sexual harassment. In her Written Complaint to Chisholm and Saab, Plaintiff claimed that, after she discussed Conway's alleged behavior with Beers on May 11, 2019, Conway "berated [Plaintiff] for coming clean to [Beers]" and "demanded that [Plaintiff] keep it all a secret, in never happened, and to sweep it under the rug." (ECF No. 53-1 at 102–04). The Written

---

[5] The Court notes that the affidavit attributed to Beers is not signed or dated. Whether the Court accepts this affidavit as a sworn declaration of Beers or not, Plaintiff's testimony and Written Complaint is sufficient to raise a genuine dispute regarding whether she believed her statements to Defendant about Beers to be true, for the reasons explained below.

Complaint noted that, after the foregoing episode with Conway, Plaintiff contacted Chisholm about Conway's alleged conduct (the Verbal Complaint made by phone on June 12, 2019). (*Id.*) Since "bringing [Conway's] sexual harassment to light[,]" the Written Complaint continued, Conway was "singling [Plaintiff] out" and "berat[ing]" her about timekeeping errors and "admitted talking to other staff about this situation[,]" notwithstanding Plaintiff's efforts to keep the matter private. (*Id.*) There is no dispute that Conway confronted Plaintiff about the timekeeping issue on June 17th and June 18th, several days after the Verbal Complaint. (Conway Aff. ¶¶ 16–20, ECF No. 53-1 at 59). According to Conway and Chisholm, however, Conway was not aware of any accusations of sexual harassment leveled against him by Plaintiff until after the Written Complaint, when Chisholm disclosed the allegations to Conway during a meeting between them and Saab on June 20, 2019. (Conway Aff. ¶ 23, ECF No. 53-1 at 60; Chisholm Aff. ¶ 21, ECF No. 53-1 at 66).

Even if Conway and Chisholm are correct and Conway's conduct toward Plaintiff after she began disclosing Conway's alleged sexual harassment was not actually retaliatory, there remains a genuine factual dispute over whether Plaintiff subjectively believed Conway's conduct toward her was retaliatory at the time she made the Written Complaint. This dispute is material as to whether Plaintiff's complaint about Conway's alleged retaliation constituted protected activity. *See Villa*, 858 F.3d at 901. The Court cannot resolve this dispute of fact on summary judgment.

\* \* \* \* \*

Defendant's reliance on *Villa* is misplaced. In *Villa*, the plaintiff's (Villa) employment was terminated after she reported to her employer's director of operations (Gresham) that a former employee (Bonilla) told Villa that a manager had offered Bonilla a pay raise in exchange for sex. *Villa*, 858 F.3d at 898–99. Villa further reported that she believed another former employee had quit because she received a similar offer from the same manager. *Id.* Gresham investigated Villa's

claims by interviewing both former employees, and both denied that the manager had offered a raise for sex. *Id.* Additionally, Bonilla denied that she ever told Villa that the manager had made this offer. *Id.* Based upon the investigation, Gresham determined that Villa had fabricated the allegations against the manager and terminated her for making the ostensibly false report. *Id.* Villa eventually filed suit against the employer for Title VII retaliation. *Id.* During discovery, Bonilla admitted in her deposition that she had lied to Gresham and that, although the manager had never offered a pay raise for sex, Bonilla had falsely told Villa that the manager had made this offer. *Id.*

The U.S. Court of Appeals for the Fourth Circuit affirmed summary judgment in favor of the employer because there was no genuine dispute that the employer believed in good faith that Villa's allegations were false and that it terminated Villa for that reason. *Id.* at 903–04. The court reasoned that "to prove that her termination violated Title VII, [the plaintiff] had to show that her employer was motivated by a desire to retaliate against her for engaging in conduct that the opposition clause protected." *Id.* at 903. Villa could not make this showing because, when it terminated Villa, the employer had "conclude[d] in good faith" that she had fabricated her report. *Id.* Villa's concession that the employer fired her based upon its conclusion that her allegations were false left no genuine dispute that termination was not caused by any retaliatory animus. *Id.* at 903–05. The Fourth Circuit did not reach the question of whether Villa's report was actually protected activity.

Unlike in *Villa*, here, neither party contends that Plaintiff was terminated because Defendant made an assessment that Plaintiff had fabricated her claims of sexual harassment, and the true reason for the termination is hotly disputed, as explained further below. Because the factual question of whether a desire to retaliate against protected activity motivated Defendant to terminate Plaintiff's employment is contested, and the dispute is genuine, it cannot be resolved on summary

judgment.

C. *Prima Facie* Causal Connection

Defendant avers that Plaintiff cannot prove a causal connection between any protected activity and the adverse action taken by Defendant in terminating her employment. Again, the Court disagrees.

Importantly, "establishing a 'causal relationship' at the *prima facie* stage is not an onerous burden." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 335 (4th Cir. 2018) (citation omitted). Indeed, "[v]ery little evidence of a causal connection is required to establish a *prima facie* case of retaliation." *Roberts*, 998 F.3d at 127 (quotation marks and citation omitted). "A plaintiff may attempt to demonstrate that a protected activity caused an adverse action [at the *prima facie* stage] 'through two routes.'" *Id*. at 123 (quoting *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783–84 (4th Cir. 2021)). The first route would require the plaintiff to establish facts "suggest[ing] that the adverse action occurred because of the protected activity." *Id*. (quoting *Johnson*, 839 F. App'x at 783–84). Alternatively, the plaintiff may demonstrate that "the adverse act bears sufficient temporal proximity to the protected activity." *Johnson*, 839 F. App'x at 784 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). The Fourth Circuit has "made abundantly clear" that, at the *prima facie* stage, "temporal proximity suffices to show a causal relationship." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 654 (4th Cir. 2021) (citing *Strothers*, 895 F.3d 317). "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers*, 895 F.3d at 335–36.

Here, Plaintiff has presented evidence of close temporal proximity between her employer

becoming aware of her complaints of sexual harassment and its termination of her employment. Plaintiff's deposition testimony indicates that Chisholm, the decision-maker who ultimately fired Plaintiff, first became aware of Plaintiff's complaints of sexual harassment no later than June 12, 2019, during a phone conversation with Plaintiff.[6] According to Plaintiff, during that phone call, she alleged that Conway had groped her and had sexually harassed her during a training class, discussed her interaction with Beers at the benefit on May 11th, and claimed that Conway had been treating Plaintiff badly at work. (Kubas Dep. 100:20–101:12, ECF No. 53-1 at 14). Chisholm acknowledges in his affidavit that Plaintiff reported Conway "ma[king] her feel uncomfortable in a 'sexually harassing way,'" but denies that Plaintiff reported any unwanted touching. (Chisholm Aff. ¶ 10, ECF No. 53-1 at 63). On June 19, 2019, Chisholm received the Written Complaint from Plaintiff by email, which alleged sexual harassment by Conway against Plaintiff and against other women, according to information Plaintiff claims she received from others, including Beers. (Chisholm Aff. ¶ 19, ECF No. 53-1 at 65–66; ECF No. 53-1 at 103). Chisholm decided to terminate Plaintiff two days later, on June 21, 2019. (ECF No. 53-1 at 68, 93). Defendant does not dispute that the termination was a materially adverse action. The time frame between Plaintiff's complaints of sexual harassment and the subsequent adverse action is sufficiently short to establish a *prima facie* causal connection between the two. *See Strothers*, 895 F.3d at 335–36.

      D. Non-Retaliatory Reasons for Materially Adverse Action

      With Plaintiff having presented sufficient evidence to establish a *prima facie* case of Title VII retaliation, the burden shifts to Defendant "to articulate a legitimate, non-retaliatory reason" for its adverse action in firing Plaintiff.

---

[6] During earlier communications with Butler-Williams, Chisholm was notified of potential complaints of sexual harassment against Conway, and he acknowledged the sensitivity of the matter in a text message to Saab. (ECF No. 53-1 at 94).

Defendant has proffered a legitimate, non-retaliatory reason for terminating Plaintiff: "failing to properly clock-in and clock-out while working from home and fraudulently clocking-in and claiming hours while not working." (Def.'s Br. Summ. J. 14; ECF No. 51-1 at 17). In his affidavit, Chisholm states that Plaintiff's employment "was terminated because she was in effect stealing from the Gym by being clocked in while attending to personal matters and not performing work on behalf of Rockwell Fitness." (Chisholm Aff. ¶ 34, ECF No. 53-1 at 68). Conway states in his affidavit that he noticed Plaintiff's failures to record her work time around mid-June 2019. (Conway Aff. ¶¶ 16–20, ECF No. 53-1 at 59). In an exchange of text messages on June 17, 2019, Plaintiff acknowledged a then-recent failure to clock in and requested that Conway record 25 hours for her, and Conway responded by instructing her to clock in and out when working with "[n]o exceptions" (ECF No. 53-1 at 98), reflecting management's concern for accurate and consistent timekeeping. Conway notes suspicion about the number of work hours Plaintiff claimed without clocking in, relative to the smaller number of hours Plaintiff worked most weeks. (Conway Aff. ¶ 18, ECF No. 53-1 at 59). Conway's affidavit indicates that the matter was escalated to Chisholm, who decided to give Plaintiff the benefit of the doubt and to record the number of hours Plaintiff requested. (*Id.*)

Notwithstanding Conway's express requirement for accurate timekeeping, Plaintiff again failed to clock in and out as required on June 17th and June 18th. (Conway Aff. ¶ 19, ECF No. 53-1 at 59). On the latter date, Conway confronted Plaintiff about her ongoing timekeeping errors and admonished her again to clock in and out accurately. (Conway Aff. ¶ 20, ECF No. 53-1 at 59). On June 20th, when Plaintiff complained by email to Chisholm about being unfairly targeted by Conway for her timekeeping errors in retaliation for disclosing Conway's alleged sexual harassment, Chisholm affirmed that he and Saab were investigating Plaintiff's allegations but

27

asked her to clock in as required to avoid further conflict with Conway. (ECF No. 53-1 at 102–03). Chisholm also granted Plaintiff's request to work from home for two weeks and later asked her to provide Chisholm with certain reports about the Gym's membership. (ECF No. 51-8 at 1, 3).

Early the following morning, Chisholm directed Plaintiff to "go in" and make deposits, indicating urgency. (ECF No. 53-1 at 109). In response, Plaintiff indicated that she was at a doctor's appointment for her daughter but would make the deposits that afternoon, suggesting that she would not be available to work until after the doctor's appointment. (ECF No. 53-1 at 110). Plaintiff has testified, however, that she decided to log in to Rockwell Fitness's system from the doctor's office and begin working. (Kubas Dep. 286:10–287:2, ECF No. 53-1 at 25). She then clocked in, immediately provided Chisholm with the total amount ready to be deposited, and continued working without clocking out, including by driving home to retrieve and prepare the bank deposits and working on the reports Chisholm had requested. (Kubas Dep. 267–69, ECF No. 53-1 at 22). Out of an apparent belief that Plaintiff was not working, Chisholm disabled Plaintiff's access to Rockwell Fitness's system upon learning that she had clocked in that morning and did not clock out after providing Chisholm with the deposit amount. (Conway Aff. ¶ 30, ECF No. 53-1 at 68). According to Chisholm, when he asked Plaintiff to explain her failure to clock out that morning, Plaintiff did not explain that she had continued to work and offered no other justification. (Conway Aff. ¶ 33, ECF No. 53-1 at 68). Chisholm then terminated Plaintiff's employment. (Conway Aff. ¶ 34, ECF No. 53-1 at 68).

The foregoing testimonial statements and written communications satisfy Defendant's burden of producing a non-retaliatory reason for Plaintiff's termination, especially considering the number of times Plaintiff had been instructed to record her work time accurately.

E. Pretext

Upon Defendant's showing of a non-retaliatory reason for discharge, the burden shifts to Plaintiff to present sufficient evidence for a jury to conclude that Defendant's non-retaliatory explanation is merely pretextual and not its true reason for firing Plaintiff, and that its true motivation was retaliation for Plaintiff's complaints of sexual harassment by Conway. *See Foster*, 787 F.3d at 250; *Westmoreland*, 924 F.3d at 726; *Navy Fed. Credit Union*, 424 F.3d at 407. A showing that the employer "at different times, gives different and arguably inconsistent explanations" may permit an "infer[ence] that the articulated reasons are pretextual." *E.E.O.C. v. Sears Roebuck and Co.*, 243 F.3d 846, 853 (4th Cir. 2001) (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000)). Likewise, "a factfinder could infer from the late appearance of [employer's] justification that it is a post-hoc rationale, not a legitimate explanation for [its] decision." *Id.* (citing *Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 813 (10th Cir. 2000)). "If a plaintiff can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination." *Foster*, 787 F.3d at 250 (citing *Reeves*, 530 U.S. at 148).

Viewing the evidence in the light most favorable to Plaintiff, a reasonable factfinder may conclude that Defendant's proffered non-retaliatory reason for terminating Plaintiff was pretextual. First, during more than 13 years of work at Rockwell Fitness, Plaintiff never had any disciplinary problems, and her employer had not raised any timekeeping issues with her until June 2019, after she reported allegations of sexual harassment by Conway. (Kubas Dep. 140:2–141:15, ECF No. 53-1 at 18). Plaintiff also points out that other employees at Rockwell Fitness had timekeeping errors, but none was formally disciplined or terminated for these errors except Plaintiff. (*See, e.g.*,

Conway Dep. 93:18–110:20, 113:6-15, ECF No. 53-1 at 29–34). Defendant offers no evidence or testimony to disprove this fact. It was not until after Plaintiff's conversation with Beers about Conway in May 2019 and Plaintiff's phone conversation with Chisholm reporting her allegations, that Conway decided to confront Plaintiff about her timekeeping issues. (Conway Aff. ¶ 16, ECF No. 53-1 at 59). "A factfinder could infer from the late appearance of [the] current justification that it is a post-hoc rationale" rather than legitimate explanation for Plaintiff's termination. *Sears Roebuck*, 243 F.3d at 853.

Moreover, there are inconsistencies in the record regarding Defendant's articulated reason for terminating Plaintiff. According to a record from the Maryland Division of Unemployment Insurance regarding Plaintiff's unemployment claim, Chisholm is reported to have explained Plaintiff's termination by stating that Plaintiff "was supposed to work in the office [on the day she was terminated]" and that "[s]he was required to tell [Chisholm] beforehand if she was working at home," but she failed to do so that day. (ECF No. 53-1 at 106). According to the record, Chisholm further stated that he "told [Plaintiff] why she was being let go . . . that she had logged in while out of the office after being told she must physically clock in at the office." (*Id*.) The foregoing statements attributed to Chisholm are inconsistent both with the email exchange between him and Plaintiff on June 19, 2019, and with the explanation of Plaintiff's termination proffered in Chisholm's affidavit and Defendant's briefing on summary judgment. In his email to Plaintiff on June 19th, Chisholm specifically granted Plaintiff permission to work from home for two weeks. (ECF No. 53-1 at 102-104). And Defendant's current explanation for terminating Plaintiff is not that Plaintiff "logged in while out of the office" when she was required to "physically clock in at the office[,]" but that she failed to clock in and out properly while working from home and fraudulently clocked in and claimed hours while not working. (Chisholm Aff. ¶ 34, ECF No. 53-1

at 68; Def.'s Br. Summ. J. 14; ECF No. 51-1 at 17). The foregoing inconsistencies in the reasons offered for Plaintiff's termination would permit a reasonable inference "that the articulated reasons are pretextual." *Sears Roebuck*, 243 F.3d at 853.

Furthermore, with a view of the facts in the light most favorable to Plaintiff, the circumstances under which Plaintiff was terminated may allow a factfinder to be suspicious of Defendant's motives and to conclude reasonably that Plaintiff's complaints of sexual harassment was an actual cause of her termination. The record suggests that, up to June 20, 2019, Chisholm did not intend or expect for Plaintiff to be terminated for her timekeeping errors. Although, in an email to Plaintiff on the prior date, Chisholm asked Plaintiff to clock in consistently, he asked her to do this to "avoid any possible conflict" between Plaintiff and Conway. (ECF No. 53-1 at 102). There was nothing in this communication that came close to warning Plaintiff that any further errors could result in termination or even that the timekeeping issue was of any actual importance to Chisholm. According to his affidavit, after concluding his investigation of Plaintiff's sexual harassment complaints on June 20th, Chisholm believed that management "would be able to have [Plaintiff] return to work without incident." (Chisholm Aff. ¶ 22, ECF No. 53-1 at 66–67).

The next morning, around 7:00 a.m., Conway informed Chisholm about a gym member's discussion with a gym employee about a rumor concerning Plaintiff's sexual harassment allegations. Shortly thereafter, Chisholm made urgent demands on Plaintiff to complete unexpected work duties. Plaintiff informed Chisholm that she was at a doctor's appointment for her daughter that morning but began responding to Chisholm's needs and clocked in to record her time working at 10:03 a.m. Plaintiff remained clocked in while continuing to work, but Chisholm apparently embraced an assumption that Plaintiff was not working, severed Plaintiff's access to Rockwell Fitness's system, and likely formed an intention to fire Plaintiff at that time, as he

expressed to Saab in a text message at 12:27 p.m. (ECF No. 53-1 at 93). When meeting with Plaintiff in her office that afternoon, Chisholm demanded not only an explanation for Plaintiff remaining clocked in that morning, but also confronted Plaintiff about the rumor relayed to him early that morning, expressing concern about the rumor spreading like a "cancer" at the Gym. Based on this record, a factfinder could reasonably conclude that Plaintiff's timekeeping was not a significant issue to Chisholm but that he was more concerned about Plaintiff's sexual harassment allegations and simply used a colorable assumption that Plaintiff was not working while clocked-in as a pretext to fire her. Such a finding could support a reasonable inference that Plaintiff was terminated in retaliation for her sexual harassment complaints. *See Foster*, 787 F.3d at 250.

In view of all the facts, including reasonable inferences to be drawn from them, in the light most favorable to Plaintiff, the Court finds that the record taken as a whole, could lead a rational trier of fact to find for Plaintiff. Accordingly, Defendant's motion for summary judgment is denied.

## IV.        Conclusion

For the reasons stated above, Defendant's motion for summary judgment (ECF No. 51) is DENIED.

September 30, 2022                              /S/
Date                                    Matthew J. Maddox
                                        United States Magistrate Judge

32